UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA HOOPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:16-cv-01543-AGF |
| | ) | |
| MEDICAL REIMBURSEMENTS OF | ) | |
| AMERICA, INC., and MERCY | ) | |
| HOSPITALS EAST COMMUNITIES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This putative class action is before the Court on the motions (ECF Nos. 73 & 79) of

Defendants Mercy Hospitals East Communities ("Mercy") and Medical Reimbursements

of America, Inc., ("MRA") for summary judgment.   On November 15, 2017, the Court

gave the parties notice that it believed one or more of Plaintiff Cynthia Hoops's claims may

be subject to summary judgment on a ground not raised by Defendants, and allowed the

parties an opportunity to submit supplemental briefing on this issue, which they have done.

The Court also heard oral argument on the motions on January 17, 2018.   Upon careful

review of the entire record, the Court will grant in part and deny in part the motions for

summary judgment.

## BACKGROUND

For the purposes of the motions before the Court, the record establishes the

following.   On May 31, 2016, Hoops was involved in an automobile accident while

driving her 2012 Acura TSX. Hoops suffered injuries during the accident and was treated in the emergency room that day at a Mercy hospital in Missouri. The medical treatment Hoops received from Mercy resulted in charges totaling $6,519.54.

Hoops's claims arise out of the way Mercy, and its billing consultant, MRA, billed Hoops and her insurers for these charges. The resolution of Hoops's claims requires consideration of four contracts and two relevant Missouri[1] insurance regulations.

**Consent and Agreement**

When Hoops obtained treatment on May 31, 2016, her husband, acting as her authorized representative, and Mercy signed a "Consent and Agreement — Physician Services and Hospital Services" ("Consent and Agreement"). The Consent and Agreement provided that Hoops consented to the services performed at Mercy, and that Hoops agreed to pay for goods and services provided at the rates disclosed by Mercy "unless [she was] entitled to pay a different amount under [her] health insurance plan . . . ." ECF No. 82-2. The Consent and Agreement contained an assignment in favor of Mercy of Hoops's "rights under all insurance and benefit plan documents, and authorize[d] direct payment to each healthcare provider of all insurance and benefits payments for services provided . . . ." *Id.*

**Network Agreement**

At all relevant times, Mercy had a Network Agreement with RightChoice Managed Care, Inc., the BlueCrossBlueShield ("BCBS") entity in Missouri. The Network

---

[1] The parties agree that Missouri law applies in this case.

Agreement applied to other BCBS affiliates, including CareFirst of Maryland ("CareFirst"), the entity through which Hoops had group health insurance coverage, as discussed below. The Network Agreement included a Plan Compensation Schedule, which has not been submitted to the Court and is not part of the record, but which the parties agree set forth a discounted rate for covered services charged by Mercy to BCBS affiliates like CareFirst.

Section 2.5 of the Network Agreement provided that Mercy must submit claims to CareFirst within 90 days from "(i) the date the Health Services are rendered for outpatient services, or (ii) the date of discharge or transfer for an inpatient admission or [CareFirst] will refuse payment, or (iii) the date of payment by the primary payor if [CareFirst] is not the primary payor." ECF No. 82-1 at 8. This section further provided that Mercy "shall not bill or seek payment from [CareFirst], a Covered Individual or any other person for Covered Services not billed within such ninety (90) day period, unless [Mercy] can establish, to the satisfaction of [CareFirst] that extenuating circumstances existed which prevented timely submission . . . ." *Id.*

Section 2.8 of the Network Agreement was titled "Payment in Full and Hold Harmless," and was divided into three subsections. Section 2.8.1 provided:

> Except as expressly set forth herein, [Mercy] agrees to accept as payment in full, in all circumstances, the applicable Company Rate whether such payment is in the form of a Cost Share,[2] or a payment by [CareFirst], or

---

[2] The Network Agreement defined "Cost Share" as "an amount which a Covered Individual is required to pay under the terms of the applicable Health Benefit Plan. Such payment may be referred to as an allowance, coinsurance, copayment, deductible, or other Covered Individual Payment responsibility . . . . The Cost Share amount is determined by

3

payment from another source If [sic] [CareFirst] is other than the primary payor, [Mercy] is not precluded from accepting amounts in excess of the Company Rate from the primary payor.   [Mercy] shall bill, collect, and accept compensation for Cost Shares.   [Mercy] agrees to make reasonable efforts to verify Cost Shares prior to billing for such Cost Shares.   In no event shall [CareFirst] be obligated to pay [Mercy] . . . any amounts in excess of the Company Rate, less Cost Shares or payment by another source, as set forth above.   Notwithstanding the foregoing, [Mercy] agrees to accept the Company Rate as payment in full if the Covered Individual has not yet satisfied his/her deductible.

Section 2.8.2 provided, in relevant part:

[Mercy] agrees that in no event, including but not limited to, nonpayment by [CareFirst], insolvency of [CareFirst], or breach of this Agreement, shall [Mercy] . . . bill, charge, collect a deposit from, seek compensation from, or have any other recourse against a Covered Individual, or a person acting on the Covered Individual's behalf, for Covered Services provided pursuant to this Agreement.   This section does not prohibit [Mercy] from collecting reimbursement for the following from the Covered Individual: . . . Cost Shares, if applicable . . . .

Section 2.8.3 provided, in relevant part:

Except as provided in this section . . . , this Agreement does not prohibit [Mercy] from pursuing any available legal remedy, including, but not limited to, collecting from any insurance carrier providing coverage to a Covered Individual.

ECF No. 82-1 at 9.

Section 9.9 of the Network Agreement, titled "Intent of the Parties," stated, in

relevant part:

It is the intent of the parties that this Agreement is to be effective only in regards to their rights and obligations with respect to each other; it is expressly not the intent of the parties to create any independent rights in any third party or to make any third party a third party beneficiary of this

the Plan."   ECF No. 82-1 at 4.

Agreement, except . . . to the extent specified in the Payment in Full and Hold Harmless section of this Agreement.

*Id.* at 19.

## CareFirst Policy

As noted above, at the time of the accident, Hoops had group health insurance coverage from CareFirst ("CareFirst Policy"), which was provided through Hoops's husband's employer. Hoops has admitted that the details of her health insurance policy are set forth in the CareFirst Evidence of Coverage document produced by Hoops and attached as Exhibit E to MRA's statement of uncontroverted material facts (ECF No. 75-5). *See* ECF No. 99 ¶ 7. The CareFirst Policy contained the following "Coordination of Benefits (COB)" section:

**6.1 Coordination of Benefits (COB)**

**A.     Applicability**

1.     This Coordination of Benefits (COB) provision applies to this CareFirst Plan when a Member has health care coverage under more than one Plan.

2.     If this COB provision applies, the Order of Determination of Rules should be looked at first. Those rules determine whether the benefits of this CareFirst Plan are determined before or after those of another plan. The benefits of this CareFirst Plan:

a)     Shall not be reduced when, under the order of determination rules, this CareFirst Plan determines its benefits before another Plan; and

b)     May be reduced when, under the order of determination rules, another Plan determines its benefits first . . . .

**B.     Definitions**

\* \* \*

<u>Plan</u> means any health insurance policy, including those of nonprofit health service Plan and those of commercial group, blanket, and individual policies, any subscriber contracts issued by health maintenance organizations, and any other established programs under which the insured may make a claim . . . .

\* \* \*

The term Plan does not include . . .

3        Coverage regulated by a motor vehicle reparation law; . . . or

6.        Personal Injury Protection (PIP) benefits under a motor vehicle liability insurance policy.[3]

<u>Primary Plan or Secondary Plan</u> means the order of benefit determination rules stating whether this CareFirst Plan is a Primary Plan or Secondary Plan as to another Plan covering the Member.

1.        When this CareFirst Plan is a Primary Plan, its benefits are determined before those of the other Plan and without considering the other Plan's benefits.

2.        When this Plan is a Secondary Plan, its benefits are determined after those of the other Plan and may be reduced because of the other Plan's benefits.

\* \* \*

**C.        Order of Benefit Determination Rules**

1.        **General.**

---

[3]        The other exclusions do not relate to automobile insurance.   For example, the term Plan also excludes "5.   An elementary and/or secondary school insurance program sponsored by a school or school system."   ECF No. 75-5 at 23-24.

When there is a basis for a claim under this CareFirst Plan and another Plan, this CareFirst Plan is a Secondary Plan which has its benefits determined after those of the other Plan, unless:

> a)      The other Plan has rules coordinating benefits with those of this CareFirst Plan; and

> b)      Both those rules and this CareFirst Plan's rules require that this CareFirst Plan's benefits be determined before those of the other Plan.

ECF No. 75-5 at 23-24.

**State Farm Policy**

At the time of the accident, Hoops also had an automobile insurance policy through State Farm ("State Farm Policy"), which covered her 2012 Acura TSX and which included medical payments coverage for medical expenses incurred because of bodily injury suffered by Hoops while occupying her 2012 Acura TSX, a newly acquired car, a temporary substitute car, a non-owned car in her lawful possession, or a trailer attached to one of these cars, subject to certain time limits not at issue here.   The State Farm Policy provided as follows with respect to medical payments coverage:

> **If Other Medical Payments Coverage or Similar Vehicle Insurance Applies**
>
> * * *
>
> 3.   The Medical Payments Coverage provided by this policy applies as primary coverage for an ***insured*** who sustains ***bodily injury*** while ***occupying your car*** or a ***trailer*** attached to it.
>
> * * *

7

4.  Except as provided in 3. above, the Medical Payments Coverage provided by this policy applies as excess coverage.

ECF No. 75-8 at 12-13.

On June 8, 2016, MRA billed Hoops's State Farm Policy for $6,519.54, the total amount of Hoops's medical expenses incurred as the result of her accident.   On June 28, 2016, State Farm determined that it owed $5,000 to Mercy, which was the policy limit for Hoops's medical payments coverage under the State Farm Policy, and issued an "Explanation of Review" explaining this determination.   State Farm paid Mercy $5,000 the same day.

Hoops subsequently sent a letter to State Farm, stating that Hoops's "health insurance carrier ha[d] an arrangement with Mercy Hospital that discount[ed] [Hoops's] medical bills," that Mercy "should have sent the bill [for Hoops's medical treatment] to [Hoops's] health insurance carrier," and that Hoops "did not ask . . . [or] authorize State Farm to pay any bills from Mercy."   ECF No. 100-17.   In that letter, Hoops asked State Farm to "immediately contact Mercy Hospital so that [her] $5,000 limit for medical payments coverage [could] be refunded by Mercy."   *Id.*   State Farm rejected Hoops's complaint, and advised her that the money State Farm paid to Mercy could not be returned.

**Medical Lien**

On July 7, 2016, MRA placed a medical lien for $6,519.54 on the tort claim that Hoops asserted against the other driver involved in Hoops's automobile accident.

Hoops initiated this class action complaint in state court on August 26, 2016, and Defendants removed the case to this Court on September 26, 2016, pursuant to the Class

Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). Hoops seeks to represent a class of :

> All Missouri residents who received medical treatment from any Missouri hospital/provider while being covered by valid commercial health insurance, and MRA sought collection from a source other than the patient's commercial health insurance such as asserting a medical lien or directly billing the patient's auto insurance medical payments coverage, during the period of August 26, 2011 to the present.

ECF No. 55 at 9. She also seeks to represent a similarly-defined subclass, but limited to those Missouri residents "who received medical treatment from any Mercy-owned or Mercy-affiliated hospital/provider in Missouri . . . ." *Id.*[4]

On September 15, 2016, MRA released the medical lien it had placed on Hoops's tort claim. MRA did not obtain any money for Mercy as a result of the lien,[5] and Hoops's tort claim remains pending.

On September 15, 2016, MRA returned Hoops's claim file to Mercy for any subsequent billing. On September 21, 2016, Mercy billed Hoops's CareFirst Policy, noting that $5,000 had already been paid on the claim.[6] With State Farm's $5,000

---

[4]     As discussed at length below, the analysis in this case turns on the specific terms of the health insurance and automobile insurance policies at issue. As such, it is difficult to understand how the members of the classes defined by Plaintiff could be similarly situated. However, in light of the Court's decision on the motion for summary judgment, it is unnecessary to address the issue at this stage.

[5]     MRA alleges that it was not aware, as of July 7, 2016, that Hoops had health insurance and that it would not have placed the lien had it known that fact. Hoops disputes that MRA was not aware of her health insurance coverage as of the date of the lien.

[6]     Specifically, Mercy's bill to CareFirst's parent company, Anthem, indicated that Anthem had not paid any amount on the claim but that "MVA" had previously paid $5,000 on the claim. ECF No. 75-23. According to MRA, "MVA" stands for "motor vehicle

payment, $1,519.54 of the total $6,519.54, remained unpaid.   CareFirst processed the

claim and determined that it owed $836 on the claim, and that Hoops was responsible for

$209 as a Cost Share, for a total of $1,045, pursuant to the discounted rates set forth in the

Network Agreement.   CareFirst explained this determination in an Explanation of

Benefits, and CareFirst issued a payment to Mercy of $836.

On October 2, 2016, Mercy billed Hoops for $209, which Hoops paid in full on

October 14, 2016.[7]   Neither CareFirst nor State Farm has complained about, sought return

of, or otherwise attempted to alter the payments made with respect to Hoops's medical

treatment.

## Claims Asserted in This Lawsuit

In her second amended complaint, filed on April 3, 2017 (ECF No. 55), Hoops

asserts six claims, on behalf of herself and the putative classes, each arising from (1)

Defendants' assertion of the medical lien on Hoops's tort claim, and (2) Defendants billing

State Farm first and, as a result, collecting more than the discounted rate set forth in

Mercy's Network Agreement with CareFirst.[8]

accident coverage."   ECF No. 74 at 3 n.14.   The bill includes "Health Plan ID" numbers
for both Anthem and "MVA."

[7]      Hoops does not challenge or assert any claims arising out of the $209 charge or
payment.

[8]      The parties' briefs and oral argument focused entirely on these two allegedly
wrongful actions.   When asked at oral argument to identify any other allegedly wrongful
action forming the basis of Hoops's complaint, Hoops's counsel identified only one:   that
if Defendants were entitled to bill State Farm in the way that they did, Defendants still
should not have billed BCBS for certain charges which State Farm paid in full.   Hoops

Specifically, Hoops asserts claims for breach of the Consent and Agreement against Mercy, for billing for and collecting more money (through the assertion of the medical lien and the bill to State Farm) than permitted under the Network Agreement (Count 1); breach of the Network Agreement against Mercy, on the theory that Hoops is a third-party beneficiary to that contract (Count 2); tortious interference with contract or business expectancy against both Defendants, for interfering with Hoops's contract with CareFirst and Hoops's reasonable expectancy under that contract that her medical bills would be satisfied in full by the discounted rate set forth in the Network Agreement (Count 3); violation of the Missouri Merchandising Practices Act ("MMPA), Mo. Rev. Stat. §§ 407.010-407.309, against both Defendants, for failing to disclose that they would assert a medical lien or that they would bill and collect from a patient's automobile insurance even when a patient has group health insurance that entitles them to a discounted rate (Counts 4 and 5); and unjust enrichment based on Defendants collecting more than they were entitled to collect under the Network Agreement (Count 6).

Hoops alleges that Defendants' actions caused her damage because, by exhausting her $5,000 limit for medical payments coverage under her State Farm Policy, she was prevented from using that coverage for other medical services not covered by her CareFirst

_____

characterized such charges as "double billing."   But Hoops was unable to identify any such charges that were allegedly "double billed," and no explanation of such charges was provided in the complaint or in response to the summary judgment motion.   Moreover, Hoops's only claimed damages are for the State Farm Policy funds that were not made available for extra charges; Hoops has never identified any damages arising out of any alleged double billing.   To the extent any claim in the complaint is based on any alleged "double billing," the Court will grant summary judgment on such claim as a matter of law.

Policy and arising out of her accident, such as copays and prescription medications, for which Hoops alleges she has "expended at least $2,013.64 out of her pocket."[9]   Hoops further alleges that she was damaged because "she was subjected to and encumbered by a Missouri medical lien despite the fact that she had commercial health insurance that guaranteed payment and despite the fact that she owed no debt to Mercy . . . ."   ECF No. 55 at 14.

**Applicable Insurance Regulations**

Missouri's regulations for "Automobile Insurance," Mo. Code Regs. Ann. tit. 20, Div. 500, Ch. 2, contains a regulation governing "Minimum Standards for Automobile Policies."   Mo. Code Regs. Ann. tit. 20, § 500-2.100.   The regulation's stated purpose is to "specif[y] the minimum standards to be found in [private passenger automobile policies used in Missouri]," and the regulation states that "[n]o private passenger automobile policy which conflicts with any of the criteria set forth in this regulation may be issued to a Missouri insured."   *Id.* § 500-2.100(2)(A).   As applicable here, the regulation provides:

> (C) Medical payments coverage shall not be excess over any accident and sickness insurance other than that provided under an automobile insurance policy unless the excess provisions are clearly disclosed to the insured and properly reflected in the rating of the coverage. This disclosure must be by endorsement or on the declarations page or by another method acceptable to the Department of Insurance.

*Id.* § 500-2.100(2)(C).

---

[9]     The parties do not dispute that such charges would have been covered under the State Farm policy medical payments coverage.

Missouri's regulations for "Accident and Health Insurance In General," Mo. Code Regs. Ann. tit. 20, Div. 400, Ch. 2, contains a regulation governing "Group Coordination of Benefits," the stated purpose of which is to "restrict[] the use of [COB] provisions in group health insurance plans to those situations where they may be equitably applied." Mo. Code Regs. Ann. tit. 20, § 400-2.030.   This regulation provides that, for the purpose of a COB provision in a group health insurance policy, "Plan" means "a form of coverage with which coordination is allowed," and "Plan may include . . . [t]he medical benefits coverage in group, group-type and individual automobile no-fault type contracts but, as to traditional automobile fault contracts, only the medical benefits written on a group or group-type basis may be included."   *Id.* § 400-2.030(2)(F)(3)(F).

<u>**ARGUMENTS OF THE PARTIES**</u>

Defendants argue that summary judgment is warranted on all claims related to the medical lien because Hoops has not articulated any conceivable damages resulting from the short-lived lien, and damage is a required element of each of Hoops's claims. Defendants note that the lien was released in September 2016, Defendants never collected anything as a result of the lien, and the lien has not impacted Hoops's tort claim, in which there has been no judgment or settlement and which remains pending.   Mercy also argues that the lien was properly asserted because Missouri law permits the assertion of a medical lien by a hospital so long as Hoops's debt on the medical bill remained outstanding. Mercy argues that, pursuant to Section 2.8.2 of the Network Agreement, Mercy was authorized to charge Hoops for Cost Shares (such as the $209 Cost Share), and Mercy was

entitled to maintain a lien until Hoops paid that amount. Mercy notes that the lien was released a month before Hoops paid the $209 Cost Share.

With respect to the claims based on Defendants billing State Farm first and, as a result, collecting more than the discounted rate set forth in Mercy's Network Agreement with CareFirst, Defendants argue that their conduct did not violate the Network Agreement. Defendants contend that, pursuant to the terms of both insurance policies, interpreted in light of Mo. Code Regs. Ann. tit. 20, § 500-2.100(2)(C), State Farm was the primary payor. Defendants further note that the insurers, not Hoops, could have corrected any improper billing and that the insurers have not complained or challenged the billing. Nor has Hoops pursued any claims against either insurer.

As indicated above, the Court invited the parties to brief whether summary judgment should be entered in favor of Defendants on Hoops's claim for breach of the Network Agreement (Count 2), and any other claims based on rights arising out of the Network Agreement, on the ground that Hoops is neither a party to nor a third-party beneficiary of the Network Agreement. In their supplemental briefs, Defendants argue that summary judgment is also warranted for this reason on all claims based on Defendants billing State Farm first and, as a result, collecting more than the discounted rate set forth in Mercy's Network Agreement with CareFirst. Defendants argue that Hoops is not a party to the Network Agreement and that Hoops is also not a third-party beneficiary of that Agreement for the purpose of such claims because the Agreement does not clearly express an intent to benefit Hoops.

Defendants note that Section 9.9 of the Network Agreement expressly disclaims an intent to create any independent rights in third parties except "to the extent specified in the Payment in Full and Hold Harmless section." The Payment in Full and Hold Harmless Section is divided into three subsections, and MRA contends that only one—Section 2.8.2—could arguably be read to create a benefit for or obligation to covered individuals like Hoops.[10] Defendants maintain that Hoops has no claim under Section 2.8.2 because Defendants did not seek compensation from Hoops other than the $209 Cost Share, which Hoops does not challenge. Defendants argue that Hoops's claims are for violations of Sections 2.8.1 and 2.8.3 of the Payment in Full and Hold Harmless section, and neither of these subsections expresses an intent to benefit a third-party beneficiary. Defendants argue that because Hoops lacks standing to enforce the Network Agreement, all her claims arising out of rights created by the Network Agreement must fail.

In response, Hoops argues that the claims related to the medical lien should survive because the Network Agreement prohibited Mercy from asserting a lien; the lien was in effect at the time that Hoops filed suit in the instant case for purposes of standing; Hoops was "damaged during the period of time her tort claim was encumbered by the lien"; even if the lien did not cause actual damage, Hoops should be entitled to nominal damages with respect to her contract and tortious interference claims; and "even if Hoops'[s] individual

---

[10] At oral argument, Mercy argued that Hoops could not be deemed to be a third-party beneficiary under any of the three subsections, while MRA acknowledged that Hoops could be deemed to be a third-party beneficiary under Section 2.8.2.

claims relating to the lien were disposed of, the case was filed as a class action and seeks injunctive relief." ECF No. 100 at 16-17.

Regarding the remaining claims, Hoops argues that "the Network Agreement prohibited Mercy from collecting more than the contractual discounted rate for medical services provided to Hoops" and instead required Mercy "to only bill [CareFirst] and accept the contractual discounted rate as payment in full." ECF No. 100 at 2, 5. Hoops contends that CareFirst was the primary, rather than the secondary, payor because the CareFirst Policy's COB rules[11] do not apply to the State Farm Policy; Mo. Code Regs. Ann. tit. 20, § 400-2.030(2)(F)(3)(F) prohibited CareFirst from coordinating benefits with medical payments coverage in individual automobile insurance policies like the State Farm Policy; and the CareFirst Explanation of Benefits did not indicate that it was coordinating benefits with State Farm.

In her supplemental briefs, Hoops argues that she is a third-party beneficiary of the Network Agreement because Section 9.9 expressly contemplates creating third-party beneficiary rights "to the extent specified in the Payment in Full and Hold Harmless section," and because the Payment in Full and Hold Harmless provisions are for the primary benefit of covered individuals like Hoops. In support of her arguments, Hoops cites a number of so-called "balance billing" cases in which courts have held that plaintiffs challenging medical liens imposed against them in violation of agreements between group

---

[11] Hoops describes COB as "a two-step process wherein the commercial health insurer (1) determines if their insurance policy coordinates with other insurance, and if it coordinates, then (2) looks to the rules within their policy to determine which policy is primary and which is secondary." ECF No. 100 at 6.

health insurers and hospitals similar to the Network Agreement here, are third-party beneficiaries of the network agreements with standing to enforce the agreements.   Hoops further argues that third-party beneficiary status is not a requirement for claims other than Count 2.

In reply, Defendants reiterate their arguments in support of summary judgment and note that even if State Farm and CareFirst were both primary payors, which is possible under Missouri law, CareFirst would be other than "the" primary payor and, as such, under the terms of the Network Agreement, Defendants were still permitted to bill State Farm first and at more than the discounted rate.   Defendants also argue that, to the extent Mo. Code Regs. Ann. tit. 20, § 400-2.030(2)(F)(3)(F) could be interpreted to preclude CareFirst from coordinating benefits with State Farm, which Defendants dispute, the regulation would be preempted by the Employee Retirement Income Security Act ("ERISA") because the CareFirst Policy is an ERISA-governed plan.

In a sur-reply permitted by the Court, Hoops argues that the Court should not consider, or Defendants should be estopped from asserting, the ERISA preemption argument raised for the first time in Defendants' reply briefs, and that in any event, Hoops's "claims are not preempted by ERISA because Hoops'[s] claims do not 'relate to' the [ERISA-governed] Plan," in that Hoops's claims "do not require interpretation of the [CareFirst] plan."   ECF No. 119 at 2-3.

## DISCUSSION

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences drawn from the record. *Combs v. The Cordish Cos., Inc.*, 862 F.3d 671, 680 (8th Cir. 2017).  As noted above, the parties agree that Missouri law applies in this case.

**<u>Claims Arising out of Medical Lien</u>**

The Court agrees with Defendants that, except with respect to the breach of contract claims as discussed below, retention of a benefit by the defendants or damage to the plaintiff is a required element of each of Hoops's claims.  *See, e.g.*, *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 614 (Mo. 2006) (holding that "damages resulting from defendant's conduct" is an essential element of tortious interference); *Binkley v. Am. Equity Mortg., Inc.*, 447 S.W.3d 194, 198-99 (Mo. 2014) (holding that an MMPA claim requires proof of "an ascertainable loss of money or property" and an unjust enrichment claim requires proof that "the defendant accepted and retained [a] benefit under inequitable and/or unjust circumstances").

Because Hoops has not articulated any loss or damages suffered from the lien, which was released before any settlement or judgment was reached in her tort claim, the Court will grant summary judgment in favor Defendants on Counts 3-6 to the extent these claims are based on Defendants' assertion of a medical lien.  *See, e.g.*, *Garrison v. RevClaims, LLC*, 247 F. Supp. 3d 987, 991-92 (E.D. Ark. 2017) (dismissing for failure to

demonstrate damages, a plaintiff's putative class action claims for unjust enrichment and violation of the Arkansas Deceptive Trade Practices Act based on a hospital's assertion of a medical lien in violation of the provider agreement between a the hospital and the plaintiff's health insurer, where the lien was released before the hospital recovered any amount on the lien).   Hoops has also not demonstrated that injunctive relief is warranted on her individual claims regarding the medical lien, and any allegations she asserts on behalf of the putative class are irrelevant at this stage, where no class has been certified nor any motion for class certification filed.

However, with respect to Hoops's contract claims (Counts 1 and 2), asserted only against Mercy, Missouri law provides that "a party may recover nominal damages if a breach is established and no actual damages are proven."[12]   *CitiMortgage, Inc. v. Royal Pac. Funding Corp*., No. 4:16CV00210 PLC, 2017 WL 3116135, at *7 (E.D. Mo. July 21, 2017) (citations omitted); *see also Dierkes v. Blue Cross & Blue Shield of Mo*., 991 S.W.2d 662, 669 (Mo. 1999) ("[N]ominal damages are available where a contract and its breach are established."); *G & J Holdings, LLC v. SM Properties, LP*, 391 S.W.3d 895, 903 (Mo. Ct. App. 2013) (holding that "[t]he existence of nominal damages is sufficient to preclude

---

[12]     The same is not true with respect to Hoops's claim for tortious interference.   *See Carter v. St. John's Reg'l Med. Ctr*., 88 S.W.3d 1, 17 (Mo. Ct. App. 2002) (holding that "[e]xcept for [*Rusk Farms, Inc. v. Ralston Purina Co.*, 689 S.W.2d 671 (Mo. Ct. App. 1985)], Missouri courts have consistently held that pecuniary loss is an essential element of an action sounding in interference with contracts or business expectancy," and that "[a] presumptive award of nominal damages is not an option in deciding if [the plaintiff] made a submissible case" for tortious interference; *but see Rusk Farms, Inc.*, 689 S.W.2d at 681 (reducing a jury award of actual damages on a tortious interference claim to nominal damages where the evidence did not support the amount of damages awarded).

summary judgment on a breach of contract claim" on the theory that "Plaintiff did not sustain any actual damages" resulting from the breach).

As to the other elements of a contract claim, Mercy does not dispute that the Consent and Agreement and Network Agreement are valid contracts. "Under Missouri law: Only parties to a contract and any third-party beneficiaries of a contract have standing to enforce that contract." *Torres v. Simpatico, Inc*., 781 F.3d 963, 971 (8th Cir. 2015) (quoting *Verni v. Cleveland Chiropractic Coll*., 212 S.W.3d 150, 153 (Mo. 2007)). Although Hoops is a party to the Consent and Agreement, she is not a party to the Network Agreement, so the Court must consider whether she is a third-party beneficiary to that Agreement.

"To be bound as a third-party beneficiary, the terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member." *Id.* "In cases where the contract lacks an express declaration of that intent, there is a strong presumption that the third party is not a beneficiary and that the parties contracted to benefit only themselves." *Id.*

> There are three types of third party beneficiaries: donee, creditor and incidental. The first two categories may recover, the third may not. A person is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed nor asserted to be due from the promisee to the beneficiary. A person is a creditor beneficiary if the performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary. Finally, if the person is neither a donee beneficiary nor a creditor beneficiary, he is an incidental beneficiary.

*L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P*., 75 S.W.3d 247, 260 (Mo.

2002). "A party claiming third-party beneficiary rights has the burden of showing that provisions of the contract were intended for its direct benefit." *Septagon Constr. Co. Inc.-Columbia v. Indus. Dev. Auth. of City of Moberly*, 521 S.W.3d 616, 624 (Mo. Ct. App. 2017).

Section 9.9 of the Network Agreement expresses an intent *not* to create any independent rights in third parties "except to the extent specified in the Payment in Full and Hold Harmless section of this Agreement," Section 2.8. Section 2.8, in turn, contains three subsections, only one of which could be said to "specif[y]" or clearly express an intent to benefit insureds like Hoops. That is Section 2.8.2, which precludes Mercy from billing, charging, seeking compensation from, or having any other recourse against Hoops for covered medical services except in certain limited respects such as Cost Shares.[13]

Although the Court agrees with Defendants that Hoops is not a third-party beneficiary with respect to most of the Network Agreement, the Court finds that Hoops is an intended third-party beneficiary of Section 2.8.2 of that Agreement. And nearly all of the cases cited by Hoops in support of her argument that she is a third-party beneficiary to the Network Agreement are "balance billing" cases where the plaintiff insureds sought to enforce provisions similar to Section 2.8.2 that were allegedly breached when a hospital sought compensation directly from the insured, by virtue of a medical lien.

As to whether Mercy breached Section 2.8.2, Mercy argues that because this provision permitted it to collect Cost Shares from Hoops, Mercy could maintain a lien

---

[13]     As discussed below, the Court does not believe that Hoops is an intended third-party beneficiary of Sections 2.8.1 or 2.8.3.

against Hoops's tort claim until such Cost Shares were paid.  *See* Mo. Rev. Stat. § 430.230 (providing that hospitals in Missouri "shall have a lien upon any and all claims . . . of any person admitted to any hospital . . . and receiving treatment . . . therein for any cause including any personal injury sustained by such person as the result of the negligence or wrongful act of another . . . for the cost of such services, computed at reasonable rates . . . ."); *Morgan v. Saint Luke's Hosp. of Kansas City*, 403 S.W.3d 115, 118–19 (Mo. Ct. App. 2013) ("[M]ost courts generally hold that a healthcare provider covered under the hospital lien statute may not assert a lien against the claim of a patient with health insurance for an amount beyond what the contract between the provider and the health insurance company dictates.").

But it is undisputed that the amount of the lien here was not limited to the Cost Shares Hoops owed under the Network Agreement, and was instead for the total amount of $6,519.54.  Although the lien was released before causing Hoops any actual damages, Hoops has made a sufficient showing of the existence of a contract and breach to proceed to trial for nominal damages.  Therefore, the Court will deny summary judgment on Counts 1 (breach of the Consent and Agreement) and 2 (breach of the Network Agreement) against Mercy, to the extent they arise from Mercy's assertion of a medical lien.

**Claims Arising Out of Order of Billing Insurers**

1. Third-Party Beneficiary

The remaining aspects of Hoops's claims turn on whether Defendants violated the Network Agreement by billing State Farm First and, as a result, collecting more than the

Agreement's discounted rate.   As discussed above, Section 9.9 of the Network Agreement expresses an intent *not* to create any independent rights in third parties "except to the extent specified in the Payment in Full and Hold Harmless section of this Agreement," which is Section 2.8.   Although Section 2.8.2 specifies an intent to benefit insureds like Hoops, Hoops's claims as to billing State Farm arise out of the other two subsections of 2.8, in which Mercy agreed to "accept as payment in full" the discounted rate unless CareFirst was "other than the primary payor," in which case Mercy was not precluded from accepting more than the discounted rate from "the primary payor" (Section 2.8.1), and in which it was made clear that Mercy was otherwise not prohibited from pursuing "any available legal remedy, including, but not limited to, collecting from any insurance carrier providing coverage" to Hoops (Section 2.8.3).

Unlike Section 2.8.2, these subsections barely mention, let alone clearly express an intention to benefit, the insureds.   Rather, they discuss the rights and obligations of CareFirst and Mercy, separate and apart from any obligation CareFirst owed Hoops as an insured.   *See, e.g.*, *Midwest Neurosurgery, P.C. v. State Farm Ins. Cos.*, 686 N.W.2d 572, 576 (Neb. 2004) ("Within the health insurance industry, it is common for insurers and medical providers to enter into agreements in which the provider agrees to accept as full payment an amount less than what is billed to the insured patient.   In exchange for the provider's agreeing to offer its services at a discounted rate, the insurer agrees to create incentives for its insureds to use the provider, thus helping to ensure a higher volume of patients for the provider.").   Indeed, at oral argument, Hoops conceded that she could not

point to any language in Sections 2.8.1 or 2.8.3 that specifies an intent to benefit insureds like Hoops.

In a similar case, *Hayberg v. Robinson Memorial Hospital Foundation*, 995 N.E.2d 888 (Ohio Ct. App. 2013), a hospital patient injured in an automobile accident brought a putative class action against the hospital, asserting claims sounding in breach of contract, conversion, unjust enrichment, and fraud, for the hospital's billing of the patient's automobile insurance for medical services first and at a higher rate than a contractually discounted rate set forth in a contract between the hospital and patient's health insurer. The state appellate court affirmed summary judgment in favor of the hospital on all of these claims, upon finding that the patient "failed to submit any evidentiary materials showing that, in executing the underlying contract, [the hospital] and the [health insurer] specifically agreed that [the patient] would be a third-party beneficiary," and that the health insurer's "payment of a discounted amount for services rendered by the hospital does not directly satisfy any separate obligation the [health insurer] owes to [the patient] i.e., [the health insurer's] only duty to [the patient] is to pay a sum to [the hospital]." *Hayberg*, 995 N.E.2d at 894-95; *see also Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 440 (Mo. 2013) ("Plaintiffs never had legal title to any claims related to their insurers' payments for alleged overcharges [by treatment providers]. The trial court did not err in finding that the insurers were the owners of any claims in this case."); *See, e.g., Harris v. St. Vincent Healthcare*, 305 P.3d 852, 857-58 (Mont. 2013) (affirming dismissal of breach of contract and constructive fraud claims arising out of hospital's billing and collecting from

third-party insurers more than the discounted rate the hospital agreed to accept "as payment in full" for covered services under a provider agreement with a health insurer, on the ground that the third-party insurers were not parties to the provider agreements and were therefore not bound by it).

This Court, too, finds that Hoops is not a third-party beneficiary entitled to enforce the provisions in the Network Agreement which, according to Hoops, prohibit Defendants from billing State Farm first and collecting more than the Agreement's discounted rate.

2. "Other Than the Primary Payor"

In any event, Defendants did not violate the Network Agreement by billing State Farm first and for the full amount. If CareFirst was "other than the primary payor," the Network Agreement permitted Defendants to accept more than the discounted rate from "the primary payor." Because the Network Agreement does not define "primary payor," the Court looks to the State Farm Policy and CareFirst Policy for guidance. *See U.S. Fid. & Guarantee Ins. Co. v. Commercial Union Midwest Ins. Co*., 430 F.3d 929, 933 (8th Cir. 2005) (interpreting Minnesota law and holding that "[w]hen two policies provide coverage for the same incident, the question of which policy provides primary coverage is a legal determination that we make by looking to the language of the policies at issue.").

When interpreting an insurance policy, the Court must give "the policy language its plain meaning, or the meaning that would be attached by an ordinary purchaser of insurance." *Doe Run Res. Corp. v. Am. Guarantee & Liab. Ins*., 531 S.W.3d 508, 511 (Mo. 2017). "If the policy language is clear and unambiguous, it must be construed as

written.   An ambiguity exists only if a phrase is reasonably open to different constructions.   Courts may not create an ambiguity when none exists."   *Id.* (citation omitted).

The Court, like the parties, looks specifically to the COB rules of each insurance policy, interpreted in light of the applicable Missouri insurance regulations.   As discussed above, Mo. Code Regs. Ann. tit. 20, § 500-2.100 requires that "[m]edical payments coverage shall not be excess over any accident and sickness insurance other than that provided under an automobile insurance policy unless the excess provisions are clearly disclosed to the insured and properly reflected in the rating of the coverage."   The State Farm Policy does not clearly disclose that its medical payments coverage is excess over any health insurance policy.

The only disclosure referencing "excess" status is limited to situations when "medical payments coverage or other similar vehicle insurance applies."   ECF No. 75-8 at 13.   It is not clear that "other medical payments coverage or similar vehicle insurance" would include a health insurance policy like the CareFirst Policy.   But even if it did, the State Farm Policy would still be primary because the provision states that, in such cases, the State Farm Policy "applies as primary coverage" in cases like Hoops's, where the insured sustained "bodily injury while occupying [her] car."   ECF No. 75-8 at 12.   In short, the State Farm Policy provides that its medical payments coverage applies as primary coverage.

The CareFirst Policy, on the other hand, has a COB section that applies when an insured "has health care coverage under more than one Plan." And "Plan" is defined broadly to include "any health insurance policy, including those of . . . individual policies, . . . and any other established programs under which the insured may make a claim." ECF No. 75-5 at 23-24.

Hoops contends that this definition does not cover automobile insurance policies that cover health expenses, such as medical payments coverage. But Hoops's interpretation would render superfluous the COB section's explicit exclusion of certain (but not all) types of such automobile insurance coverage from the definition of "Plan." *See Nooter Corp. v. Allianz Underwriters Ins. Co.*, No. ED 103835, 2017 WL 4365168, at *6 (Mo. Ct. App. Oct. 3, 2017) ("[W]e aim to give a reasonable meaning to every provision [of an insurance policy] and to avoid an interpretation that renders some provisions trivial or superfluous."). That the COB section explicitly excludes from the definition of "Plan," "[c]overage regulated by a motor vehicle reparation law" and "Personal Injury Protection (PIP) benefits under a motor vehicle liability insurance policy," but not medical payments coverage, suggests that medical payments coverage is included within the definition.[14]

_____

[14] The Court finds, and the parties do not appear to dispute, that medical payments coverage is neither "coverage regulated by a motor vehicle reparation law" nor "Personal Injury Protection (PIP) benefits." *See also* 9 Couch on Ins.§ 125:1 (explaining that "motor vehicle accident reparations" laws are statutes providing for "no-fault automobile reparations system[s]" that provide for "statutory benefits," limited by statute, for losses resulting from automobile accidents without regard to tort liability); 11 Couch on Ins. § 158:4 ("While serving similar functions as personal injury protection (PIP) benefits, medical payments coverages have been distinguished from PIP on the ground that medical payments provisions are specifically limited with respect to terms of coverage and the

*See Gen. Am. Life Ins. Co. v. Barrett*, 847 S.W.2d 125, 133 (Mo. Ct. App. 1993) (applying the rule of contract interpretation, "expressio unius est exclusio alterius," meaning that the "expression of one thing is the exclusion of another or the mention of one thing implies exclusion of another," to the interpretation of an insurance contract); *see also Hendrickson v. Cumpton*, 654 S.W.2d 332, 334 (Mo. Ct. App. 1983) ("Medical payment coverage in an automobile insurance policy is simply a form of health insurance.").

Hoops also contends that Missouri's Group COB regulation, Mo. Code Regs. Ann. tit. 20, § 400-2.030(2)(F)(3)(F), prohibits CareFirst from coordinating with medical payments coverage in an individual automobile insurance policy like the State Farm Policy. But the Group COB regulation explicitly permits group health insurance plans to coordinate benefits with "medical benefits coverage in . . . individual automobile no-fault type contracts." *Id.* Hoops argues that this refers only to no-fault coverage under state motor vehicle reparation laws, which as described above, are statutory systems that have been enacted by some states, to provide for payments of certain benefits for losses resulting from automobile accidents without regard to tort liability, within the limits specified by the statute. *See* 9 Couch on Ins. § 125:1. It is undisputed that Missouri has not enacted such a no-fault, motor vehicle reparations law. Thus, Hoops argues that the medical payments coverage in the State Farm Policy must be a "traditional automobile fault contract," which, pursuant to the Group COB regulation, may be coordinated "only when the medical benefits [are] written on a group or group-type basis." Because the State Farm Policy is

_____

period of eligibility while PIP benefits require that the insurer pay all reasonable personal injury expenses arising from the automobile accident.").

an individual, rather than a group, policy, Hoops argues that the regulation prohibits coordination.

The Court rejects Hoops's argument. The Group COB regulation is a Missouri regulation. Missouri would have little reason to include the term "no-fault type contracts" in the regulation if such contracts referred *only* to no-fault policies required by statute, which do not exist in Missouri. Rather, the Court reads "no-fault type contracts" to mean just what it says—coverage provided by contract without regard to fault. Medical payments coverage falls within that definition. [15] *See, e.g.*, *Cameron Mut. Ins. Co. v. Madden*, 533 S.W.2d 538, 545, 547 (Mo. 1976) (explaining that, although "no statute requires the inclusion of medical payment coverage in an automobile policy," recovery under a medical payments coverage clause "is completely independent of liability on the part of the insured"); *Oie v. Travelers Indem. Co*., No. CIV A 07-5447 (JAP), 2008 WL 4067308, at *1 (D.N.J. Aug. 26, 2008) ("In the automobile insurance industry, medical payments coverage is a contractual form of 'no-fault' coverage entered into between the insurance company and the insured for payment of medical bills); 11 Couch on Ins. § 158:2 (explaining that "[r]ecovery under the medical payments clause of an automobile liability policy is completely independent of liability on the part of the insured" and that "no-fault statutes have obviated the need for medical payments coverage in certain situations.").

Nor does the administrative history of the regulation, as discussed by Hoops in response to

---

[15] Because the Court finds that Missouri's Group COB regulation does not conflict with the CareFirst Policy, the Court need not reach the question of whether the regulation is preempted by ERISA.

the summary judgment motion, alter the Court's conclusion. A review of that history does not convince the Court that "no-fault type contracts" refers only to no-fault policies required by statute.

In short, the Court finds that the medical payments coverage of the State Farm Policy here falls within the CareFirst Policy's definition of a "Plan" for COB purposes. And under the CareFirst Policy's COB Order of Benefit Determination rules, the CareFirst Plan is a secondary plan unless the State Farm Policy medical payments coverage "has rules coordinating benefits with those of [the] CareFirst Plan," and "both those rules and [the] CareFirst Plan's rules require that [the] CareFirst Plan's benefits be determined before those of" the State Farm Policy. ECF No. 75-5 at 24. Because the State Farm Policy medical payments coverage does not have rules coordinating benefits with those of the CareFirst Plan, the CareFirst Plan is secondary.

Supporting this interpretation is the fact that State Farm did not in fact coordinate benefits with CareFirst. Further, contrary to Hoops's argument that CareFirst paid the claim as primary payor without considering State Farm's payment, the Court notes that Mercy did not submit its claims for payment to CareFirst within 90 days from the date of Hoops's medical services or discharge, but rather, consistent with Section 2.5 of the Network Agreement, within 90 days from the later date of payment by State Farm, the primary payor. And there is nothing in the record to suggest that CareFirst believed Mercy's claim submission was untimely.

For all of these reasons, the Court finds that the Network Agreement permitted Mercy to bill State Farm first and for the full amount. Because, except as set forth above with respect to the medical lien and any alleged double billing, each of Hoops's claims is based directly or indirectly on this alleged violation of the Network Agreement, the Court will grant summary judgment in favor of Defendants on Hoops's remaining claims.

**Experts**

The parties have also filed motions to exclude certain expert testimony pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). ECF Nos. 70 & 76. The Court did not rely on any expert's opinion in ruling on the motion for summary judgment, and the *Daubert* motions are now moot to the extent they relate to claims resolved here as a matter of law. Before denying the motions as moot, however, the Court will ask the parties to advise the Court, not more than seven days after the date of this Memorandum and Order, whether any part of their *Daubert* motions relates to the remaining claims in this case, and if so, which part(s).

**CONCLUSION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motions for summary judgment are **DENIED in part**, with respect to Plaintiff's breach of contract claims (Counts I and II) only to the extent such claims arise out of the assertion of a medical lien, as set forth above; the motions are otherwise **GRANTED**. ECF Nos. 73 & 79.

**IT IS FURTHER ORDERED** that, within **seven (7) days** of the date of this

Memorandum and Order, the parties shall file a joint notice advising the Court whether any part of their motions to exclude expert testimony (ECF Nos. 70 & 76) relates to the claims remaining in this case, and if so, which part(s). Failure to comply with this Order will result in the denial of these motions as moot.

**IT IS FURTHER ORDERED** that, pursuant to the Case Management Order (ECF No. 34), within **14 days** of the date of this Memorandum and Order, the parties shall file a joint proposed schedule to address Phase II of this case, with class discovery and the filing of any motion for class certification with respect to the remaining claims to be completed in not more than six months.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of March, 2018.