UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CYNTHIA HOOPS, | ) |
| Plaintiff, | ) ) ) |
| v. | )  Case No. 4:16-cv-01543-AGF |
| MEDICAL REIMBURSEMENTS OF AMERICA, INC., et al., | ) ) ) ) |
| Defendants. | ) |

**Memorandum in Support of
Defendant Mercy Hospitals East Communities' Motion for Reconsideration
of the Court's Denial of Summary Judgment as to Counts 1 and 2
of Plaintiff's Second Amended Complaint Concerning the Medical Lien**

**Introduction**

On March 2, 2018, the Court granted summary judgment in favor of Defendants Mercy Hospitals East Communities ("Mercy") and Medical Reimbursements of America, Inc. ("MRA") as to all claims of Plaintiff Cynthia Hoops except her claims against Mercy for breach of contract as to the short-lived medical lien that Defendants asserted upon her tort claim against the driver who caused her injuries. (ECF No. 133). As for the medical lien, the Court granted summary judgment to Defendants on Hoops' claims for tortious interference, violation of the Missouri Merchandising Practices Act, and unjust enrichment (Counts 3-6) because Hoops suffered no actual damage from the lien. (ECF No. 133, p. 18). But the Court denied summary judgment as to Counts 1 and 2 for breach of the Consent and Agreement[1] and the Network Agreement[2] (the

---

[1] The Consent and Agreement is between Mercy and Hoops. (ECF No. 133, p. 2).

[2] The Network Agreement is between Mercy and RightChoice Managed Care, Inc., the BlueCross Blue Shield ("BCBS") entity in Missouri, and applies to other BCBS affiliates,

"Agreements") after concluding that "Hoops has made a sufficient showing of the existence of a contract and breach to proceed to trial for nominal damages" because "the amount of the lien here was not limited to the [$209] Cost Shares Hoops owed under the Network Agreement, and was instead for the total amount of $6,519.54 [Mercy's full charges]." (ECF No. 133, p. 22).

Mercy respectfully submits that in reaching this conclusion and denying summary judgment on Counts 1 and 2 as to the lien, the Court misconstrued Missouri law and the Agreements. Under the Missouri medical lien statute, Mo. Rev. Stat. § 430.230, and the Agreements, Mercy had the right to assert and maintain a lien for its full charges to protect itself in case Hoops lacked coverage for her treatment or otherwise remained liable for Mercy's full charges. Mercy retained this right until early October 2016, when Hoops' health insurer, CareFirst of Maryland ("CareFirst"), confirmed that Hoops had coverage for her treatment, determined the respective amounts owed by CareFirst and Hoops to Mercy under the Network Agreement and Hoops' health plan, and paid Mercy the amount owed by CareFirst. Section 2.8.3 of the Network Agreement expressly allowed Mercy to maintain a lien for its full charges until and unless the hold harmless provision in Section 2.8.2 was triggered, and the hold harmless provision was not triggered until *after* CareFirst determined in early October 2016 that Hoops was a "Covered Individual" and received "Covered Services" at Mercy and that the exceptions to the hold harmless provision did not apply. Until CareFirst made this determination, Hoops was not entitled under the Consent and Agreement to pay less than Mercy's full charges. Because it is undisputed that Mercy released its lien on September 15, 2016—before CareFirst made this

---

including CareFirst of Maryland, the entity through which Hoops had group health insurance coverage. (ECF No. 133, pp. 2-3).

determination—Mercy did not breach the Agreements or otherwise violate Missouri law governing medical liens.

A "district court has the inherent power to reconsider and modify an interlocutory order any time prior to entry of judgment." *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007); *see also* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims ... may be revised at any time before the entry of a judgment adjudicating all the claims...."). Here, the Court should reconsider its summary judgment ruling and enter summary judgment in favor of Mercy as to Hoops' claims in Counts 1 and 2 concerning the lien (which would resolve all remaining claims in the case).

## Argument

### I. The Agreements must be construed in accordance with Missouri law governing medical liens.

The Agreements must be construed in accordance with Missouri law governing medical liens because the Consent and Agreement was signed and performed in Missouri and Section 9.8 of the Network Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Missouri." (Mercy SJ Ex. 1-A). Under Missouri law, "unless a contract provides otherwise, the law applicable thereto at the time and place of its making, including statutory provisions and judicial precedents, is as much a part of the contract as though it were expressly referred to and incorporated in its terms." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 713 (8th Cir. 2001) (quotation omitted).

**II. Under Section 430.230, a hospital may maintain a lien for its full charges until a health insurer has confirmed that the patient has coverage for her treatment, determines the respective amounts owed by the health insurer and the patient under the network agreement and the patient's health plan, and pays the hospital the amount owed by the health insurer.**

Section 430.230 provides that hospitals in Missouri "shall have a lien upon any and claims ... of any person admitted to any hospital ... and receiving treatment ... therein for any cause including any personal injury sustained by such person as the result of the negligence or wrongful act of another ... for the cost of such services, computed at reasonable rates...."

In *Morgan v. Saint Luke's Hosp. of Kansas City*, 403 S.W.3d 115 (Mo. Ct. App. 2013), the Missouri Court of Appeals construed Section 430.230. The court summarized the facts in that case as follows:

> St. Luke's first submitted its bill to Ms. Morgan's health insurance and received payment from that insurance for such bill, all pursuant to the agreement between Ms. Morgan's health insurance and St. Luke's. This same agreement entitled Ms. Morgan to a contractual reduction in the amount of her medical bills incurred with St. Luke's. Then St. Luke's returned the funds received from the health insurance company and instead filed a lien against any recovery in Ms. Morgan's third party tort claim against the other driver in the accident. The lien was for the total amount of services rendered, without a reduction.

*Id.* at 116. The court stated:

> At issue in this appeal is whether section 430.230 allows a healthcare provider to file a lien on a patient's claim against a third-party tortfeasor despite (1) the existence of a health insurance contract between the provider and the patient's health insurance company providing for a discount in the amount of the patient's medical bills, *and (2) the payment of the discounted amount from the insurer to the provider.*

*Id.* at 117 (emphasis added). The court held that if the patient's allegations in her petition were true, the hospital could not assert any lien *after* the hospital had billed the patient's health insurer and received payment from the health insurer because "according to the pleadings here, [the

'patient's] debt has been extinguished" by the health insurer's payment to the hospital and "[a] lien cannot exist in the absence of a debt." *Id.* at 120. The court observed:

> This question is one of first impression in Missouri. Courts in other states with hospital lien statutes have considered this issue under various factual circumstances, and most courts generally hold that a healthcare provider covered under the hospital lien statute may not assert a lien against the claim of a patient with health insurance for an amount beyond what the contract between the provider and the health insurance company dictates. The focus of courts so holding is on the existence of an underlying debt being necessary to support a lien, leading them to reason that a provider is not entitled to file a lien under the hospital lien statute *when the patient's obligation to the provider has been satisfied by the payment made by her health insurer*.

*Id.* at 118-19 (emphasis added).

As in *Morgan*, courts in other jurisdictions have recognized that a hospital's statutory lien rights are impacted *after* the hospital has received payment from a health insurer pursuant to a contract providing for discounted rates of the hospital's charges. *See Parnell v. Adventist Health Sys./W.*, 109 P.3d 69, 71-72 (Cal. 2005) ("In this case, a hospital received payment from a patient and his health insurer and agreed to accept that payment as 'payment in full' for its services. Nonetheless, the hospital asserted a lien under the HLA, seeking to recover the difference between its usual and customary charges and the amount received from the patient and his insurer. We now consider whether the hospital may do so. We conclude that it may not."); *Midwest Neurosurgery, P.C. v. State Farm Ins. Companies*, 686 N.W.2d 572, 579 (Neb. 2004) ("The use of the phrase 'payment in full' in the Managed Care Agreement contemplates that Midwest will accept the amount computed under the fee schedule as full satisfaction of the debt; once that amount is paid, the debt is extinguished."); *N.C. ex rel. L.C. v. A.W. ex rel. R.W.*, 713 N.E.2d 775, 776 (Ill. App. Ct. 1999) ("Here, it is clear that the contract between NIMC and One Health extinguished all debts once plaintiff's insurer paid NIMC at the agreed rate. Therefore,

when the debt was extinguished pursuant to the contract, NIMC no longer had any putative lien rights.").

Neither *Morgan,* nor any other Missouri appellate case, nor courts in other jurisdictions have held that a hospital is precluded from maintaining a lien for its full charges *before* a health insurer has confirmed that the patient has coverage for her treatment, determines the respective amounts owed by the health insurer and the patient under the network agreement and the patient's health plan, and pays the hospital the amount owed by the health insurer. Just the opposite, courts have recognized that a hospital is entitled to maintain a lien for its full charges until and unless these events have occurred and any potential uncertainty about the patient's health insurance has been resolved. *See, e.g., Gister v. Am. Family Mut. Ins. Co.*, 818 N.W.2d 880, 899 (Wis. 2012) ("[A] debt for medical treatment from a patient to another party should not be rigidly extinguished simply because the law may ultimately direct the bill to a different party... St. Joseph's liens should not have been invalidated on the exclusive ground that Medicaid *may* have ultimately paid for the charges."); *Kight v. MCG Health, Inc.*, 769 S.E.2d 923, 925 (Ga. 2015) ("Contrary to the ruling of the trial court and Kight's arguments to this Court, the Hospital *was* owed money on the date that the lien was filed. As a result, Kight's principal argument that there was no debt on which to base any lien must fail.").

Courts have so ruled because a hospital cannot know for certain whether the patient's treatment will be covered by health insurance and subject to a discounted rate until her health insurer has confirmed the patient's coverage for her treatment and paid the hospital the amount owed by the health insurer. The patient may not have had health insurance coverage at the time of treatment even though she told the hospital that she did. Even if the patient has health insurance, her health plan may not cover all or part of her treatment because of exclusions in the

plan or the patient's failure to comply with the plan's utilization management requirements. And there may be myriad other reasons why a discounted rate does not apply such that the patient remains liable for the hospital's full charges.

Because of this uncertainty concerning a patient's health insurance and financial responsibility to the hospital, courts have recognized that a hospital is entitled to maintain a lien for its full charges and thereby protect itself in case there is no health insurance coverage for the patient's treatment and the patient remains responsible to the hospital for its full charges. As explained in *Gister*:

> Whenever there is any uncertainty or ambiguity in the law as to who will ultimately pay a hospital bill, or as to the extent to which a hospital is prohibited from billing a patient, it does not make sense to regard a debt on the part of a patient owed to a hospital as foreclosed by law for purposes of a hospital lien. One can infer that proposition from the fact that courts have disallowed liens in such circumstances only when there is no doubt that someone other than the patient is responsible for satisfying the debt. The principle is sensible, as it would be illogical to consider a debt legally impossible for purposes of a lien when that impossibility is not grounded in a legal certainty. Applying this general principle to the case at bar, we hold that a patient's debt to a hospital is extinguished for purposes of a hospital lien placed upon a settlement between a patient and an insurer covering a tortfeasor's liability, if it ever is, only when the following can be accurately said: that the hospital is legally barred from ever billing the patient, either directly or indirectly.

818 N.W.2d at 897–98 (citations omitted).

A contrary rule would leave the hospital exposed and without any lien during the time period between when the patient receives treatment and when the patient's health insurance coverage is resolved and made certain. During that time period, the patient could settle her claim against the tortfeasor and receive payment from the tortfeasor or the tortfeasor's insurance before the hospital could assert its lien. *See, e.g., Ex parte Infinity S. Ins. Co., Inc.*, 737 So. 2d 463, 466 (Ala. 1999) ("If the patient settles with the tortfeasor and the hospital has failed to perfect its lien, the hospital's only remedy is against the patient."). That outcome would completely defeat

the dual purpose of Section 430.230 "of ensuring that injured patients are promptly treated without consideration of their ability to pay and financially protecting health care providers to enable them to continue to provide care." *Morgan*, 403 S.W.3d at 118.

**III.   Under the Agreements, Mercy could maintain a lien for its full charges until CareFirst confirmed that Hoops had coverage for her treatment, determined the respective amounts owed by CareFirst and Hoops under the Network Agreement and Hoops' health plan, and paid Mercy the amount owed by CareFirst.**

These considerations, which balance the rights of the hospital and the patient, are reflected in the Agreements. Section 2.8.3 of the Network Agreement states that "[e]xcept as provided in this section [2.8], this Agreement does not prohibit Provider from pursuing any available legal remedy," and a statutory medical lien is one such "available legal remedy." Section 2.8.2 of the Network Agreement begins that "Provider agrees that in no event … shall a Provider … bill, charge, collect a deposit from, seek compensation from, or have any other recourse against a *Covered Individual* … for *Covered Services* provided pursuant to this Agreement," but continues that "[t]his section does not prohibit Provider from collecting reimbursement … from the Covered Individual" if:

- the Covered Individual owes any Cost Shares (Section 2.8.2.1);

- the Covered Individual receives "Health Services that are not Covered Services" (Section 2.8.2.2);

- there is a "reduction in or denial of payment as a result of the Covered Individual's failure to comply with his/her utilization management program" (Section 2.8.2.3); or

- "Health Services [ ] are not payable in the Covered Individual's Health Benefit Plan because the Provider does not participate in the applicable Plan Program" (Section 2.8.2.4).

(Mercy SJ Ex. A-1 (emphasis added)).

Section 2.8.2 protects a patient such as Hoops only *after* the applicable BCBS entity (here, CareFirst) has determined that the patient is a "Covered Individual" and has received "Covered Services" and that the other exceptions to the hold harmless provision in Section 2.8.2 do not apply. Article I of the Network Agreement defines "Covered Individual" as "any individual who is eligible, *as determined by Plan*, at the time services are rendered to receive Covered Services under a Health Benefit Plan." (Mercy SJ Ex. A-1, p. 3 (emphasis added)). "Covered Services" is defined as "Medically Necessary Health Services, *as determined by Plan* and described in the applicable Health Benefit Plan, for which a Covered Individual is eligible for coverage." (*Id.* (emphasis added)). And "Medically Necessary" is defined as "*a determination*, through utilization management, audit or normal claims adjudication processes or under the terms of the applicable Health Benefit Plan … that" five criteria are met. (*Id.* (emphasis added)).

Until CareFirst determined that Hoops had coverage for her treatment, she was not a "Covered Individual" for "Covered Services" for purposes of Section 2.8.2 of the Network Agreement, and Section 2.8.2 did not override Mercy's right under Section 2.8.3 to assert and maintain a lien for its full charges. Once CareFirst confirmed her coverage for her treatment and calculated her Cost Shares, then—and only then—Section 2.8.2 prohibited Mercy from further maintaining any lien in an amount greater than the amount of her Cost Shares (as determined by CareFirst). Because it is undisputed that Mercy had already released its lien by the time CareFirst made its coverage determination in early October 2016, Mercy did not breach the Network Agreement.

Nor did Mercy breach the Consent and Agreement. Section 2 of the Consent and Agreement provides in pertinent part: "**Financial Agreement:** I guarantee and agree to pay for

all goods and services provided to me or the patient named below at the rates listed in Mercy's Charge Description Master as of the date of treatment, *unless I am entitled to pay a different amount under my (or the patient's) health insurance plan....*" (Mercy SJ Ex. B-1 (emphasis added)). Hoops did not become "entitled to pay a different amount under" her health insurance plan until CareFirst determined that she had coverage for her treatment and determined the "different amount" that she "was entitled to pay" (*i.e.*, her Cost Shares) pursuant to the Network Agreement and her health insurance plan. Accordingly, Mercy did not breach the Consent and Agreement by asserting a lien for its full charges because Mercy released the lien before CareFirst determined that she was entitled to pay less than Mercy's full charges.

In its summary judgment ruling, the Court acknowledged that Mercy was entitled to assert a lien, but erroneously concluded that when the lien was asserted on July 7, 2016, the amount of the lien could be no greater than the amount of Hoops' Cost Shares ($209). However, Section 430.230 did not require that the amount of Mercy's lien initially had to be equal to the amount of the Cost Shares that CareFirst subsequently determined were owed by Hoops. *See Kight v. MCG Health, Inc.*, 769 S.E.2d 923, 925 (Ga. 2015) (rejecting patient's argument that hospital's lien was invalid because lien was originally for full charges and was later reduced to amount that patient owed under his health insurance: "[The patient's] tertiary argument that the Hospital's lien was required to be exact on the date it was filed or be considered void ab initio also fails. There is nothing in [the Georgia medical lien statute] imposing such a requirement, and we will not judicially legislate one."). Such a requirement would make no sense because Mercy was never privy to the terms of Hoops' health plan and had no way of knowing whether she in fact had coverage for her treatment or the amount of Hoops' Cost Shares before CareFirst determined coverage in early October 2016 and calculated the Cost Shares pursuant to the terms

of her health plan. Mercy was entitled to assert a lien for its full charges because if CareFirst had denied coverage, Hoops' would have been responsible for Mercy's full charges. Even with coverage, the Cost Shares could have ranged anywhere from nothing to the full amount of the discounted rate under the Network Agreement ($1,045), depending on Hoops' deductibles, copayments, and coinsurance under her health plan, which CareFirst administered.

* * *

In sum, under Section 430.230 and the Agreements, a hospital such as Mercy can originally assert a medical lien in the amount of its full charges and later reduce its lien to the amount owed by the patient under her health plan after her health insurer confirms coverage for the patient's treatment, pays the amount owed by the health insurer, and determines the amount owed by the patient. *See, e.g., Kight*, 769 S.E.2d at 924 (hospital acted lawfully when it initially asserted lien for full charges and subsequently reduced lien to deductibles and co-pays that patient's health insurer determined were owed by patient). Here, Mercy released its lien altogether before CareFirst confirmed Hoops' coverage for her treatment, paid Mercy the amount owed by CareFirst, and determined the Cost Shares owed by Hoops. Thus, Mercy did not breach the Agreements and did not violate Section 430.230. The Court should enter summary judgment in favor of Mercy on Count 1 and 2 as to the lien.

## Conclusion

The Court should reconsider its summary judgment ruling and enter summary judgment in favor of Mercy as to Hoops' claims in Count 1 and 2 concerning the lien.

Respectfully submitted,

THOMPSON COBURN LLP

By /s/ Allen D. Allred
Allen D. Allred, #26367
Jeffrey R. Fink, #44963
One US Bank Plaza
St. Louis, Missouri 63101
314-552-6000
314-552-7000 (Fax)
aallred@thompsoncoburn.com
jfink@thompsoncoburn.com

Attorneys for Defendant
Mercy Hospitals East Communities

## Certificate of Service

I hereby certify that on September 26, 2018, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record.

/s/Allen D. Allred