FOR THE CASE OF

# Cynthia Hoops v Medical Reimbursements of America, Inc. et al

TRANSCRIPT OF

# Misti Voorhies

June 26, 2017

## *Stone & George*

### COURT REPORTING

2020 Fieldstone Pkwy

Suite 900 - PMB 234

Franklin, TN 37069

(615) 268-1244



EXHIBIT

1

This transcript is intended for your law firm's own use. If you wish to share this transcript with an outside law firm, log back in to your CasePlannerPro account and click the **Share** button.

For questions, call (615) 268-1244
or send an email to nangeorge@stoneandgeorge.com

**Page 1**

```
1.        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF MISSOURI
2.              EASTERN DIVISION

3.

4.
     CYNTHIA HOOPS,          )
5.                          )
          Plaintiff,        )
6.                          )
     vs.                    ) No. 4:16-CV-01543-AGF
7.                          )
     MEDICAL REIMBURSEMENTS OF )
8.   AMERICA, INC. AND MERCY  )
     HOSPITALS EAST COMMUNITIES,)
9.                          )
          Defendants.       )
10.                         )
     ----------------------------
11.

12.

13.  Deposition of:

14.

15.  MISTI VOORHIES

16.

17.  Taken on behalf of the Plaintiff

18.

19.  June 26, 2017

20.

21.

22.  -------------------------------------------
          CASSANDRA M. BEILING, CCR, LCR# 371
23.      STONE & GEORGE COURT REPORTING
             2020 Fieldstone Parkway
24.          Suite 900 - PMB 234
             Franklin, Tennessee 37069
25.            615.221.1089
```

**Page 2**

```
1.   APPEARANCES:

2.
     For the Plaintiff:
3.
        HOLLORAN SCHWARTZ & GAERTNER, LLP
4.      Attorneys at Law
        By:  Thomas E. Schwartz, Esq.
5.      9200 Litzsinger Road
        St. Louis, Missouri 63144
6.      (314) 772-8989 (phone)
        (314) 279-1333 (fax)
7.      tschwartz@holloranlaw.com
8.
9.   For Defendant Medical Reimbursements of America:
10.     DENTONS US, LLP
        Attorneys at Law
11.     By:  Stephen O'Brien, Esq.
        One Metropolitan Square, Suite 3000
12.     St. Louis, Missouri 63102
        (314) 259-5904 (phone)
13.     (314) 566-0468 (fax)
        stephen.obrien@dentons.com
14.
15.  For Defendant Mercy Hospitals East Communities:
16.
        THOMPSON COBURN, LLP
17.     Attorneys at Law
        By:  Allen D. Allred, Esq.
18.     One US Bank Plaza
        St. Louis, Missouri 63101
19.     (314) 552-6000 (phone)
        (314) 552-7000 (fax)
20.     aallred@thompsoncoburn.com
21.
22.
     Also Present:
23.
        Chad Powers, Esq.
24.     General Counsel for Medical Reimbursements
        of America, Inc.
25.
```

**Page 3**

```
1.            I N D E X
                               PAGE
2.   WITNESS:

3.   MISTI VOORHIES

4.   Direct Examination By Mr. Schwartz      5
     Cross-examination By Mr. Allred        136
5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.  ** Reporter's Note:  All names are spelled
     phonetically unless otherwise provided to the
25.  Reporter by the parties.
```

**Page 4**

```
1.         The deposition of MISTI VOORHIES was taken
2.   by counsel for the Plaintiff, pursuant to notice,
3.   at the offices of Medical Reimbursements of
4.   America, Inc., 6840 Carothers Parkway, Franklin,
5.   Tennessee, on June 26, 2017, for all purposes
6.   under the Missouri Rules of Civil Procedure.
7.

8.         It is agreed that Cassandra M. Beiling,
9.   being a licensed court reporter in the state of
10.  Tennessee, may swear the witness, and that the
11.  reading and signing of the completed deposition by
12.  the witness are not waived.
13.

14.

15.

16.              *  *  *

17.

18.

19.

20.

21.

22.

23.

24.

25.
```

Page 5

1.            * * * * * * * *
2.            MISTI VOORHIES
3.       (Was thereupon called as a witness and,
4.   after having been first duly sworn, was examined
5.   and testified as follows:)
6.            DIRECT EXAMINATION
7.   BY MR. SCHWARTZ:
8.       Q.   Can you state your name for the record.
9.       A.   Misti Voorhies.
10.      Q.   And where do you live, Ms. Voorhies?
11.      A.   Murfreesboro, Tennessee.
12.      Q.   Okay.  Can you tell me a little bit
13.  about your educational background.
14.      A.   Graduated from high school in '01 and
15.  attended MTSU for a few semesters.
16.      Q.   Where did you go to work after that?
17.      A.   Walmart.
18.      Q.   Okay.  And how long were you at Walmart?
19.      A.   Seven years, I believe, roughly.
20.      Q.   So about when to when?
21.      A.   It would have probably been '02 to '10,
22.  roughly.
23.      Q.   Okay.  And what did you do there?
24.      A.   Cashier and customer service, up front.
25.      Q.   Okay.  Where did you go after Walmart?

Page 6

1.       A.   I went to -- I believe it was MSM.  It's
2.   called MSM Industries, in Smyrna.
3.       Q.   What do they do?
4.       A.   They handle under-laminate for your
5.   carpet, nonslip.
6.       Q.   How long were you there?
7.       A.   Probably two years.
8.       Q.   Okay.  And where did you go to work
9.   after MSM?
10.      A.   I was at Verizon call center.
11.      Q.   How long were you at Verizon?
12.      A.   Probably around three years.
13.      Q.   That brings us to about what year?
14.      A.   So ten, twelve -- so my years are a
15.  little off.  I started here in 2010, so ...
16.      Q.   Okay.  That's all right.
17.      A.   It's off.  It's definitely off.
18.      Q.   Did you go to MRA after Verizon?
19.      A.   Yes.
20.      Q.   All right.  And when do you believe that
21.  you hired on at MRA?
22.      A.   It was June 21st of 2010.
23.      Q.   Okay.  And what were you hired on as?
24.      A.   First-party claims rep.
25.      Q.   And what does a first-party claims rep

Page 7

1.   do?
2.       A.   We handle any incoming claims and we
3.   coordinate insurance benefits for the patient.
4.       Q.   Tell me what you mean by handling
5.   incoming claims.
6.       A.   So the hospital will send us over bills.
7.   Once the bill has been put into the system and an
8.   account created, that's when it would come over to
9.   me to coordinate the insurance benefits.
10.      Q.   And tell me what you mean by
11.  coordination of insurance benefits.
12.      A.   We try to verify what insurances are
13.  available to the patient, starting with MedPay
14.  first, then health, and then liability, slash,
15.  attorney.
16.      Q.   Okay.  And how was it that you went
17.  about determining what insurances were available?
18.      A.   Sometimes we got the insurances from the
19.  hospital.  Other times we would call the patient.
20.  And then whatever was missing, we would just
21.  obtain from those two sources.
22.      Q.   Okay.  Did you work on a particular team
23.  when you were first hired on?
24.      A.   Yes.
25.      Q.   What team did you work on?

Page 8

1.       A.   Do you mean, like, supervisor?
2.       Q.   Did you work for a team for a certain
3.   location or a certain hospital system?
4.       A.   It was -- there was a number of
5.   hospitals in the team.  I couldn't tell you what
6.   they were at this point.
7.       Q.   Okay.  How long did you hold the job of
8.   a first-party claims rep?
9.       A.   I've been there seven years, so I would
10.  say probably about five years.
11.      Q.   Does that take us to about 2015?
12.      A.   Correct.
13.      Q.   Okay.  Were you promoted?
14.      A.   I was.
15.      Q.   And what were you promoted to?
16.      A.   Team lead.
17.      Q.   And what team did you lead?
18.      A.   It would have been my supervisor at the
19.  time.  So I was transferred to another team.
20.  Again, different facilities.  I couldn't tell you
21.  which facilities were.  But I was under
22.  another supervisor, and I was his team lead.
23.      Q.   Okay.  So does each -- strike that.
24.           Who was the supervisor that you worked
25.  under when you were first promoted to a team lead?

Page 9

1.      A.  Oscar.
2.      Q.  What's Oscar's last name?
3.      A.  Beunrostro.  I could not tell you how to
4.  spell it.
5.      Q.  How long did you hold the job of team
6.  lead?
7.      A.  About a year.
8.      Q.  What did you do after that?
9.      A.  Became a supervisor.
10.     Q.  What was the name of the group that you
11. supervised?
12.     A.  It's just Team 3.
13.     Q.  How long did you hold the job of
14. supervisor over Team 3?
15.     A.  I'm still a current supervisor.
16.     Q.  Okay.  Do you know what year it was that
17. you took the job as supervisor of Team 3?
18.     A.  It would have been, I think -- I think
19. August of last year would been a year, so it
20. probably would have been '15.  So, again, my years
21. are probably off by a year.
22.     Q.  Okay.  How many people were working in
23. Team 3?
24.     A.  When I first took over, I believe there
25. were roughly 14 to 15.

Page 10

1.      Q.  And can you categorize those 14 to 15
2.  employees for me.
3.      A.  What do you mean by "categorize"?
4.      Q.  Well, what they did or what hospitals
5.  they do work for or --
6.      A.  There's about seven that worked for
7.  certain facilities.  Again, they range, as far as
8.  states, from Illinois to Iowa.  And then I had
9.  four or five that worked strictly Mercy accounts.
10.     Q.  Okay.  When you first got to Team 3 --
11. strike that.
12.         Was the Mercy account at MRA already in
13. place by the time you became supervisor of Team 3?
14.     A.  Yes.
15.     Q.  Who was supervising Team 3 before you?
16.     A.  I don't know.
17.     Q.  Did you have to do anything to
18. transition into the supervisory task of overseeing
19. the MRA account for Mercy?
20.     A.  No.
21.     Q.  There wasn't anything that you had to
22. meet with the previous supervisor to deal with?
23.     A.  No.
24.     Q.  Did Team 3 have any team leads that
25. worked under you?

Page 11

1.      A.  I did end up having two, yes.
2.      Q.  Okay.  Were there two team leads in
3.  place in 2015, when you joined?
4.      A.  I don't remember.
5.      Q.  Who were the team leads?
6.      A.  At that time, it would have been a
7.  Chrisy Harkins.  She was the one over Mercy.  And
8.  then I had another one that worked the other team,
9.  which was Chris Fleming.
10.     Q.  What was the other team referred to as?
11.     A.  They're not referred to as anything.
12. They're just Team 3.
13.     Q.  Is Chrisy Harkins still with MRA?
14.     A.  Yes.
15.     Q.  What is her position now?
16.     A.  Still team lead.
17.     Q.  For Mercy?
18.     A.  Yes.  Well, for both teams now.
19.     Q.  That position was consolidated?
20.     A.  Correct.
21.     Q.  What do you call the folks that worked
22. under Chrisy Harkins on the Mercy team?
23.     A.  They're just considered Team 3.
24.     Q.  But are they considered first-party
25. billing reps or --

Page 12

1.      A.  Yeah.  All of them are just considered
2.  auto claims reps.
3.      Q.  Is there any difference between an auto
4.  claims rep and a first-party claims rep?
5.      A.  No.  It was just renamed.
6.      Q.  Do you know when that took place?
7.      A.  I don't remember.
8.      Q.  Do the auto claims reps work with
9.  insurance other than first-party insurance?
10.     A.  We do.  We handle all the insurances
11. until we finish first-party.  And then it gets
12. moved on to another department.
13.     Q.  Okay.  Tell me what you mean by handle
14. all insurances.
15.     A.  So we try and figure out what all
16. insurances are available; first-party health and
17. liability.  We will bill them as we see them, as
18. far as coordination is concerned.  And then after
19. that, once first-party is resolved, we move that
20. account to the next department.
21.     Q.  When you said you bill them in the order
22. that you see them, can you explain that to me?
23.     A.  So if a patient has commercial health,
24. we would not bill liability.  If a patient has no
25. health or government health, we would bill

Page 13

1.  liability.
2.      Q.  Do you ever bill commercial health
3.  insurance?
4.      A.  Some -- some provider, we do bill
5.  health.  Not my team, no.
6.      Q.  Okay.  So is it fair to say that Team 3
7.  never bills commercial health?
8.      A.  Correct.
9.      Q.  And MRA never bills commercial health
10. for Mercy?
11.     A.  Correct.
12.     Q.  We're going to come back to some of
13. that, but can you tell me the individuals who have
14. worked on the Mercy team since you've been there?
15.     A.  I can try to remember them all.
16. Currently, I have -- well, currently my entire
17. team works Mercy, because we've consolidated my
18. team.  So right now there's Chris Fleming, Dean
19. Heckman, Mattie Marhine, Melissa Hunt, Catherine
20. Richard, Gladys Hale, Nicole Wilson, Amanda
21. Muleman, Shallyn Mosely, and Chrisy Harkins.
22.        Prior, it would have also included Tara
23. Love.  I believe that's all that can I remember at
24. this time.
25.     Q.  Is Tara Love still with MRA?

Page 14

1.      A.  She is not.
2.      Q.  Do you know why she left?
3.      A.  I do.
4.      Q.  Why?
5.      A.  Falsification of her time card.
6.      Q.  You listed out several people that are
7.  currently on Team 3.  Which of those individuals
8.  worked on the Mercy account, exclusively, prior to
9.  the consolidation?
10.     A.  Shallyn Mosely, Chrisy Harkins, Nicole
11. Wilson, Amanda Muleman, and Tara Love.
12.     Q.  Ms. Voorhies, when did you first learn
13. about this case?
14.     A.  Last week.
15.     Q.  Prior to last week, you never heard
16. about any litigation involving Ms. Hoops?
17.     A.  Never.
18.     Q.  Did Ms. Love tell that she was giving a
19. deposition in this case?
20.     A.  She did not.
21.     Q.  Do you recall anyone coming to you prior
22. to last week asking you for any information you
23. may have had regarding Cindy Hoops' account here
24. at MRA?
25.     A.  Nobody.  Never.

Page 15

1.      Q.  Have you had any conversations about
2.  this case with anyone other than a lawyer?
3.      A.  I have not.
4.      Q.  Have you gone back and looked at any
5.  documents relating to Cindy Hoops?
6.      A.  No.
7.      Q.  Have you gone back to look at any data
8.  on a computer --
9.      A.  No.
10.     Q.  -- relating to Ms. Hoops?
11.     A.  No.
12.     Q.  Do you know what month you became the
13. supervisor of Team 3?
14.     A.  August.  I believe it was '15.  2015.
15.     Q.  And you don't know who was working on
16. the Mercy account, either as team leader or
17. supervisor, prior to you in August of 2015?
18.     A.  No.  No, sir.  Not offhand.
19.     Q.  When you came on as supervisor of Team 3
20. and became responsible for the Mercy account, who
21. did you report to?
22.     A.  Kristina Jolley.
23.     Q.  And in August of 2015, what was Kristina
24. Jolley's title or job?
25.     A.  I don't know the official title.  She

Page 16

1.  was manager over the auto department.
2.      Q.  Do you still report to her today?
3.      A.  I do.
4.      Q.  Do you know how long Ms. Jolley has been
5.  with the company?
6.      A.  I do not.
7.      Q.  Was Ms. Jolley at MRA when you joined
8.  the company?
9.      A.  In 2010?
10.     Q.  Yes, ma'am.
11.     A.  I believe so, yes.
12.     Q.  So you report to Kristina Jolley as the
13. supervisor of Team 3?
14.     A.  Yes.
15.     Q.  How many other teams like yours report
16. to Ms. Jolley?
17.     A.  For the auto department, there would be
18. three other teams.
19.     Q.  I take it those are Teams 1, 2, and 4?
20.     A.  Correct.
21.     Q.  Does she supervise any other teams other
22. than the auto department teams?
23.     A.  Currently, yes.
24.     Q.  What other teams does she supervise?
25.     A.  TPL and PCC and Health.

**Provided by Stone & George Court Reporting (615) 268-1244**

Page 17

1.     Q. I got the TPL and the Health. What was
2. the other?
3.     A. PCC.
4.     Q. What is PCC?
5.     A. Our patient contact center.
6.     Q. Do you know who -- strike that.
7.     Do you know when Ms. Jolley began
8. supervising those other three groups?
9.     A. I don't.
10.    Q. Do you know who was supervising those
11. other groups before Ms. Jolley?
12.    A. Not offhand.
13.    Q. When you joined the Team 3 as supervisor
14. over the Mercy account, did you have to do some
15. things to learn about what the nature of MRA's
16. account with Mercy was?
17.     MR. O'BRIEN: Object to the form.
18. BY MR. SCHWARTZ:
19.    Q. Let me ask a different question. It was
20. a bad question.
21.     When you joined Team 3, what did you do
22. to familiarize yourself with the Mercy account?
23.    A. I reviewed the client profile.
24.    Q. Okay. What is the client profile?
25.    A. It lists specific information pertaining

Page 18

1. to that client. Do we bill government health for
2. them? Do we pursue liability for them? Things of
3. that nature.
4.    Q. Okay. I want to go through that with
5. you. Where would you find the client profile?
6.    A. Several areas. It would be attached --
7. there's a hyperlink in each account that we can
8. click on. There's also one on our main Share
9. Point page.
10.    Q. Does the client profile look the same
11. whether I access it by a hyperlink in each account
12. or the main Share Point page?
13.    A. Exactly the same.
14.    Q. How many pages is it, roughly?
15.    A. I would say roughly, maybe ten. That's
16. a guess.
17.    Q. Will you take me through and tell me, as
18. best you recall, what information would be on
19. Mercy's profile page?
20.    A. It would list their tax I.D., their
21. mailing address, their billing address, whether or
22. not we would work premises accounts. It lists
23. their liability, so what their threshold is for
24. liability if we were to pursue it.
25.    Q. What does that mean, "threshold for

Page 19

1. liability"?
2.    A. So if an account is under a thousand
3. dollars, we would not pursue liability.
4.    Q. But you still might pursue MedPay?
5.    A. Correct.
6.    Q. Do you believe that that's what the
7. threshold is, $1,000?
8.    A. It is $1,000.
9.    Q. Okay. I'm sorry. Go ahead.
10.    A. It lists if we are liability-elect for
11. certain government payers.
12.    Q. What does that mean?
13.    A. So some clients want us to pursue the
14. liability carrier before we bill or pursue
15. government health, Medicare. When I say "we,"
16. that doesn't mean MRA. It just means the
17. hospital. So the hospital wants to pursue and
18. bill Medicare before liability.
19.    Q. And what does Mercy do in that regard?
20.    MR. ALLRED: Objection. Beyond the
21. scope of the allowed discovery in this case. No
22. relevance to the facts of this case, which
23. discovery is limited to regarding Ms. Hoops.
24. BY MR. SCHWARTZ:
25.    Q. You can answer.

Page 20

1.     MR. O'BRIEN: I'll join the
2. objection, though. It doesn't have anything to do
3. with Hoops's claims whatsoever.
4.    You can answer.
5.     THE WITNESS: I believe it's
6. Medicare. I'm not sure what other government
7. payers offhand, but we would pursue liability
8. before we ask the client to bill Medicare.
9. BY MR. SCHWARTZ:
10.    Q. Okay. Can you continue on with what
11. else -- what other information is in the client
12. profile?
13.    A. It would list our account managers for
14. Mercy. It would --
15.    Q. Do you know who they are?
16.    A. It is -- you put me on the spot. I
17. can't think of, offhand. I'm sorry.
18.    Q. Okay. Is there more than one?
19.    A. There's only one.
20.    Q. Is it a man or a woman?
21.    A. I don't remember.
22.    Q. Is that somebody you regularly speak
23. with?
24.    A. I know who it is.
25.    Q. Okay. Great.

Page 21

1.      A.  It's Jackson.  It's a male.  I believe
2.  his last name is Tucker.
3.      Q.  Go on with the client profile, please.
4.      A.  It will list if we accept any discounts
5.  for MedPay.  So sometimes MedPay carriers will
6.  allow discounts.
7.      Q.  I'm not following.  What is that?  What
8.  is a discount for MedPay?
9.      A.  So a client may have a contract with,
10.  let's say, Coventry, which is a bill reviewer.  So
11.  if the client has a contract with them, we may
12.  accept a 75 percent payment.
13.      Q.  And when you say the client may have a
14.  contract, do you mean Mercy -- or the hospital?
15.      A.  The hospital.
16.      Q.  And would that contract be with the
17.  MedPay insurer?
18.      A.  (No verbal response.)
19.      Q.  Who would the contract be with that it
20.  allows you to discount?
21.      MR. O'BRIEN:  Object to legal
22.  conclusions and object to foundation.
23.      But if you understand the question
24.  and can answer it, you can answer it.
25.      MR. ALLRED:  I join.

Page 22

1.      THE WITNESS:  I believe it would be
2.  between the bill reviewer and the hospital.  I'm
3.  not 100 percent.
4.  BY MR. SCHWARTZ:
5.      Q.  What is a bill reviewer?
6.      A.  A third party.  So State Farm would send
7.  their bill to be reviewed by another company.
8.      Q.  Do you know if Mercy accepts any
9.  discounts with any providers?
10.      MR. ALLRED:  Objection.  Lack of
11.  foundation as to this witness testifying about
12.  Mercy's procedures with regard to bill collection.
13.  No foundation, and no establishment of her
14.  knowledge.  Just guesswork.
15.      MR. SCHWARTZ:  Yeah.  Let me
16.  rephrase the question.
17.  BY MR. SCHWARTZ:
18.      Q.  What does the patient profile -- strike
19.  that.
20.      What does the client profile form say in
21.  regards to the Mercy program in accepting
22.  discounts for MedPay?
23.      MR. O'BRIEN:  If you know what it
24.  says.  And don't guess or speculate.  But if you
25.  know, you can answer.

Page 23

1.      THE WITNESS:  I would have to look
2.  at it.  I don't know.
3.  BY MR. SCHWARTZ:
4.      Q.  In your experience, does State Farm
5.  MedPay use a bill reviewer?
6.      A.  I don't remember.
7.      Q.  What else would be in the client
8.  profile?
9.      A.  Without looking at it, I don't remember.
10.  Those would be some of the main points that would
11.  be listed in the profile.
12.      MR. SCHWARTZ:  Stephen, has the
13.  client profile for Mercy been produced in this
14.  case?
15.      MR. O'BRIEN:  I don't think so.
16.  BY MR. SCHWARTZ:
17.      Q.  You had said that this client profile
18.  can be accessed by way of a hyperlink in each
19.  account.  Can you explain that to me.
20.      A.  Each bill that comes in is attached to
21.  an account, the account number that we get from
22.  the provider.  And at the bottom of our program,
23.  it will list the account number, it will list
24.  provider that's associated with it, and it will
25.  list, I believe, the date of service.  And you can

Page 24

1.  click on the provider's name, and that's when it
2.  will pull up the client profile.
3.      Q.  Do you know if the client profile is
4.  updated from time to time?
5.      A.  It is.
6.      Q.  Do you know who is responsible for
7.  updating the client profile at MRA?
8.      A.  I don't know of everybody that would be.
9.  I can tell you that Jackson would be one of them,
10.  since he's the account manager.
11.      Q.  Can anyone at MRA update the profile?
12.      A.  No.
13.      Q.  So in other words, access to changes for
14.  the client profile can only be made by Mercy.
15.      A.  That I don't know.
16.      Q.  Do the auto claims reps have access to
17.  the client profile?
18.      A.  Yes.
19.      Q.  Are they trained on how to access the
20.  client profile?
21.      A.  Yes.
22.      Q.  Are they encouraged to look at the
23.  client profile in the course of their work in
24.  processing MedPay claims?
25.      A.  Yes.

Page 25

1.   Q.  Can you give me, in your experience,
2.  different scenarios where an auto claims rep may
3.  need to access the Mercy client profile?
4.   A.  To see if we work premises accounts, to
5.  see if we work comp accounts, what the threshold
6.  is to pursue a liability, if we're liability-elect
7.  for certain government payers.  Those would just
8.  be a few.
9.   Q.  Getting back to where we were prior to
10.  getting into the client profile, I asked you what
11.  you did to familiarize yourself with the Mercy
12.  account at MRA when you became supervisor of
13.  Team 3.  Was there anything else that you would
14.  have needed to look at when you became responsible
15.  for the Mercy team to familiarize yourself with
16.  the Mercy account?
17.   A.  No.
18.   Q.  That was the quintessential document?
19.   A.  Correct.
20.   Q.  Was there any other information
21.  available to you, if you wanted to look at it, to
22.  have an understanding as to what MRA -- strike
23.  that.
24.   Was there any other information that was
25.  available to you that you didn't access that would

Page 26

1.  have provided you information on what MRA does for
2.  Mercy?
3.   A.  Not that I can think of.
4.   Q.  Have you ever seen the document that has
5.  been marked as Exhibit 1?
6.   MR. O'BRIEN:  To Mr. O'Connell's
7.  deposition?
8.   MR. SCHWARTZ:  Yes.
9.   THE WITNESS:  (Reviews document.)
10.  No.  This does not look familiar.
11.  BY MR. SCHWARTZ:
12.   Q.  Okay.
13.   MR. ALLRED:  Off the record, Tom.
14.   (Whereupon, Mr. Allred exits the room
15.  following an off-the-record discussion.)
16.   MR. SCHWARTZ:  And for the record,
17.  Exhibit 1 from the O'Connell deposition is the
18.  Accident Claims Management Agreement between MRA
19.  and Mercy; is that correct?
20.   MR. O'BRIEN:  Well she doesn't
21.  know.
22.   MR. SCHWARTZ:  Well, no.  I'm
23.  asking you.
24.   MR. O'BRIEN:  That appears to be
25.  the document that you have there, yes.

Page 27

1.   You're going to have to swear me in
2.  next.
3.  BY MR. SCHWARTZ:
4.   Q.  Ms. Voorhies, let me show you what has
5.  been marked as Exhibit 5 in the O'Connell
6.  deposition, which is the Mercy Shared
7.  Understanding document.  I'll have you take a look
8.  at that and tell me if you've ever seen that
9.  before.
10.   A.  (Reviews document.)  It does not look
11.  familiar, no.
12.   Q.  Were there any other notes or memoranda
13.  or other documents available to you, other than
14.  the client profile, that told you what work MRA
15.  did for Mercy?
16.   A.  Not that I can recall.
17.   Q.  Prior to -- well, strike that.
18.   So can you tell me, as best you
19.  understand it, what MRA does for Mercy on the
20.  Mercy account?
21.   A.  We would receive the account.  It would
22.  be reviewed for leads.  So auto insurance, whether
23.  there's auto, health, or liability insurance.  We
24.  would then coordinate those insurance benefits
25.  starting with MedPay first.  From there, once

Page 28

1.  resolved -- by "resolved," it means whether MedPay
2.  is exhausted, we received payment, there is no
3.  MedPay -- we would move the account along,
4.  depending on what type of health insurance or if
5.  there is no health insurance.
6.   For Mercy, in particular, if there was
7.  Medicare and liability, we would bill liability
8.  and send it over to the liability department if it
9.  was over $1,000 balance.
10.   If there is no health, same process.  We
11.  would bill liability, send it over to liability to
12.  track if it was over $1,000.  If there was
13.  commercial health, we would return it back to the
14.  hospital for them to bill commercial at that time.
15.  We would request them to go ahead and bill
16.  commercial at that time.
17.   (Mr. Allred enters the room.)
18.  BY MR. SCHWARTZ:
19.   Q.  Does that summarize, basically, what MRA
20.  does for Mercy?
21.   A.  Yes.
22.   Q.  I want to go through a couple of those.
23.  First, let's talk about receiving the account.
24.   A.  Okay.
25.   Q.  What does that mean for the MRA/Mercy

Page 29

1.  account?
2.      A.  Typically, for any provider, we would
3.  get a bill electronically, and our data entry
4.  department would input that into the system and
5.  create an account for us to review.
6.      Q.  And when you say you receive a bill
7.  electronically, can you describe that for me?
8.      A.  You mean, like, what type of bill?
9.      Q.  Yeah.  I mean, is it a collection of
10. paperwork?  Is it a simple form?
11.     A.  That I don't know.
12.     Q.  Do you regularly see it?
13.     A.  I only see it once the account is
14. created, which, at that point, it becomes a UB-04.
15. So before it gets to me, I don't know if it comes
16. over as a UB-04 or if it's just information that
17. they create into a UB-04.  I don't know.
18.     Q.  Okay.  Can you tell us what a UB-04 is?
19.     A.  A bill.  That's the only thing I know it
20. as.
21.         MR. SCHWARTZ:  Exhibit 26, Mercy 30
22. through 34.
23.         MR. O'BRIEN:  And you're only
24. showing her the UB-04 out of there?
25.         MR. SCHWARTZ:  Yes.

Page 30

1.          MR. O'BRIEN:  Which is the first
2.  page.
3.          MR. SCHWARTZ:  Yes.
4.          MR. O'BRIEN:  All right.
5.          MR. SCHWARTZ:  You've got a good
6.  memory.
7.          MR. O'BRIEN:  I was just looking at
8.  it.
9.  BY MR. SCHWARTZ:
10.     Q.  Ma'am, let me show you what's been
11. marked as Exhibit 26.  And I'm going to just ask
12. you about the first page of this document which
13. has been Bates-stamped Mercy 30.  Will you take a
14. look at that for me, please.
15.     A.  Okay.  (Reviews document.)
16.     Q.  What is that document?
17.     A.  A UB-04.
18.     Q.  Okay.  Is that the form that you were
19. talking about earlier?
20.     A.  Yes.
21.     Q.  All right.  Does the billing in this
22. UB-04 format come to MRA from Mercy, or does MRA
23. create this form?
24.     A.  I don't know.
25.     Q.  Do you know what information Mercy sends

Page 31

1.  to MRA to start an account for a patient, and how
2.  it comes?
3.      A.  I don't.
4.      Q.  Is that not something that you regularly
5.  work with?
6.      A.  I don't.  It's a completely different
7.  department, so I would not have any real knowledge
8.  of how it comes over.
9.      Q.  Okay.  Could you explain to me the
10. department that receives that information and tell
11. me about that.
12.     A.  It's data entry.  So they handle any
13. incoming accounts and claims that we get.
14.     Q.  So for a new patient, the information
15. sent to MRA from Mercy goes first to the data
16. entry department?
17.     A.  I believe so, yes.
18.     Q.  Are there any data entry department
19. employees that specifically work the Mercy
20. account?
21.     A.  I don't know.
22.     Q.  Do you know who is the supervisor of the
23. data entry department?
24.     A.  The manager would be Michael Fields.
25.     Q.  So whatever Mercy sends over to MRA's

Page 32

1.  data entry department, the data entry department
2.  then works on that information and presents that
3.  information in some format to the auto department;
4.  is that correct?
5.      A.  Yes.
6.      Q.  And what does the auto department
7.  typically receive from the data entry department
8.  on Mercy patients?
9.      A.  It's an entire account that's been
10. created, so it will list the bill.  It will list
11. patient's information.  So contact information,
12. name, the account number, and then if there are
13. any leads that came over from the hospital.  By
14. "leads," again, I mean insurances, whether that's
15. auto or health.
16.     Q.  Okay.  So it has the patient contact
17. information?
18.     A.  Correct.
19.     Q.  The billing information?
20.     A.  Yes.
21.     Q.  And you said the third thing was leads?
22.     A.  Yes.
23.     Q.  Are those three things --
24.         MR. O'BRIEN:  I think she said
25. account number third, but ...

Page 33

1.  BY MR. SCHWARTZ:
2.      Q.  I'm sorry.  Well, let me go back and
3.  make sure.  We have the patient information, the
4.  account number --
5.      A.  Correct.
6.      Q.  -- the bill --
7.      A.  Yes.
8.      Q.  -- and the leads.
9.      A.  And leads, yes.
10.     Q.  Those are the four things that you
11. receive -- strike that.
12.         Those are the four categories of
13. information that the auto department receives from
14. the data department at MRA?
15.     A.  I mean, there's other things we receive,
16. like, I mean, they attach an entire account to
17. give to us.  So it's got the client profile
18. attached.  It's got the -- it's got Mercy.  It's
19. got the provider's name.  I mean, there's a lot of
20. different things that are attached to an account
21. other than those four things.
22.     Q.  What does that look like?  Can you kind
23. of describe it for me.  Is it a --
24.     A.  It's different tabs.  So we have an
25. in-house built program.  So when we get the

Page 34

1.  account, there's tabs.  We just click on each tab
2.  and it'll -- it has different information in each
3.  one.
4.      Q.  Okay.
5.      A.  It's hard to really explain.
6.      Q.  Okay.  But getting back to what MRA does
7.  for Mercy, you said the first thing is, is you
8.  receive the account.  Is what you just described
9.  for me what you meant by receiving the account?
10.     A.  Yes.
11.     Q.  And then you said once you receive the
12. account, you coordinate those insurance benefits,
13. starting with MedPay first; is that correct?
14.     A.  Yes.
15.     Q.  Okay.  Can tell me what you do next with
16. the information that you receive.
17.     A.  I don't think I really understand your
18. question.  I'm sorry.
19.     Q.  Yeah.  No problem.  Back before we got
20. into the account and how you receive it, you
21. basically gave me a summary of what MRA does for
22. Mercy under the Mercy account.  And you said after
23. you receive the account, the auto department
24. coordinates those insurance benefits, starting
25. with MedPay first.

Page 35

1.      A.  (Nods head.)
2.      Q.  Do you recall telling me that?
3.      A.  Yes.
4.      Q.  Tell me what you mean by that, what that
5.  means.  And I want to take it through a step at a
6.  time.
7.      A.  Okay.  So if we have a no-fault
8.  first-party lead, we would call that insurance
9.  carrier.  We would determine if a claim has
10. already been opened, and then we would ask if
11. MedPay is available for that patient.
12.         If we determine there is MedPay and the
13. claim has already been filed, we would go ahead
14. and obtain the adjuster's information and send the
15. bill over to them.
16.     Q.  I want to talk to you a little bit about
17. that.  Where does the no-fault lead come from?
18.     A.  Several different ways.
19.     Q.  Okay.  Explain to me what the various
20. ways are.
21.     A.  It can come from the provider.  It can
22. come from a contact we had with the patient.  Or
23. it can come from a program that runs in the
24. background to look for any claims that may be open
25. for the patient.

Page 36

1.      Q.  And I take it if the provider gives you
2.  the no-fault lead, it's in the information that
3.  you described as receiving the account?
4.      A.  Yes.
5.      Q.  Okay.  And then the next place that a
6.  lead could come from, you said, is a patient
7.  contact; is that right?
8.      A.  Yes.
9.      Q.  Who at MRA does the patient contact for
10. the Mercy account?
11.     A.  Again, it will vary.  If there are no
12. leads on an account, then our PCC department would
13. make contact to the patient.
14.     Q.  PCC?
15.     A.  Yes.  However, if there's a lead that
16. comes in and it's labeled as no-fault but we
17. determine it's liability, then my team would keep
18. it and we would make a contact to the patient.
19.     Q.  Can you explain that to me.
20.     A.  So, for example, if a State Farm lead
21. comes over, we assume that it's no-fault until we
22. call.  So if my team called State Farm and we
23. determined that's actually a third-party liability
24. claim, we would first see if they have
25. first-party.  If they don't, my team makes a call

Page 37

1.  to the patient to see if they've opened a claim
2.  with their first-party carrier.
3.      Q.  I want to talk to you about the patient
4.  contact.  Are people in the auto department
5.  trained as to what to say to the patient when they
6.  call?
7.      A.  Yes.
8.      Q.  Tell me about that.
9.      A.  We explain that our calls are recorded.
10.  We explain coordination of benefits and how that
11.  works, that their no-fault carrier is primary, and
12.  then we lay out the process of how we bill or how
13.  billing is done in general.  And then we ask if
14.  they have opened a claim with their insurance
15.  carrier.
16.      Q.  And how is the information provided to
17.  the auto claims reps as to what they should say?
18.      A.  They get that information during
19.  training.
20.      Q.  And have you ever seen any written
21.  documentation that sets forth what they're
22.  supposed to say when they contact the patient?
23.      A.  Yes.
24.      Q.  You have seen that?
25.      A.  Yes.

Page 38

1.      Q.  And where did you see that?
2.      A.  It's in our training documents that are
3.  on our Share Point page.
4.      Q.  If the patient doesn't answer the phone
5.  and you get an answering machine, are MRA
6.  employees told what to say on the message?
7.      A.  I believe that is in our training as
8.  well, yes.
9.      Q.  And as best you recall, what does that
10.  training material say?
11.      A.  I don't remember.  Something -- I don't
12.  want to guess.  I don't remember.
13.      Q.  Do you know how they identify
14.  themselves?
15.      A.  As calling on behalf of the provider.
16.  So they give their name.  "I'm calling on behalf
17.  of Mercy."  That's how we identify ourselves.
18.      Q.  Do you ever identify yourselves as MRA?
19.      A.  Not to a patient.
20.      Q.  You had said that the calls -- that the
21.  patient is told that the calls are recorded.  Are
22.  all calls recorded?
23.      A.  Not for everybody, but for my team, yes,
24.  every single call.
25.      Q.  Do you monitor those calls?

Page 39

1.      A.  Not regularly.
2.      Q.  What would cause you to go back and
3.  listen to a recorded call?
4.      A.  For training purposes, if I'm looking at
5.  a work review, if there is a complaint from any
6.  individual, whether that's the patient, an
7.  insurance carrier.  That's all I can think of
8.  right now.
9.      Q.  Do you know how long they're kept?
10.      A.  I don't.
11.      Q.  Are messages, phone messages, left for a
12.  patient recorded?
13.      A.  Yes.  Every outbound call is recorded.
14.      Q.  You had said that the auto claims rep
15.  explains coordination of benefits to the patient.
16.  Can you tell me how they go about doing that and
17.  what they say.
18.      A.  This would not be verbatim.  We would
19.  explain -- we would confirm that they're in an
20.  auto accident.  We would then state, "We're
21.  coordinating your insurance benefits.  I
22.  understand you were in an accident.  I would like
23.  to see if you have filed a claim with your auto
24.  insurance."  They would ask why.
25.          We would say, "It's a coverage on your

Page 40

1.  no-fault -- or it's a coverage on your auto
2.  policy, regardless of who's at fault.  It would be
3.  primary, and it would pay out to your limits until
4.  you settle.  Or if there is no settlement, because
5.  there's no liability claim, it would minimize your
6.  out-of-pocket expenses.
7.          From there, we let them know if they did
8.  not have the coverage, we would bill their -- the
9.  hospital would bill their health insurance and
10.  then liability would pay out once they have a
11.  settlement, again, if there is a liability claim.
12.      Q.  So the auto claims rep is told to tell
13.  the patient that the patient's MedPay is primary?
14.      A.  Yes.
15.      Q.  Is the auto claims rep trained or told
16.  how to handle a situation if the patient says,
17.  "I'm not going to tell you who my auto insurance
18.  is with"?
19.      A.  Yes.
20.      Q.  What do you do then?
21.      A.  We let them --
22.      Q.  Or -- strike that.
23.          What are they told to do in that
24.  situation where the patient says that they won't
25.  tell them who their auto coverage is with?

Page 41

1.        A.  Well --
2.            MR. O'BRIEN:  Object to relevance.
3.   It's not our situation.  I don't ...
4.            THE WITNESS:  We let them know --
5.   at that point, we would send -- depending on their
6.   health insurance, we would send the account back
7.   to the hospital for health to be billed or we
8.   would track the liability.
9.   BY MR. SCHWARTZ:
10.       Q.  Is the auto claims rep instructed how to
11.  handle a scenario where the patient tells them
12.  that they don't want their MedPay billed?
13.       A.  Yes.
14.       Q.  What?
15.           MR. O'BRIEN:  Same objection, to
16.  relevance.  It's not our scenario here.  This is
17.  beyond the scope of discovery.
18.           But you can answer his question.
19.           THE WITNESS:  We don't do anything.
20.  The same thing, depending on the health.  What the
21.  situation is would determine what we do next, send
22.  it over to liability or return it.
23.  BY MR. SCHWARTZ:
24.       Q.  Getting back to leads.  You had said
25.  that the MedPay lead might come from the provider

Page 42

1.   and it might come from the patient, or there was a
2.   third category that you had mentioned, which is a
3.   program that runs from the background, I believe,
4.   is what you said.
5.        A.  Yes.
6.        Q.  Tell me what you mean by that third
7.   category.
8.        A.  If there are no leads that come through,
9.   there's a button that data entry -- it's not a
10.  button; it's a selection.  It will say actionable
11.  leads.  They would say no.  And then a system goes
12.  out and tries to locate a claim for the patient.
13.  So there's certain criteria that this program
14.  looks.  So the patient's name and some other items
15.  I'm not aware of runs in the background and it
16.  will pull back any claims that are open for the
17.  patient.
18.       Q.  So when you say that the program runs in
19.  the background, what do -- I'm not sure I
20.  understand that.
21.       A.  It's just a -- it just runs -- like, we
22.  don't do anything.  It's just a system.  It -- I
23.  guess -- I don't how it works, to be honest.  It
24.  just runs in the background.  It just goes out
25.  into internet world and pulls back claims that are

Page 43

1.   associated with that patient's information.
2.        Q.  Okay.  What does somebody in the auto
3.   department have to do to trigger that program that
4.   runs in the background?
5.        A.  My team, auto team, does nothing.  It's
6.   not us.  It's data entry.
7.        Q.  But do you have to -- does somebody on
8.   your team have to request that?
9.        A.  No.
10.       Q.  Okay.  So if the account is -- strike
11.  that.
12.           When the account is received by data
13.  entry, if there's no leads from the provider, then
14.  the data entry department requests that this
15.  program run in the background to go out and get
16.  information?
17.       A.  Yes.
18.       Q.  Okay.  So someone in the data entry
19.  department runs this program prior to your
20.  receiving the account from data entry?
21.           MR. O'BRIEN:  Object to foundation.
22.           If you understand the process and
23.  know, you can answer his question.
24.           THE WITNESS:  Can you repeat the
25.  question?

Page 44

1.   BY MR. SCHWARTZ:
2.        Q.  Sure.  You were telling me about this
3.   third category of a lead, and it comes from a
4.   program that runs in the background.  And you had
5.   said that your department doesn't have anything to
6.   do with that, and your department doesn't even ask
7.   that that program be run.  But it is run, if it is
8.   run, by the data entry department prior to you
9.   receiving the account.  Do I have that correct?
10.       A.  Yes.
11.       Q.  Do you have any knowledge as to what
12.  program is used or how it works in the data entry
13.  department?
14.       A.  I do not.
15.       Q.  Can you tell by looking at the account
16.  information that you receive from data entry
17.  whether or not this program run in the background
18.  has been used for a particular patient's account?
19.       A.  Yes.
20.       Q.  How do you know that?
21.       A.  The bottom of the account, there is a
22.  notes tab, and if I click on that, I can see if
23.  that program ran or not.
24.       Q.  All right.  So at this point, by the
25.  time you receive the information from the data

Page 45

1.  entry, you -- let's assume that you have a
2.  no-fault lead.  What do you do with that no-fault
3.  lead?
4.      A.  We would call the insurance carrier, ask
5.  if a claim was open, and then ask if there is
6.  no-fault coverage available to the patient.  If
7.  there is, we would obtain the adjuster handling
8.  that portion of the claim, and we would send our
9.  bill over to be on file.
10.     Q.  Okay.
11.         MR. SCHWARTZ:  Are you doing okay?
12.         THE WITNESS:  Yes.
13.         MR. SCHWARTZ:  Anybody need a break
14. or anything before we get into another area?
15.         (No verbal response.)
16. BY MR. SCHWARTZ:
17.     Q.  Are calls to the no-fault insurance
18. carrier recorded?
19.     A.  Yes.
20.     Q.  Are auto claims reps trained as to what
21. to say to the insurance company?
22.     A.  Yes.  There's not a particular verbiage,
23. but they are trained to ask certain questions.
24.     Q.  Is it similar to how they're trained to
25. speak to a patient?

Page 46

1.      A.  (No verbal response.)
2.      Q.  I mean, in other words, is it the same
3.  kind of guidelines or is there a script or -- how
4.  is the training?  I have not seen the training.
5.      A.  The patient calls have a particular --
6.  well, if we leave a message there's a particular
7.  script.  But no, there's -- I don't think there's
8.  a particular script for either one.
9.      Q.  Okay.  Are there guidelines?
10.     A.  Yes.
11.     Q.  Tell me about the guidelines, as you
12. recall them.
13.         MR. O'BRIEN:  Is there a point to
14. any of this?
15.         MR. SCHWARTZ:  Yes.
16.         MR. O'BRIEN:  I guess I'm just
17. missing the relevance of what training our people
18. have in talking to insurance adjusters.
19.         MR. SCHWARTZ:  Well, we don't know
20. what MRA told State Farm when State Farm called.
21. We haven't been provided a recording of that.  We
22. haven't seen a transcript of that.
23.         MR. O'BRIEN:  And what claim
24. relates to whatever we might have said about ...
25.         MR. SCHWARTZ:  I'm sorry?

Page 47

1.          MR. O'BRIEN:  What claim in this
2.  case relates to whatever conversations we might
3.  have had with State Farm?
4.          MR. SCHWARTZ:  Most of them.
5.          MR. O'BRIEN:  You have no claims
6.  about us making misrepresentations to State Farm,
7.  as best I know, right?
8.          MR. SCHWARTZ:  Well, I --
9.          MR. O'BRIEN:  Or any
10. representations to State Farm.  So I guess I just
11. am missing the point.
12.         MR. SCHWARTZ:  Well, at the heart
13. of our whole cause of action is how Mercy and MRA
14. billed the auto MedPay.
15.         MR. O'BRIEN:  Right.
16.         MR. SCHWARTZ:  We claim that they
17. shouldn't have.
18.         MR. O'BRIEN:  On what basis.
19.         MR. SCHWARTZ:  It's in our
20. petition.
21.         MR. O'BRIEN:  Well, okay.  You --
22. okay.
23.         MR. SCHWARTZ:  I mean, it's
24. certainly relevant and discoverable.  I mean,
25. if -- if, you know --

Page 48

1.          MR. O'BRIEN:  What's relevant and
2.  discoverable?
3.          MR. SCHWARTZ:  How they went about
4.  calling and making a claim.
5.          MR. O'BRIEN:  I'd like discovery on
6.  why you think there's a claim, why you think that
7.  has any pertinence whatsoever, because I don't
8.  think there's a legal basis to any of this stuff.
9.          MR. SCHWARTZ:  Well, you can direct
10. her not to answer.
11.         MR. O'BRIEN:  I -- okay.  I will
12. not instruct her not to answer, but I think this
13. is all pointless, and I think it's beyond the --
14. it's certain -- I'm not hearing anything that
15. relates to Hoops.
16.         THE WITNESS:  I don't remember the
17. question.
18.         MR. SCHWARTZ:  I'm sorry.  Can you
19. go back and read it.
20.         (Whereupon, the requested question
21. was read back by the reporter.)
22.         THE WITNESS:  To an insurance
23. carrier, correct?
24. BY MR. SCHWARTZ:
25.     Q.  Yes, ma'am.

Page 49

1.  A.  We just ask if there's a claim open for
2. a patient.  We give them the patient's name, a
3. claim number, if we have it, and the date of
4. injury.
5.  Q.  How do they identify themselves?
6.  A.  How does who identify themselves?
7.  Q.  How does the MRA employee identify
8. themselves to the insurance company?
9.  A.  "Hi. My name is so-and-so. I'm calling
10. on behalf of so-and-so."
11.  Q.  Do they say "on behalf of Mercy"?
12.  A.  If that's who we're calling for, yes.
13.  Q.  And then you tell them the patient's
14. name and then -- continue on, please.
15.  A.  We ask -- we say, "I'm trying to locate
16. a claim for this patient.  Can you see if there is
17. one?"
18.  Depending on what criteria they ask for,
19. that'll say, "Yes.  Here's the claim number.
20. Here's the adjuster handling it." And then we
21. either ask them or the adjuster what type of
22. coverage is available.  So is this a no-fault
23. claim?  Is this a liability claim?
24.  Q.  Does the MRA employee tell the auto
25. insurance company rep that the MedPay is primary?

Page 50

1.  A.  No.
2.  Q.  Do you -- strike that.
3.  Does the MRA employee tell the auto
4. insurance company that they are doing a
5. coordination of benefits?
6.  A.  There's a possibility.
7.  Q.  Does the MRA employee tell the auto
8. insurance carrier that the patient has health
9. insurance, if the patient has health insurance?
10.  A.  No.
11.  Q.  Is the MRA employee instructed not to
12. tell the auto insurance company that the patient
13. has health insurance?
14.  A.  I don't think there's ever been any word
15. of that.  I don't -- I don't -- I don't know.
16.  Q.  You don't recall that being discussed.
17.  A.  No, I don't.
18.  Q.  So what happens next?  Let's assume that
19. you talk with the insurance company and they tell
20. you that the patient does, in fact, have auto
21. MedPay.  What does the MRA employee do next?
22.  A.  Fax over our bill.
23.  Q.  Okay.  Do you fax over the bill even if
24. you haven't spoken with the patient yet?
25.  A.  Yes.

Page 51

1.  Q.  Do you fax over the bill as soon as you
2. receive confirmation from the auto insurance
3. company that the patient has MedPay?
4.  A.  Yes.
5.  Q.  Is there any criteria at MRA wherein
6. auto claims representatives are instructed to
7. first try to reach the patient prior to sending
8. that bill over to the auto MedPay?
9.  A.  No.
10.  Q.  Are MRA employees instructed to contact
11. the patient and give them a choice as to whether
12. or not a bill is submitted to auto MedPay?
13.  A.  No.
14.  Q.  In the conversation that MRA auto reps
15. have with the patient, are they instructed to tell
16. the patient that the patient has a choice as to
17. whether or not their bill is sent to auto MedPay?
18.  MR. O'BRIEN:  Object. Assumes
19. facts not in evidence.
20.  MR. ALLRED:  Objection.
21.  MR. O'BRIEN:  Because she doesn't
22. have a choice.
23.  MR. ALLRED:  I join in that
24. objection.  There's no foundation to the question
25. that there's any obligation on behalf of MRA or

Page 52

1. Mercy to apprise a patient about supposed rights
2. that don't exist.
3.  MR. O'BRIEN:  Let me just object,
4. too, that it's calling for a legal conclusion as
5. well.  So I'll just add that as a basis for the
6. objection.
7.  You can answer.
8.  THE WITNESS:  No.
9.  MR. ALLRED:  Did you get my
10. objection, Ms. Reporter?
11.  THE REPORTER:  Yes, I did.
12. BY MR. SCHWARTZ:
13.  Q.  Just to confirm, you were not involved
14. in the implementation of the Mercy account at MRA.
15.  A.  Correct, I was not.
16.  MR. SCHWARTZ:  Let's go off the
17. record for a minute.
18.  (Whereupon, a discussion off the
19. record occurred.)
20. BY MR. SCHWARTZ:
21.  Q.  Let me hand to you what's been marked as
22. Exhibit Number 12 from the O'Connell deposition.
23. It's a pretty good stack of documents.  And I'm
24. going to ask you to take me through it and explain
25. it to me.  So I'm going to give it to you and give

Page 53

1.  you a chance to look over it and familiarize
2.  yourself with it before I start asking you
3.  questions.  Okay?
4.      A.  Okay.
5.      Q.  And you take your time, and you sort of
6.  tell me when you're ready.  And we'll be going
7.  through it so it's not like you have to go through
8.  and identify everything and memorize it.  Just
9.  look through to make sure you're familiar with the
10. various sections of it.
11.          MR. O'BRIEN:  Of documents like
12. this one in particular, not of this particular
13. document.
14.          MR. SCHWARTZ:  Well, both.
15.          MR. O'BRIEN:  Okay.
16.          MR. SCHWARTZ:  I'm going to ask her
17. about that type of document, and then I'm going to
18. have her take me through it.
19.          If you remember, when we asked
20. Ms. Love, she kind of said she wasn't -- and we're
21. also going to talk about it today, so --
22.          MR. O'BRIEN:  I understand.
23.          MR. SCHWARTZ:  -- whichever.
24.          MR. O'BRIEN:  But I think she's
25. able to talk about the documents in general.

Page 54

1.  Whether she knows these specific entries or this
2.  specific case, you can ask her.  I just don't want
3.  to mix the two together, her general knowledge and
4.  her knowledge of Hoops.
5.  BY MR. SCHWARTZ:
6.      Q.  Ma'am, have you gone through Exhibit 12?
7.      A.  I have looked at this, yes.
8.      Q.  Okay.  And if you look at the top
9.  right-hand corner of those various pages, it looks
10. to me like there are a series of documents here.
11. In other words, the first two pages say 1 of 2 and
12. 2 of 2.  And there's another document that has
13. three pages and another document that has nine
14. pages.  Do you see that?
15.     A.  Yes.
16.     Q.  Okay.  I just wanted to kind of point
17. that out to you.
18.     A.  Okay.
19.     Q.  Can you tell me, generally speaking,
20. what do you call these types of documents that
21. have been marked as Exhibit 12?
22.     A.  They would be the history of an account.
23.          MR. O'BRIEN:  And just for fairness
24. to you, we, MRA, put these documents together and
25. produced them to Mr. Schwartz.  Mr. Schwartz

Page 55

1.  compiled them as -- all, 1 through 75, as they're
2.  numbered there.  Whether that's the way you see
3.  them or use them or not, that's the way we gave
4.  them to Mr. Schwartz.  That's how he has them.
5.  But I don't know that it's fair to you to say that
6.  1 through 175 all go together in one little fell
7.  swoop the way he's packaged them up.
8.  BY MR. SCHWARTZ:
9.      Q.  Right.  I agree with that.  And that's
10. kind of why I was trying to point out to you, in
11. the top right-hand corner that this exhibit is,
12. Exhibit 12, is actually a collection of documents
13. that were Bates-stamped 1 through 75 and produced
14. to me.  So I don't know what they are and how they
15. differ from one another or where they come from or
16. really anything about them.
17.     A.  Okay.
18.     Q.  So what I'm asking you to do is just
19. explain to me generally what these various
20. documents are.  And we can start at the beginning
21. and you can kind of tell me what it is, where I
22. would find this, and what kind of information it
23. would tell us.
24.     A.  So this would be -- these would be --
25. this information, you would find at the bottom of

Page 56

1.  the account, so where all these tabs are.  So it
2.  looks like this one is the history of the account.
3.      Q.  Okay.  When you say "this one," are you
4.  looking at a certain number of pages?
5.      A.  From what I can see, all of them -- no.
6.      Q.  Well, take your time and look to make
7.  sure that that's what they all are.
8.      A.  (Reviews document.)  So the first
9.  39 pages would be the history of an account.
10.     Q.  And can you tell me what that means,
11. "history of an account"?
12.     A.  It will go through what has taken place
13. on the account.  So when the account was
14. originally created in data entry, what has been
15. done, what calls have been made, what changes have
16. been made, if there's any leads that have been
17. added to the account, who has been in the account,
18. and who has done certain things to the account.
19.     Q.  Okay.  So the first 39 pages is the
20. history of the account.  And is it organized --
21. remember, I had told you at the top right-hand
22. corner, there is a page 1 of 2, that kind of
23. thing?
24.     A.  Uh-huh.
25.     Q.  Is this organized by date?  In other

1.   words, if we look at the first two pages, it looks
2.   like, to me, that that's from 6/6/16; is that
3.   correct?
4.        MR. O'BRIEN:  Let me just object to
5.   foundation.
6.       So to the extent you're speaking
7.   about this from your general experience and you
8.   guys are talking about these documents, that's
9.   fine.  I just don't want it -- frankly, if you
10.  have specific information about this specific
11.  history and know it, that's fine, too.  I just
12.  don't want to mix those two together.  So if
13.  you're answering because you know MRA generally
14.  keeps these documents, I want that clear.
15.      If you're answering because you know
16.  exactly what's on these pages because you've got
17.  information about these particular pages, that's
18.  certainly -- let's make that clear, too.
19.      So I don't know what your foundation
20.  is for answering his questions.  That's the reason
21.  for my objection.
22.       MR. SCHWARTZ:  All right.  Well,
23.  let me clarify.
24.  BY MR. SCHWARTZ:
25.    Q.  At this point, I'm not asking about any

1.   specific information in these documents with
2.   regards to Ms. Hoops.  I'm trying to understand
3.   what these documents are and how MRA keeps them
4.   and retrieves them.  Do you follow me?
5.    A.  Yes.
6.    Q.  So I guess my question to you is does
7.   it -- in your experience with account history
8.   documents, does it appear to you that the account
9.   history documents are organized by date?
10.    A.  They are.  So there's a tab.  Once you
11.  go into the history tab, there's a date tab as
12.  well, and it starts the newest date that the
13.  account has been accessed and goes down to the
14.  oldest date.
15.    Q.  So, for instance, if we look at these
16.  particular pages, does it appear to you that the
17.  first two pages of the exhibit set forth the
18.  activities for this account on 6/6/16?
19.    A.  Correct.
20.    Q.  And then, for example -- and we won't go
21.  through the whole thing -- but the next three
22.  pages following that set forth the activities on
23.  6/7/16.
24.    A.  Yes.
25.    Q.  And do these account history documents

1.   pull together the activities at MRA for all
2.   departments, such as data entry, liability, auto,
3.   so on and so forth?
4.    A.  Yes.
5.    Q.  All right.  We're going to come back to
6.   these, because I'm going to ask you if you can
7.   understand specifically what these say.
8.    A.  Okay.
9.    Q.  But let's go on to the next collection
10.  of documents that appears to me to be -- well,
11.  let's go on to page 40.  And what I mean by
12.  page 40, the MRA number at the bottom, right-hand
13.  corner.
14.    A.  I'm there.
15.    Q.  What -- strike that.
16.      Can you describe for me the next
17.  documents and what they are that begin at 40.
18.    A.  (Reviews document.)  So 40 through 69
19.  would be our notes tab, which gives you
20.  information as to if that program I spoke about
21.  earlier ran in the background.  It also provides
22.  you with calls that have been made or any letters
23.  that have been sent.
24.    Q.  So the notes tab, which is pages 40
25.  through 69 include information on calls made?

1.    A.  Yes.
2.    Q.  And letters sent?
3.    A.  Yes.
4.    Q.  Any other type of activity that's set
5.   forth in the notes section?
6.    A.  That program that I spoke about earlier,
7.   where it tries to obtain leads for us.
8.    Q.  Anything other than those three
9.   categories?
10.    A.  I think that's -- I think that's it.  It
11.  will give when the account was closed.  And I
12.  believe that's all.  I could be mistaken.
13.    Q.  Okay.  Let's go on to the next section.
14.       MR. O'BRIEN:  You can take it apart
15.  if you want to, if that's helpful.
16.       THE WITNESS:  Okay.
17.      They appear to be our call forms.
18.  BY MR. SCHWARTZ:
19.    Q.  70 through ...
20.    A.  75.
21.    Q.  75.  And what are call forms?
22.    A.  Any time we call an individual, whether
23.  that's the patient, attorney, an insurance
24.  carrier, we create a call form.  And it will list
25.  the information that we were able to obtain.

Page 61

1.    Q.  Would there be a call form for every
2.  call that's made?
3.    A.  There should be.
4.    Q.  At least that's the rule at MRA, is that
5.  if you make a call, you're supposed to fill out a
6.  call form?
7.    A.  Yes.
8.    Q.  Are you familiar with any documents,
9.  other than these three categories that we've just
10.  discussed and are set forth in Exhibit 12, that
11.  would tell us about MRA's activities with regard
12.  to a particular patient?
13.    A.  Not that I'm aware of.
14.    Q.  I take it that the recordings, the call
15.  recordings, would be something separate than these
16.  things?
17.    A.  Yes.
18.    Q.  Anything other than those?
19.    A.  Not that I'm aware of.
20.    Q.  All right.  Okay.  What I would like to
21.  do -- and we'll go through each of these three
22.  categories.  And I'm going to ask you if you will
23.  take me through these dates and explain to me the
24.  information that's on there, and tell me if you
25.  can tell by looking at these documents what

Page 62

1.  transpired with regards to MRA's activities
2.  relating to Ms. Hoops.
3.    A.  Okay.
4.    Q.  Do you understand that?
5.    A.  Yes.
6.    Q.  Okay.  Great.  Let's start with 6/6 of
7.  '16.  On that second box, next to "Motor Vehicle
8.  Accident," there's a number there.  Do you know
9.  what that is?
10.    A.  Are you speaking of the Number 434?
11.  That number?
12.    Q.  Yes, ma'am.
13.    A.  That would be MRA's event number.
14.    Q.  What is an "event number"?
15.    A.  That's how we -- that's how we associate
16.  a patient.  That's basically our account number
17.  for the patient.
18.    Q.  So in other words, an event number is an
19.  account number for the patient.
20.    A.  Correct, that MRA has created for that
21.  patient.
22.    Q.  And so, for instance, for this whole
23.  thing involving Cindy Hoops, there would be one
24.  event number.
25.    A.  Yes.

Page 63

1.    Q.  All right.  Thank you.  And to the right
2.  of that, there are two dates, 5/31/16 and 6/6/16.
3.  What are those?
4.    A.  Those would be -- typically, those are
5.  dates of service so that -- she would have been
6.  seen from 5/31 to 6/6, or it could be from what
7.  the UB came over as her dates of service.
8.    Q.  You mean dates of service at the
9.  hospital?
10.    A.  Correct.
11.    Q.  And then to the right of that, there's
12.  the word "closed."
13.    A.  Yes.
14.    Q.  What does that mean?
15.    A.  It means the account is closed.
16.    Q.  Does it mean that it was closed on
17.  6/6/16, when this -- these two documents were
18.  made, or closed when somebody went onto the system
19.  and printed these documents off?
20.    MR. O'BRIEN:  Well, I'm not sure
21.  the document was made on 6/6/16.  I won't agree
22.  with you there.
23.    MR. SCHWARTZ:  Well, I guess what I
24.  was -- the events --
25.    MR. O'BRIEN:  I'll agree with you

Page 64

1.  the event is described there --
2.    MR. SCHWARTZ:  Okay.  Well, let's
3.  verify so that we're on the same page.
4.    The events set forth in this two-page
5.  document track the events of 6/6/16, but the
6.  document was created when it was printed off at a
7.  later date.  Do I have that right?
8.    MR. O'BRIEN:  That would be my
9.  understanding.  I'm not sure she -- the witness is
10.  going to know at all.  But you and I can probably
11.  agree to something like that.
12.    MR. SCHWARTZ:  Okay.  Can we just
13.  stipulate to that --
14.    MR. O'BRIEN:  There is a date of
15.  January of 2017 at the bottom right --
16.    MR. SCHWARTZ:  Yeah, January 6,
17.  2017.  That's when these were --
18.    MR. O'BRIEN:  Which is probably our
19.  production page -- yeah, that's probably when we
20.  were gathering the documents to produce --
21.    MR. SCHWARTZ:  And that's when they
22.  were printed off.
23.    MR. O'BRIEN:  I believe that's
24.  right.
25.    MR. SCHWARTZ:  All right.

Page 65

1.  BY MR. SCHWARTZ:
2.      Q.  So as you understand it, does that mean
3.  that it was closed as of that date?
4.      A.  Yes.
5.      Q.  Okay.  "Driver contact attempts," what
6.  does that mean?
7.      A.  It means we were made aware that the
8.  patient was the driver in the accident, and we
9.  made two contact attempts to her.  So phone calls.
10.     Q.  Okay.
11.         MR. O'BRIEN:  And, again, I just
12.  want it clear that she's reading and interpreting
13.  these documents.  You haven't asked her if she is
14.  aware of Hoops or the situation.  So I don't know
15.  if she's answering your question because she knows
16.  Hoops was -- we tried -- MRA tried to call Hoops
17.  twice or whether she's just reading the document.
18.         MR. SCHWARTZ:  Okay.
19.         MR. O'BRIEN:  But I assume that
20.  we're all comfortable that she's --
21.         MR. SCHWARTZ:  Okay.  Yeah.  No.  I
22.  appreciate that.  That's a good -- that's a good
23.  point.
24.  BY MR. SCHWARTZ:
25.     Q.  Let's set these documents aside for a

Page 66

1.  second and let me just ask you a few questions.
2.      A.  Okay.
3.      Q.  Do you have any recollection, as you sit
4.  here today, separate and away from the documents
5.  we have in front of us, as to MRA's handling of
6.  Cindy Hoops' file?
7.      A.  I do not have any recollection.
8.      Q.  Do you know if you had any personal
9.  involvement other than your work as a supervisor
10.  of the Team 3 that handles the Mercy account
11.  relating to Hoops' file?
12.     A.  I don't remember.
13.     Q.  So as I'm asking you these questions,
14.  you're going to be looking at these documents and
15.  doing the best you can to interpret them for me,
16.  but you're getting the investigation from these
17.  documents, not any personal knowledge that you
18.  have.
19.     A.  Correct.
20.     Q.  Okay.  So let's get back to these.  Does
21.  this document, this first page, tell us when those
22.  calls were made to the driver?
23.     A.  Not this first page, no.
24.     Q.  And up in the right-hand corner, there's
25.  a name, Kathy Garst.  Who is that?

Page 67

1.      A.  She would be part of our legal
2.  department.
3.      Q.  Okay.
4.          MR. O'BRIEN:  For your information,
5.  the paralegal that helped us gather the documents
6.  for the production.
7.  BY MR. SCHWARTZ:
8.      Q.  All right.  So let's move on down to the
9.  events, the body of the document.  Can you just
10.  generally tell me when the first event is and just
11.  kind of take me through it?  Just generally tell
12.  me what this information is.
13.     A.  So this first page would be where we
14.  obtain the account from the provider, and it was
15.  entered into the system.  The second page would
16.  continue that.
17.     Q.  Okay.  So this information that's on
18.  these first two pages from 6/6/16, it looks like
19.  it's all timed at, like, 12:42 p.m. on 6/6/16.  Is
20.  this information that came directly from Mercy to
21.  this system, or had data entry already worked with
22.  the information, if you know?
23.     A.  I don't want to assume.  I don't know.
24.     Q.  So whether or not the information set
25.  forth on these two pages for 6/6/16 was like this,

Page 68

1.  as it came from Mercy or whether it had been
2.  culled out by the data entry department, you don't
3.  know.
4.      A.  Correct, I don't know.
5.      Q.  If we go down to this area that I'm
6.  indicating there, there's a line that says
7.  "Financial Class NG."  What is that?
8.      A.  I don't know.
9.      Q.  And there's a line right under that that
10.  says "Facility, 21."  Do you know what that is?
11.     A.  I don't.
12.     Q.  Let's go on to 6/7 of '17.  On this
13.  document, under the "who" section, there's a
14.  column here that has "who" in other areas
15.  (indicating) and gives us the name.  But there's
16.  no name under that.  Do you know why?
17.     A.  Again, I would be assuming.  It would be
18.  the system.  And nobody has actually accessed the
19.  account to this point.
20.     Q.  All right.
21.         MR. O'BRIEN:  You don't have to
22.  guess.  If you know, you can answer.  If you
23.  don't, that's fine.
24.  BY MR. SCHWARTZ:
25.     Q.  Down here at the bottom of the page --

Page 69

1.  and we're on MRA 3 -- it says "Institutional Claim
2.  6/13/16." Do you know what that means?
3.      A. The claim was attached. So the UB-04.
4.      Q. Is a UB-04 claim institution -- or, I'm
5.  sorry -- is a UB-04 bill called an "Institutional
6.  Claim"?
7.      A. Yes.
8.      Q. Okay. This gets back to something we
9.  were discussing earlier. Does this tell us one
10. way or the other as to whether the UB-04 claim
11. that we looked at came from Mercy or whether it
12. was created by MRA?
13.     A. I don't know.
14.     Q. But at any rate, this tells us that the
15. UB-04 -- strike that.
16.        Do you know why, on this page, which
17. deals with events of 6/7 of '16, there's a date
18. attached to the institutional claim that says 6/13
19. of '16, which is a later date?
20.        MR. O'BRIEN: Objection. I think
21. you're misreading the document. I'm not sure
22. that's the case.
23.        But if you know the answer and can
24. correct it, you can answer.
25.        MR. SCHWARTZ: Oh, I see.

Page 70

1.        THE WITNESS: I don't know.
2.        MR. SCHWARTZ: I'm sorry. Right.
3.  BY MR. SCHWARTZ:
4.      Q. It says, "Date ready to investigate,
5.  6/13/16." Do you know what that means?
6.      A. I don't.
7.      Q. Moving on to the next page, MRA 4, it
8.  looks like there are a series of charges for
9.  various services. Is that what this appears to
10. be?
11.     A. Yes.
12.     Q. Is this typically how this information
13. comes?
14.     A. I don't know.
15.     Q. Let's move on to MRA 6, which is a
16. nine-page document that deals with events of
17. 6/8/16. Do you see that?
18.     A. Yes.
19.     Q. All right. And it looks like the first
20. name we see associated in these documents is Tara
21. Love on 6/8 of '16; is that correct?
22.     A. Yes.
23.     Q. And I think the easiest thing might be
24. if you just start at the top of the document and
25. kind of tell me what these various activities were

Page 71

1.  as you understand them from reading this document.
2.      A. So Tara, it looks like she opened a
3.  request to call the patient because we had no
4.  MedPay lead. She then closed it out. I'm --
5.      Q. Does this indicate that she called the
6.  patient?
7.      A. Not that I can tell from here.
8.      Q. Did you say that she was making a
9.  request that the patient be called?
10.     A. Yes. When we open a patient call
11. request, we have to input information in order to
12. go to the -- there's two parts to each call form.
13. So the first one is going to be who we're calling
14. and why we're calling. And then once you select
15. "next," then it brings up the official call form.
16. So she would have to enter in why she was calling,
17. which would be why she put "will patient open a
18. MedPay claim."
19.     Q. In other words, does it appear to you at
20. this point Tara Love, the plan was for her to call
21. the patient and ask the patient if she was going
22. to open a MedPay claim?
23.     A. From this information, yes.
24.     Q. All right. Because at this point in
25. time, it's your understanding that MRA did not

Page 72

1.  know of any leads for medical payments coverage.
2.      A. From my understanding, correct.
3.      Q. Okay. What transpires next?
4.      A. Once she closed it out, she billed a
5.  carrier, since it states "no-fault billing
6.  letter," and it was sent to the mail room to send
7.  out. So I don't know if it was faxed or mailed,
8.  from this information.
9.      Q. What is a "no-fault billing letter"?
10.     A. It's a letter that we attach to the bill
11. stating we are billing the patient's no-fault. I
12. don't know the exact verbiage of that letter.
13.     Q. Do you know who the no-fault billing
14. letter would have been sent to?
15.     A. Not from this information, no.
16.     Q. And that's at 12:38:50?
17.     A. Yes.
18.     Q. Okay. What happens next?
19.     A. She updated the, what we call, phase
20. detail.
21.     Q. Let me stop you for a second. Okay.
22. I'm sorry. It looks like this goes in reverse
23. chronological order. So take a look at it, but it
24. looks like --
25.        MR. O'BRIEN: Well, we started at

Page 73

1.   6/6 and we're up to 6/8.
2.           MR. SCHWARTZ:  No, no.  I mean,
3.   this particular document, this nine page document
4.   for 6/8 of '16.
5.           MR. O'BRIEN:  Oh, I got you.
6.           MR. SCHWARTZ:  It looks like it
7.   starts on the last page.  So let's go the other
8.   way, and it will be clearer.
9.   BY MR. SCHWARTZ:
10.       Q.  If you can start at page 9, which is at
11.   8:28:15 a.m.
12.       A.  At what time?
13.           MR. O'BRIEN:  He's starting in the
14.   back.
15.           THE WITNESS:  Right.  But 6/8
16.   starts back here on page 14.
17.           MR. O'BRIEN:  And he's just telling
18.   you that the earliest events are back here going
19.   forward.  So he just wanted to take you through
20.   the events of June 8th --
21.           THE WITNESS:  So you want to start
22.   at page 14.
23.           MR. O'BRIEN:  -- early in the
24.   morning and go through the day.
25.           THE WITNESS:  So on page 14, it

Page 74

1.   shows Amanda Higgins, which is our data entry rep.
2.   It looks like at that point she requested to have
3.   the program run in the background since there were
4.   no leads.  It says, "Has Actionable Lead, No," so
5.   the system ran.
6.   BY MR. SCHWARTZ:
7.       Q.  Is Amanda in data entry or in auto?
8.       A.  Data entry.
9.       Q.  Okay.  So Amanda -- strike that.
10.           Is this before the information is sent
11.   to the auto department?
12.       A.  Yes.
13.       Q.  Got it.  Okay.  So the first order of
14.   business on 6/8 of '16 is Amanda working in the
15.   data entry department, getting this file ready to
16.   go to auto.
17.       A.  Correct.
18.       Q.  And from this, it appears to you that
19.   she believed that there was no lead, so she had
20.   this program run in the background?
21.       A.  Yes.
22.       Q.  Go ahead.
23.       A.  The program ran and was successful, so
24.   Brittany Gilley came in and reviewed that response
25.   that we had got back from the program.

Page 75

1.       Q.  Who is Brittany Gilley?  What department
2.   does she work in?
3.       A.  She would have been on my team.  I did
4.   not mention her earlier, as I forgot.  She's no
5.   longer with us.
6.       Q.  Okay.  So Ms. Gilley received the file
7.   from data entry?
8.       A.  It was assigned to her, correct.
9.       Q.  Was she the first one it was assigned
10.   to, based on these documents?
11.       A.  Based on -- I can't tell, based on these
12.   documents.
13.       Q.  And this says something on "Lead Name,"
14.   going back to the first, and it says "Hayden
15.   Slavinski."  Do you see that?  Do you know who
16.   that is?
17.       A.  I don't.
18.       Q.  Go ahead.  Continue on.
19.       A.  So on page 13, it shows that she added a
20.   lead of Progressive that would have come from the
21.   program that we received back.
22.           And then on page 12, she made a call to
23.   Progressive and obtained the adjuster's
24.   information assigned to the patient's claim.
25.       Q.  Does it appear that she -- that

Page 76

1.   Ms. Gilley called Progressive?
2.       A.  Based off of what I can tell from this
3.   document, yes.
4.       Q.  So based on these documents, it looks
5.   like that was the first call made, was to
6.   Progressive?
7.       A.  Yes.
8.       Q.  Okay.  Go ahead.
9.       A.  At that point, Tara came into the
10.   account.
11.       Q.  And is that just because Ms. Gilley left
12.   for the day or -- why does the account move from
13.   Ms. Gilley to Ms. Love?
14.       A.  That's not typically something that
15.   happens, so why that happened in this particular
16.   account, I could not answer.  I don't know.
17.       Q.  Is it more typical for the same
18.   individual to stay on the account?
19.       A.  Yes.
20.       Q.  And why this moved on from Gilley to
21.   Love, we don't know.
22.       A.  I don't.
23.       Q.  It's not something we can tell from
24.   these documents?
25.       A.  That's correct, I can't.

Page 77

1. Q. Okay. Go ahead.
2. A. It looks like Tara updated to reflect
3. that this was a Liability BI claim. She updated
4. the adjuster's contact information, from what I
5. can tell. And then on her call form, she was able
6. to determine from Progressive that the patient had
7. State Farm Insurance.
8. Q. Does it appear that she learned about
9. the fact that Ms. Hoops had State Farm automobile
10. insurance from the Progressive adjuster?
11. A. From this information, yes, that's where
12. she obtained the lead.
13. Q. Okay. Go ahead.
14. A. It looks like she billed an insurance
15. carrier. I could not, from this information, give
16. you which carrier, but I know that she sent out
17. the liability letter. She then added the State
18. Farm lead to the account.
19. Q. Let me go back for a second. Where are
20. you looking at that says she sent out --
21. A. Oh, that would be on page 10. I'm
22. sorry.
23. Q. On page 10?
24. A. The MRA page 10. It would be at
25. 11:11:55. And then off to the right it says

Page 78

1. "Liability Billing Letter."
2. Q. And by "Liability Billing Letter," does
3. that mean that it was -- a bill was sent to
4. Progressive?
5. A. I don't know which insurance carrier,
6. based off of this.
7. Q. Don't we know by this point that State
8. Farm is Hoops' carrier and Progressive is the
9. other driver's carrier?
10. A. Yes. But if I were to tell you it's
11. Progressive, I'd be assuming, so I don't know.
12. Q. Okay. All right. But in normal
13. parlance, the other driver would be the liability
14. letter and the no-fault letter would be to the
15. patient's insurer.
16. A. Correct.
17. Q. Okay. Okay. Go ahead.
18. MR. ALLRED: Tom, just so I can
19. follow the bouncing ball -- I may have missed it.
20. You may have already -- I'm sure you already asked
21. it. How did MRA know about Progressive?
22. MR. SCHWARTZ: They ran a search in
23. the background.
24. MR. ALLRED: And found what?
25. MR. SCHWARTZ: Presumably

Page 79

1. information about the automobile accident and who,
2. at least, the other driver's carrier was. That's
3. all we know.
4. MR. ALLRED: Okay. All right. It
5. wasn't in the profile.
6. MR. SCHWARTZ: No.
7. MR. ALLRED: Okay.
8. BY MR. SCHWARTZ:
9. Q. Go ahead.
10. A. So she added the State Farm lead that
11. she obtained from Progressive. On page 9, the
12. only real information is she updated to show
13. that -- she updated primacy, so she reflected
14. State Farm was the primary insurance carrier in
15. this account.
16. Q. Where do you see that?
17. A. It's at the very, very top.
18. Q. Okay. So is she -- strike that.
19. What does that tell you, looking at
20. page 9 at the top of that where it says
21. "Primacy 1"? What does that tell us?
22. A. In general, primacy would be how we
23. coordinate insurance benefits. So it would be
24. one, no-fault; depending on health, whether it
25. would be second; and then liability, third.

Page 80

1. Q. Okay. So is that the first time that
2. somebody entered something on the system with
3. regard to primacy?
4. A. That I don't know.
5. Q. How does that normally work? When does
6. somebody make an entry that ends up in something
7. being printed that says primacy?
8. A. Once we've obtained additional leads,
9. then primacy is set. So if we only have a health
10. lead, that's primary. It's set as 1.
11. Q. Okay. Go ahead.
12. A. On page 8 she calls State Farm. She
13. confirms that there is a claim open for the
14. patient and we obtain a claim number and the
15. adjuster that's handling that claim -- well, in
16. this case, it's a team that's handling that claim.
17. So she obtains their contact information and
18. updates it.
19. Q. Okay. So does this indicate that a
20. second call was made, in Hoops' file, and that was
21. to State Farm?
22. A. Correct.
23. Q. And that call was made by Tara Love?
24. A. Yes.
25. Q. Okay. Go ahead.

Page 81

1.     A.  On page 7, she made a note stating,
2.  apparently, the patient may have another name that
3.  she goes by, which is Cindy Luna, and that no
4.  injuries had been reported.  It gives who she
5.  spoke to at State Farm.
6.     Q.  Was this the same phone call?
7.     A.  It appears so, yes.
8.     Q.  Who did she speak with at State Farm?
9.     A.  Kristy.  And then she sent out the bill
10.  to State Farm.
11.     Q.  And that would have been the second
12.  letter sent?
13.     A.  Correct.
14.     Q.  The first letter, we don't know who it
15.  was sent to, but it was referred to as a
16.  "liability letter"?
17.     A.  Yes.
18.     Q.  And then the second letter was a letter
19.  to State Farm?
20.     A.  Correct.
21.     Q.  And that letter was with the bill?
22.     A.  Yes.
23.     Q.  And can you tell me, when a letter goes
24.  out to State Farm in a scenario like this, what is
25.  sent?

Page 82

1.     A.  The liability -- I'm sorry -- the
2.  no-fault letter, just standard.
3.     Q.  What's the no-fault letter?
4.     A.  It's the first page attached.  Again, I
5.  don't know the verbiage of it.
6.     Q.  Is that the one that says "Assignment of
7.  MedPay"?
8.     A.  Yes.
9.     Q.  Okay.  Is that all we sent out?
10.     A.  Yes.  With a no-fault carrier -- to a
11.  no-fault carrier.
12.     Q.  And do you send that letter -- strike
13.  that.
14.        Does MRA send that letter out to MedPay
15.  carriers for all Mercy patients?
16.     A.  Yes.
17.     Q.  And is the same letter sent out to
18.  other -- strike that.
19.        Is that same letter used to bill MedPay
20.  insurers for all hospitals?
21.     A.  Yes.
22.     Q.  Has MRA used that letter as long as
23.  you've been at MRA?
24.     A.  A form of that letter, yes.
25.     Q.  Do you know when MRA started using the

Page 83

1.  letter that is at issue here in this case?
2.     A.  I don't.
3.     Q.  Do you know who at MRA decides what goes
4.  into those kinds of letters?
5.     A.  I don't.
6.     Q.  Go ahead.  So you said that the cover
7.  letter goes to the insurer.  What else?
8.     A.  And the bill.
9.     Q.  And the UB-40?
10.        MR. O'BRIEN:  04.
11.  BY MR. SCHWARTZ:
12.     Q.  I'm sorry.  UB-04?
13.     A.  Yes.
14.     Q.  All right.
15.     A.  And there's also a -- it's the no-fault
16.  billing letter.  There's a status questionnaire so
17.  that the adjuster can fill it out saying, "Is
18.  there no-fault?  Is it exhausted?  Was payment
19.  issued?  Who is it issued to?"  So it's something
20.  the insurance carrier will keep on hand and fill
21.  out once they research it.  And then the UB-04 is
22.  also attached.
23.     Q.  Let me show you what has been marked as
24.  Exhibit Number 4.  Have you seen -- not that
25.  particular document that is assigned in the Hoops

Page 84

1.  case, but have you seen that document that is
2.  entitled "Mercy Consent and Agreement"?
3.     A.  An AOB, I have seen them, yes.
4.     Q.  Okay.  Have you seen that particular
5.  form, that consent and agreement?
6.     A.  Not that I remember.
7.     Q.  Okay.  Do you know if that form is sent
8.  by MRA to the MedPay insurer when you bill the
9.  MedPay insurer?
10.     A.  Sometimes.
11.        MR. ALLRED:  Just to be clear --
12.  objection -- she's never seen that document
13.  before, and you asked her that document.  And
14.  she's talking about an AOB, which is a penumbra,
15.  if you will, of AOBs.  She's not saying that
16.  document is sent, because she hasn't seen it
17.  before, just so we're clear.
18.        MR. O'BRIEN:  So in general, do we
19.  send AOBs to MedPay carriers?
20.  BY MR. SCHWARTZ:
21.     Q.  Yeah.  As a general proposition, does
22.  MRA send a signed assignment of benefits form to
23.  the MedPay insurers?
24.     A.  Sometimes.
25.     Q.  When do they send one and when do they

Page 85

1. not?
2.     A.  We send them if the adjuster requests
3. it.  We send them for certain insurance carriers
4. and states.  We request them up front.  And I
5. believe that's all.
6.     Q.  Is there anything about Missouri,
7. specifically, that relates to whether or not you
8. send a signed AOB?
9.         MR. ALLRED:  Objection as to lack
10. of foundation of this witness, one, knowing
11. anything about Missouri; and, two, when you say
12. "Missouri," what does that mean?  Regulations of
13. the Department of Insurance?  State Statute --
14.         MR. SCHWARTZ:  Let me rephrase the
15. question.
16. BY MR. SCHWARTZ:
17.     Q.  You said that sometimes MRA sends a
18. signed AOB to the MedPay insurer depending upon
19. the state or the insurer.  Did I have that right?
20.     A.  Correct.
21.     Q.  All right.  So this case was in
22. Missouri.  In your experience in dealing with MRA,
23. do they do anything with regard to sending a
24. signed AOB if the patient is in Missouri?
25.     A.  We do, but without looking at training,

Page 86

1. I could not tell you the exact ...
2.     Q.  All right.  But as you sit here today,
3. you think that there's something with regard to
4. Missouri one way or the other.
5.     A.  Yes.
6.         MR. ALLRED:  Objection.
7. BY MR. SCHWARTZ:
8.     Q.  We'll get to that.
9.         MR. ALLRED:  Objection.  I think
10. that mischaracterizes her testimony.  I don't
11. believe it was established that she knows anything
12. about but, I guess, an implied Missouri
13. requirement.  I don't recall any such testimony
14. coming out of her mouth, and I don't recall any
15. such question as to any Missouri requirement.  I
16. don't get that.  So I don't --
17. BY MR. SCHWARTZ:
18.     Q.  Have you ever --
19.         MR. SCHWARTZ:  I'm sorry.  Are you
20. finished?
21.         MR. ALLRED:  Yes.
22. BY MR. SCHWARTZ:
23.     Q.  Have you ever instructed your employees
24. who work on the Mercy account to send signed AOBs
25. for Missouri Mercy files?

Page 87

1.     A.  Me, personally, no.
2.     Q.  Okay.  Have you heard of anyone else
3. telling your employees that they need to send an
4. assigned AOB if it's a Missouri Mercy case?
5.     A.  Not me.  I have not heard, no.
6.     Q.  Is there anything in these documents
7. that are contained in Exhibit 12 that tell you
8. whether or not this document that's marked as
9. Exhibit 4 was sent to State Farm?
10.     A.  Is this -- I'm assuming -- oh, this is
11. 12.
12.     Q.  That's Exhibit 12.
13.     A.  So you want to know if anything --
14.         MR. O'BRIEN:  Do you want her to
15. look through all --
16.         MR. SCHWARTZ:  No.
17. BY MR. SCHWARTZ:
18.     Q.  Is there anything that you would look to
19. to say, "Well, if we sent this document out, this
20. Exhibit 4, signed consent and agreement, then I
21. could tell that from looking at a particular
22. document"?
23.         MR. O'BRIEN:  So would there be a
24. notation about an AOB going in these -- in --
25.         //

Page 88

1.         MR. SCHWARTZ:  Yeah, one way or the
2. other.
3.         THE WITNESS:  In this ...
4.         (Reviews document.)  I can assume.
5. So no, I can't tell you.  There are certain things
6. that we send out, so I could say that it went out.
7. But unless I'm actually looking the physical
8. account, I cannot tell you.
9.     Q.  So as we sit here today, in your review
10. of the documents that you've been provided,
11. whether a signed AOB went out to State Farm or
12. not, you don't know.
13.     A.  I could not tell you based off of this
14. right here (indicating).
15.         MR. O'BRIEN:  "This" being
16. Exhibit 12.
17.         THE WITNESS:  Correct.
18.         MR. ALLRED:  Tom, do you want to do
19. five minute -- no more than five-minute head call,
20. or do you want to wait till the top of the hour?
21.         MR. O'BRIEN:  Do you need a break?
22.         THE WITNESS:  I'm fine.
23.         MR. O'BRIEN:  You're fine.  Allen,
24. apparently, wants a break.
25.         MR. SCHWARTZ:  Then let's take a

Page 89

1.   break.
2.          (Recess observed.)
3.   BY MR. SCHWARTZ:
4.       Q.  Ma'am, we talked a little bit about what
5.   was probably sent to State Farm by MRA in the form
6.   of a bill, and you were taking me through
7.   Exhibit 12 for the events of 6/8.  So can you
8.   continue from there?  I believe that you were
9.   on --
10.         MR. O'BRIEN:  Page 8?
11.  BY MR. SCHWARTZ:
12.      Q.  -- page 8.
13.      A.  She updated the State Farm lead to show
14.  their team handling the claim.  And then on page 7
15.  is where she entered that the patient may go by a
16.  Cindy Luna.  She updated to show that the bill was
17.  sent, at the top.  And then on page 6 it shows the
18.  letter went to the mail room.  The letter was a
19.  no-fault billing.  And her follow-up shows, "Was
20.  MedPay opened?"  At that point, that's when she
21.  made the request to call the patient to see if she
22.  would be opening the MedPay portion.  Well, she,
23.  yeah, made the request to call the patient.
24.      Q.  Okay.  And who would she have been
25.  requesting to call the patient?

Page 90

1.       A.  We would have, my team.  Her.  Tara
2.   would have made the call.
3.       Q.  So why does she have to put in a
4.   request?
5.       A.  That's where earlier when I said there's
6.   two parts, you have to open the request, enter in
7.   certain information, and once you select next,
8.   that's when the actual call form ...
9.       Q.  All right.  Let's move on to 6/10 of
10.  '16, which is the next date.  It looks like that's
11.  a two-page document.  So, again, going in reverse
12.  order, let's look at MRA 16, if you could pick up
13.  where you left off.
14.      A.  It shows that I entered the account and
15.  closed an activity.  I don't know what that
16.  activity would be, based off of this information
17.  here.
18.      Q.  So why would you have gotten involved at
19.  this point?
20.      A.  There are numerous reasons.  It could
21.  have been something as simple as the program that
22.  runs in the background to give us leads.  There
23.  may have been an update, so I would have come in
24.  and just dismissed that.
25.      Q.  Dismissed what?

Page 91

1.       A.  That activity.  That -- if the program
2.   comes back with an update, typically it could be
3.   anything as simple as a period was added to the
4.   program, to that particular update that came back
5.   to us.
6.       Q.  Are you talking about the results --
7.       A.  Correct.
8.       Q.  -- of the search that's done in the
9.   background?
10.      A.  Yes.
11.      Q.  Okay.
12.      A.  So I would have come in and just
13.  dismissed that, so that way my reps -- it's
14.  basically busy work.  My reps do not need to see
15.  that.  So I would have come in and dismissed it.
16.         There's numerous reasons as to why I
17.  would have come in and closed out an activity.
18.      Q.  What is in the right of that bottom
19.  section?  It says MRA/baynem, B-A-Y-N-E-M.
20.      A.  That's my maiden name.
21.      Q.  Okay.  Got it.  And is that still how
22.  the computer tracked you, at least as of that
23.  date?
24.      A.  It still tracks me as of today's date.
25.      Q.  Okay.  All right.  Go ahead.

Page 92

1.       A.  I can't really tell much more on this,
2.   page 16, as to what took place, based off of this
3.   information.  It looks like a letter would have
4.   gone out.  It shows pending to an address.
5.       Q.  Do we know who the letter was from and
6.   who it was to?
7.       A.  It would have been from us, but based
8.   off of this address, I don't know whose address
9.   that is, so I'm not sure.
10.      Q.  Where do you see an address?
11.      A.  On the right-hand side, at 5:09:45, it
12.  shows 10091 Bufflon Drive.
13.      Q.  All right.  So if that is Hoops'
14.  address, does that tell you that a letter was sent
15.  to Hoops?
16.      A.  If that is her address, then yes.
17.      Q.  All right.  So that's the third letter
18.  that was sent out, and that was to Hoops on 6/10
19.  of '16?
20.         MR. O'BRIEN:  That's --
21.  BY MR. SCHWARTZ:
22.      Q.  Or a letter to Bufflon Drive was sent on
23.  6/10 of '16.
24.         MR. O'BRIEN:  Yeah.  You and I may
25.  agree to that, but this witness doesn't, for

**Provided by Stone & George Court Reporting (615) 268-1244**

Page 93

1. foundation.
2.   MR. SCHWARTZ:  Right.
3. BY MR. SCHWARTZ:
4.   Q.  But is it fair that that's the third
5. letter that we've seen in this trail that we're
6. going through?
7.   A.  From what I can tell, yes.
8.   Q.  Okay.
9.   A.  On page 15, she made a call -- Tara made
10. a call and left a message on a voice mail.  From
11. this information, I cannot tell you who that
12. message was left for or what call was made, to
13. who.
14.   Q.  Okay.  And that would have been the
15. third phone call made, at this point?  We had a
16. call to Progressive --
17.   A.  From what I can tell, yes.
18.   Q.  -- a call to State Farm, and then a call
19. to -- this call that was left went to voice mail?
20.   A.  Correct.
21.   Q.  Okay.  What is -- what do you see on
22. page 17?
23.   A.  A letter request.  Without assuming, I'm
24. not sure exactly what that means.
25.   Q.  But this is a letter request?

Page 94

1.   A.  That's what it's labeled as, yes.
2.   Q.  And the letter request was made on 6/11
3. at 6:01?
4.   A.  From this document, yes.
5.   Q.  Okay.  And then what's the next
6. document, on page 18?
7.   A.  Again, a letter request.  And it's
8. showing the letter, successfully, was delivered.
9.   Q.  On 6/13 of '16?
10.   A.  Correct.
11.   Q.  Again, we don't know what letter this
12. refers to?
13.   A.  I don't.
14.   Q.  Okay.  What do we have on page 19?  It
15. looks like that refers to activity on 6/15 of '16?
16.   A.  Looks like that's the program that I've
17. previously mentioned to obtain leads.  It came
18. through again, and Tara just closed that activity
19. out.
20.   Q.  Page 20?
21.   A.  It looks like the program came back with
22. a lead, or no lead.  Again, it could be anything.
23. But the program came back with an update.
24.   Q.  And, again, what this program is and
25. what it does and who runs it and what information

Page 95

1. it pulls, you have no knowledge of.
2.   A.  Correct.
3.   Q.  Do you know what department does?  Is
4. that all data entry?
5.   A.  I don't know.
6.   Q.  On page 21 for 6/20/16?
7.   A.  Tara closed out some activities.  She
8. updated the patient's role to show that the
9. patient was the driver and a third party was at
10. fault.
11.   Q.  And where did she get that information
12. from?
13.   A.  The program, from the previous day.
14.   Q.  So the program that runs in the
15. background is continuing to mine other information
16. and send this information to you-all in some
17. format?
18.   A.  Correct.
19.   Q.  Do we have any documents in front of us
20. that tell us what that program that's running in
21. the background is gathering up relative to
22. Ms. Hoops' case and providing MRA?
23.   A.  That I don't know.
24.   Q.  Do you know what department would know
25. about that?

Page 96

1.   A.  I could pull the information.  It's not
2. on -- it's not in this document, though.
3.   Q.  How would you pull that information?
4.   A.  I would go to the actions tab, which is
5. right next to the history tab.
6.   Q.  And what would that show you?
7.   A.  It will pull up exactly what was pulled
8. back to us to view.
9.   Q.  Okay.  Continue on with 6/20.
10.   A.  She left another voice mail on 6/20.
11.   Q.  Do we know who for?
12.   A.  I do not, based off this information.
13.   Q.  Okay.  And that was the fourth phone
14. call?
15.   A.  From what I can tell, yes.
16.   From there, it looks like the program
17. ran again on 6/20 around 10:00 that night.  I
18. would have entered the account on 6/21.  So on
19. page MRA 22, I would have closed that activity
20. out.
21.   Q.  Let me go back to page 22 again.  It
22. says "Accident, Intersection, IV ran red light
23. and" -- what does "IV" stand for?
24.   A.  I don't know.
25.   Q.  Who would have entered that information

Page 97

1.  onto this form?
2.      A.  It's automatic.  It comes from that
3.  program that feeds back to us, and that's
4.  automatic.  It was already in there.
5.      Q.  All right.  Okay.  Go ahead.
6.      A.  (No verbal response.)
7.      Q.  So on page 23 for 6/22/16.
8.      A.  It appears again that the program ran.
9.  And on page 24, Tara closed that out.
10.     Q.  It looks like the next date for some
11. activity is all the way to 7/5/16.
12.     A.  Yes.
13.     Q.  And that's MRA 25?
14.     A.  Correct.
15.     Q.  Does that tell us there that there
16. really wasn't any activity between 6/23 of '16 and
17. 7/5 of '16?
18.     A.  From this, from what I can tell, that's
19. correct.
20.     Q.  Okay.  All right.  Now, please tell me
21. what you can tell occurred based on MRA 25.
22.     A.  Tara closed out an activity.  I'm not
23. sure what that activity is, based off of this.
24. She then sent the account over to our liability
25. department.

Page 98

1.      Q.  Tell me what you mean by "sent the
2.  account over to our liability department."
3.      A.  She changed the -- she opened an
4.  activity and assigned that activity to our TPL
5.  department.
6.      Q.  The TPL department and the liability
7.  department are the same thing?
8.      A.  Correct.
9.      Q.  In other words, when you use the term
10. "liability," you're talking about the TPL.
11.     A.  Correct.
12.     Q.  Okay.
13.     A.  A lien request was automatically opened,
14. based off of the criteria that was listed.
15.     Q.  Tell me what you mean by a "lien
16. request" and the "criteria."  Where are you seeing
17. that?
18.     A.  Well, there -- it shows a lien request
19. was opened at 11:45:21 a.m.
20.     Q.  Okay.  And so does it appear from this
21. that on 7/5/16 Tara Love requested that a lien be
22. asserted to Progressive?
23.     A.  Based off of this, from what I can tell,
24. yes, it looks like Tara requested it.
25.     Q.  Okay.  Is that something, typically,

Page 99

1.  that the auto department does, or is that
2.  something that the third-party liability
3.  department does?
4.      A.  It can be both.  But typically, auto
5.  would request that lien.
6.      Q.  So the auto department deals with
7.  third-party liens.
8.      A.  We only open an activity to have one
9.  filed.  We do not actually do the filing.
10.     Q.  In other words, is that your way of
11. communicating to the third-party liability that
12. you think a lien is appropriate?
13.     A.  That is our way of telling our legal
14. department that we think a lien should be filed.
15. And they would research.
16.     Q.  The legal department researches to see
17. if a lien should be filed.
18.     A.  From what I know, yes.
19.     Q.  Okay.  Continue on, please.
20.     A.  She updated the -- she updated one of
21. the leads -- based off of this, I can't tell you
22. which one -- to show that the patient -- what
23. we'd -- our terms, MRA's terms -- refused to open
24. a claim with the carrier.
25.     Q.  Where do you see that?

Page 100

1.      A.  That would be at 11:45:35.  This is just
2.  a general -- we have codes that we use.  It's just
3.  a general code that was used to show that there
4.  was no claim open, because the patient did not
5.  file one.
6.          And then it looks like --
7.      Q.  There was no claim open with who?
8.      A.  I can't tell by this information.
9.      Q.  What does A0-16 mean?
10.     A.  It means we submitted a claim to an
11. insurance carrier.  By "claim," that means a
12. UB-04.
13.     Q.  And do you know what insurance adjuster
14. this is referring to?
15.     A.  Not based off of this specific document,
16. no.
17.     Q.  Okay.  And then to the right of that,
18. there's a number that looks like F4-629.  What
19. does that mean?
20.     A.  "No funds were available from this payer
21. because the patient refused to open a claim."  And
22. I'm reading that directly from the document.
23.     Q.  And do you know, would have been
24. verbiage that Tara Love would have entered into
25. the system?

Page 101

1.  A.  No.  It's already -- we pick the number
2.  that best fits what is currently going on with
3.  that account.  That number -- well, that F4-629 is
4.  always associated with that verbiage.
5.  Q.  Okay.
6.  A.  So we don't enter in a specific
7.  verbiage, no.
8.  Q.  Does this indicate to you that someone
9.  from MRA talked to Ms. Hoops and she refused to do
10. something?
11. A.  Based off of this, no.  I can't tell.
12. Q.  Okay.  All right.  Continue on, please.
13. A.  The program ran again in the background
14. on 7/5.  And then on 7/7, MRA page 26, it shows
15. that our liability department entered the
16. account -- well, I misspoke.  Somebody else, other
17. than auto, entered the account.
18. Q.  What do you mean by "entered the
19. account"?
20. A.  They came in to research or do what they
21. needed to do on the account.
22. Q.  Okay.  And is that Joshua Carlson?
23. A.  Correct.
24. Q.  Do you know what department he worked at
25. back in July of '16?

Page 102

1.  A.  I do not.
2.  Q.  And what does it indicate that
3.  Mr. Carlson did once he entered in to the account?
4.  A.  There was a letter, a lien notice
5.  letter, that was sent.  It looks like there were
6.  two of them.
7.  Q.  Does it indicate who they were sent to?
8.  A.  It does not.  Not that I can tell.
9.  Q.  Have you ever seen the name Joshua
10. Carlson before?
11. A.  I have.
12. Q.  Where have you seen that?
13. A.  In accounts.
14. Q.  Do you know if he works in third-party
15. liability?
16. A.  I do not know.
17. Q.  So on 7/7 of '16, there were two more
18. letters sent?
19. A.  Correct.
20. Q.  Okay.  Let's go on to the next.
21. A.  MRA page 27, I'm not sure what -- based
22. off this, I'm not sure what took place, of what's
23. listed.
24.     On 7/8, the program ran again for leads.
25. Q.  And this is the program in the

Page 103

1.  background?
2.  A.  Correct.
3.  Q.  Do we know what it was telling you at
4.  that point?
5.  A.  I don't, without looking at the actual
6.  response.
7.  Q.  Let's move on to 7/12/16.
8.  A.  I'm not sure what took place on this
9.  date, based off of what's here in front of me.
10. Q.  Okay.  So that's a -- all right.  Does
11. it indicate that the program was running?
12. A.  Not that I can tell.
13. Q.  7/13 of '16?
14. A.  Chrisy Harkins entered and closed out
15. some activities.  I'm not aware of what
16. activities, based off of what I have here in front
17. of me.
18. Q.  What does that mean when you say they
19. "closed out some activities"?
20. A.  It could mean a lot of things.  There
21. was just an activity that's sitting there that
22. needed to be addressed, whether it's just a note
23. of some kind -- I mean, it could be anything.
24. Just -- nothing that needs to be followed up on.
25. It's just an activity that needs to be closed.

Page 104

1.  Q.  Okay.  7/20/16?
2.  A.  Based off of this, I'm not sure what
3.  took place.
4.  Q.  On the 7/20 document, which is MRA 31,
5.  over on the right-hand column, a couple of times,
6.  it refers to "Activity Type," and it says
7.  "Duplicate Custom Field System."  Or Duplicate
8.  Custom Field System."
9.      Does that mean anything to you?
10. A.  Not to me, no.
11. Q.  7/29 of '16?
12. A.  It shows --
13. Q.  And it looks like this is a three-page
14. document.
15. A.  Okay.  So it shows Magen Hendrix came in
16. and opened a transaction for a payment that was
17. received.
18. Q.  Right.  And can you tell what payment
19. was received?
20. A.  Based off of this page, MRA 34, no I
21. cannot.
22. Q.  Would this indicate whether that payment
23. was physically sent to MRA or whether the payment
24. was physically sent to Mercy?
25. A.  Based off of this document, I cannot

Page 105

1.   tell.
2.       Q.   How does that typically work?
3.       A.   What do you mean by "typically work"?
4.       Q.   In other words, does the MedPay insurer
5.   send the money to Mercy Hospital or do they send
6.   it to MRA?
7.       A.   It depends.  They are -- they typically
8.   send it to the client.  Sometimes they send it
9.   here.
10.      Q.   Can you tell from any of these documents
11.  where they sent it?
12.      A.   I can tell from this document where it
13.  was sent, yes.
14.      Q.   All right.  Where were the funds sent?
15.      A.   It would have gone to the client, based
16.  off of MRA 33.
17.      Q.   So how did you -- strike that.
18.           How did MRA know that this $5,000 was
19.  sent to Mercy?
20.      A.   Our AR department searched the client
21.  from this.  I can tell they searched the client
22.  system and located that payment on the patient's
23.  account.
24.      Q.   Where can you tell that they searched
25.  the system?

Page 106

1.       A.   On MRA page 33 at 11:27:03 a.m.
2.       Q.   Does it -- and this was Magen Hendrix.
3.   Does it look like she was just checking the system
4.   to see -- following up to see if the money came
5.   in?
6.       A.   Correct.
7.       Q.   All right.  And she checked, and the
8.   money did come in?
9.       A.   Correct.
10.      Q.   And what is she documenting on this
11.  system?
12.      A.   She placed the payment in our
13.  transactions tab and invoiced it, and then set up
14.  what we call an underpayment activity.
15.      Q.   So does this -- going back to -- does
16.  this indicate that the $5,000 was received by
17.  Mercy on 7/19 of '16?
18.      A.   (No verbal response.)
19.      Q.   I'm looking at the bottom of --
20.      A.   Yeah.  I'm not -- yeah.  It shows it
21.  posted in the client system on 7/19/2016.
22.      Q.   Okay.  What did you do next once you'd
23.  learned that $5,000 had been paid by State Farm to
24.  Mercy?
25.           MR. O'BRIEN:  What did MRA do, not

Page 107

1.   what did Misti Voorhies do.
2.   BY MR. SCHWARTZ:
3.       Q.   What did MRA do?
4.       A.   MRA would have invoiced it, and then an
5.   underpayment transaction activity would have
6.   opened for my team to review.
7.       Q.   Okay.  Tell me what you mean by
8.   "invoiced it."
9.       A.   It's just input into the system.  I
10.  don't know how AR handles payments.
11.      Q.   What is "AR"?
12.      A.   Accounts receivable.
13.      Q.   Thank you.  And what was -- what did you
14.  say after that?
15.      A.   They would open an underpayment
16.  activity.
17.      Q.   Okay.  What is an "underpayment
18.  activity"?
19.      A.   It's basically alerting my team or the
20.  auto team that a payment has been received, and
21.  for us to review it.
22.      Q.   And who reviewed it?
23.      A.   I would have reviewed it, based off of
24.  this document.
25.      Q.   On 32, close to the bottom here --

Page 108

1.       A.   Okay.
2.       Q.   -- there's a notation made by, I
3.   suppose, Magen Hendrix of an adjustment of
4.   $1,519.54.  Do you know what that means?
5.       A.   I do not.
6.       Q.   Do you, in the course of your work on
7.   the Mercy account, ever deal with adjustments?
8.       A.   Not that I can recall offhand.
9.       Q.   Above from that, can you tell me what
10.  happened next?
11.      A.   So after Magen opened the underpayment
12.  activity, I came in and completed that activity
13.  and updated to reflect that the payment was
14.  received from State Farm and it exhausted the
15.  patient's benefits.  And then something looks like
16.  I opened a request for a lien from Missouri.
17.      Q.   At this point, you had requested a lien?
18.      A.   It looks like, based off this, yes.
19.      Q.   All right.  And so you had requested a
20.  lien to whom?
21.      A.   It would have gone over to the lien
22.  department.  So they would have reviewed to
23.  file -- go ahead and file that lien.
24.      Q.   And that was going to be a lien for
25.  what, for what amount?

Page 109

1.    A.  It would have been for the remaining
2.  balance after the $5,000.  And I'm not sure what
3.  that balance would be, based off this.
4.    Q.  Okay.  Let's move on to 8/4/16, which is
5.  MRA 35.
6.    A.  Joshua failed the lien request.  I can't
7.  tell you why, based off of this.
8.    Q.  Are you looking at 35?
9.    A.  Yes.
10.    Q.  Okay.  I'm sorry.  He said -- you said
11.  he "failed it"?
12.    A.  Joshua failed the activity for the lien
13.  request.
14.    Q.  What does that mean?
15.    A.  It means it didn't meet criteria for
16.  some reason.  It could vary as to why that reason
17.  is.  And it went back to Tara to review.
18.    Q.  And what did Tara do?
19.    A.  She closed out the activity.  And that's
20.  all I can tell from this page.
21.    Q.  Okay.  Let's go on to 8/22/16.
22.    A.  Brittany Bishop entered the account.
23.  She closed out an activity.
24.    Q.  Who is Brittany Bishop?
25.    A.  She's in our TPL department.

Page 110

1.    Q.  I'm sorry.  And what does this indicate
2.  that she did?
3.    A.  She closed out some activity.  I can't
4.  tell you what activity that is.  And then a letter
5.  was sent out.  I can't determine who that letter
6.  went to, based off this.
7.    Q.  But it was sent out on 8/22/16?
8.    A.  Correct.
9.    Q.  Okay.  9/15 of '16?
10.    A.  Cindy entered -- Cindy Collins entered
11.  the account and shows a lien release notice letter
12.  on 9/15, and some activities were closed out.
13.  Again, I'm not sure what activities those are.
14.    Q.  What department is Cindy Collins in?
15.    A.  She's part of our legal department.
16.    And then it shows the account was closed
17.  out.  The entire account was closed.
18.    Q.  On 9/15 of '16?
19.    A.  From what I can tell, yes.
20.    Q.  Let's go on to 12/7/16.
21.    A.  Okay.
22.    Q.  What does this indicate?
23.    A.  It show that the lien was released, and
24.  I updated the close return text from service
25.  exception to reflect that it was closed because we

Page 111

1.  received a payment that exhausted the patient's
2.  benefits.
3.    Q.  So if the file was closed by Cindy
4.  Collins back on 9/15 of '16, why was there
5.  activity on 12/7 of '16?
6.    A.  Because the way that an account is
7.  closed, we track it for MRA purposes.  That's
8.  beyond my knowledge.  But I know that we track as
9.  to why accounts are closed based on the close
10.  return text.  So, in this case, it was closed
11.  incorrectly, based off the return text, so I
12.  updated it.  It remained closed.  It never
13.  reopened.  I just updated it to reflect the
14.  correct reason it was closed.
15.    Q.  Okay.  And under there -- strike that.
16.    On that page, which is MRA 39, it says,
17.  "We are returning this account to your facility
18.  for health insurance billing."  Is that correct?
19.    A.  Under the "was" part?
20.    Q.  Yes.
21.    A.  Correct.
22.    Q.  All right.  So is it at this point that
23.  MRA sends the account back to Mercy for health
24.  insurance billing?
25.    A.  Not on 12/7, no.  That would have

Page 112

1.  been --
2.    Q.  When was that?
3.    A.  On 9/15/2016, when the account was
4.  originally closed.
5.    Q.  So it was on 9/15/16 that Cindy Collins
6.  from the legal department closed the file and
7.  returned the account to Mercy for billing of the
8.  health insurance.
9.    A.  Based off of the return text, yes.
10.    Q.  Let's move on to 40 through 69, which
11.  are the notes tabs.  If you can take me through
12.  those.
13.    A.  Through 69?
14.    Q.  Yes, ma'am.
15.    A.  Okay.  Is there a specific question you
16.  want to know?
17.    MR. O'BRIEN:  Well done.
18.  BY MR. SCHWARTZ:
19.    Q.  How are these organized?  Are these by
20.  date?
21.    A.  It appears so, yes.
22.    MR. SCHWARTZ:  Let's go off the
23.  record for a second.
24.    (Whereupon, a discussion off the
25.  record occurred.)

**Provided by Stone & George Court Reporting (615) 268-1244**

Page 113

BY MR. SCHWARTZ:

1. Q.  Ms. Voorhies, we're looking at these
2. documents that are 40 through 69, which is,
3. according to your testimony earlier, parts of the
4. notes tab on MRA's system.  Can you tell me how
5. these are organized?  Are they chronological?
6. A.  It appears they are, yes.
7. Q.  And do they go in reverse order?
8. A.  Yes.
9. Q.  All right.
10. A.  From oldest to newest.  They're all the
11. exact same thing.  It's all -- just -- each tab,
12. it kind of gives you more information as to what
13. took place on that day.
14. Q.  So does this information track the
15. information that is in the account history
16. documents that are marked MRA 1 through 39?
17. A.  At a high level, yes.  So it's not as
18. detailed as the history tab.
19. Q.  All right.  In other words, what we just
20. went through is more detailed than this.
21. A.  Correct.
22. Q.  Let's take a look at 68.  I'm going to
23. go through these in reverse order, if that helps.
24. MR. ALLRED:  You know what you

Page 114

1. could do, since you just hung up on the binding
2. company thing, why even go through it with her?
3. Why not just ask the 30(b)6, unless Stephen agrees
4. to something else?  You know -- I mean, because
5. you're getting it twice then.  Because if you
6. think it's superfluous coming from her, why not
7. just ask the 30(b)6?
8. MR. SCHWARTZ:  Well, we're working
9. through it.  Let's just go a step at a time.  We
10. can -- I mean, you know --
11. MR. ALLRED:  Do you see my point?
12. MR. SCHWARTZ:  But she has --
13. MR. ALLRED:  If you don't think it
14. means any consequence, what she says, well, then,
15. okay.
16. MR. SCHWARTZ:  Well, I think it is
17. of consequence because she had knowledge and she
18. knows --
19. MR. ALLRED:  Well, they contradict
20. each other, I guess, but, you know, I don't -- I
21. know Steve's not going to have that.
22. MR. O'BRIEN:  He just wants to
23. learn.  He's just asking his questions.
24. BY MR. SCHWARTZ:
25. Q.  Page 68, towards the top, it says

Page 115

1. "Denial Reason," and it says, "Service exception
2. health carrier exclusions.  What does that mean?
3. A.  Typically, that means -- now, again, I'm
4. not talking about this particular account.
5. Typically, that means that the provider does not
6. want us to work an account that has a specific
7. health carrier listed.  So if the patient has
8. BlueCross BlueShield, that provider may not want
9. us to work the account because they want to handle
10. that account solely, themselves, so we would
11. return that with this denial reason.
12. Q.  Okay.  And when you say that "they don't
13. want us to work the account," what do you mean by
14. that?
15. A.  They don't want us to do anything on
16. that account.
17. Q.  Even a MedPay collection?
18. A.  Correct.
19. MR. ALLRED:  Show my objection that
20. she's -- somehow, some confusion in this
21. record, that what she just said, there's no
22. foundation that it has anything to do with Mercy.
23. She's dealing in some abstraction as to how she
24. works, but that's not to say that that contributed
25. to Mercy's thinking or the relationship on this

Page 116

1. particular account, Hoops, and MRA's function
2. pursuant to their contract of December of 2013.
3. MR. O'BRIEN:  Yeah.  Allen, it's
4. already clear that she doesn't know anything about
5. Hoops's case in particular, and is not answering
6. these questions about --
7. MR. ALLRED:  Right.
8. MR. O'BRIEN:  -- just in general.
9. MR. ALLRED:  I'm just worried about
10. some of these questions, Steve, that some law
11. clerk or the judge reads it and somehow ties it
12. into the case at hand versus some big picture that
13. may or may not pertain to our case.
14. MR. O'BRIEN:  I think your point is
15. well taken, but I think the record is pretty clear
16. from earlier that that's exactly the situation.
17. She's just speaking, in general, as to what --
18. MR. ALLRED:  But then what happens
19. is -- you know from your experience as a lawyer --
20. somebody cherry-picks a question and an answer out
21. of the transcript without the -- maybe that's our
22. job to clarify it, so -- but look back 20 pages
23. prior.  It was made clear she's not speaking for
24. Mercy.  And then you have this contest, "Oh, no,"
25. you know.  So my point is --

Page 117

1.          MR. O'BRIEN:  No, no.  I get that.
2.          MR. ALLRED:  It can be always
3.   confused, maybe, intentionally.
4.          MR. O'BRIEN:  But you and I know
5.   that we can trust Tom, and that he would never
6.   cherry-pick the record.  He would never do
7.   something like that.
8.          MR. ALLRED:  No.  But he's -- I
9.   know he's a very honest man, but I also know that
10.  he's an advocate that might just approach that
11.  line where things are arguable.  Not
12.  intentionally confusing, but intentionally
13.  arguable.
14.         MR. O'BRIEN:  I think your point is
15.  well taken, Allen.  I agree.
16.         We love you, Tom.
17.         MR. ALLRED:  Even though you're a
18.  rascal.
19.  BY MR. SCHWARTZ:
20.     Q.  If we could turn to 56, please.
21.     A.  (Complies.)
22.     Q.  In the middle of that page, the activity
23.  of 6/20/16, it says, "Called patient.  Left
24.  message."  And this goes back.  When we were
25.  looking at the account history on 6/20, it

Page 118

1.   indicated that a call was made, but we weren't
2.   sure who it was made to.  Does this shed some
3.   light on who was called on 6/20?
4.      A.  (Reviews document.)
5.      Q.  Well --
6.      A.  I just want to make sure.
7.      Q.  That's all right.  Let me just ask a
8.   different question.  Does this document indicate
9.   that the patient was called and a message was left
10.  for the patient on 6/20/16?
11.     A.  Based off of this page, yes.
12.     Q.  All right.  Let's look to 53, please.
13.     A.  Okay.
14.     Q.  Here again, does it indicate that the
15.  patient was called and a message was left on 6/10
16.  of '16?
17.     A.  Correct.
18.         MR. O'BRIEN:  I could've answered
19.  that one.
20.  BY MR. SCHWARTZ:
21.     Q.  Let's look at page 40, please.
22.     A.  Okay.
23.     Q.  What is this document?
24.         MR. O'BRIEN:  That one page?
25.         MR. SCHWARTZ:  Yes.

Page 119

1.          THE WITNESS:  This particular page
2.   would show the notes tab, and, I mean --
3.   BY MR. SCHWARTZ:
4.      Q.  Does this sort of summarize, in short
5.   form, all the activity from 6/6/16 to 12/7/16?
6.          MR. O'BRIEN:  Well, don't they all
7.   do that, Tom?
8.          THE WITNESS:  They do.  They're
9.   just -- again, each -- each page just expands what
10.  took place on that particular day.
11.         MR. SCHWARTZ:  Okay.
12.         MR. O'BRIEN:  And each page is a
13.  different day, or focuses on a different day.
14.         THE WITNESS:  Right.
15.         MR. O'BRIEN:  Someone just opened
16.  up or expanded the whatever for each different
17.  day, and then put them all in order.
18.         MR. SCHWARTZ:  All right.
19.  BY MR. SCHWARTZ:
20.     Q.  Let's move on to 70 through 75.
21.     A.  Okay.
22.     Q.  You had told me earlier that pages 70 to
23.  75 were call forms; is that correct?
24.     A.  Correct.
25.     Q.  Let's look at pages 70 and 71.  Do those

Page 120

1.   relate to a particular call?
2.      A.  70 would reflect a particular call, and
3.   then 71 lists the documents that are attached to
4.   the account.
5.      Q.  And they appear to go in reverse order,
6.   so let's first look at pages 74 and 75.
7.      A.  Okay.
8.      Q.  Can you tell me what -- on the bottom of
9.   this document, on 74, there are "Claim Documents."
10.  Do you see that?
11.     A.  Yes.
12.     Q.  All right.  I want to go through those,
13.  that list with you.
14.     A.  Okay.
15.     Q.  The first is "Institutional Claim from
16.  Mercy Hospital St. Louis."  Is that the UB-04 that
17.  we referred to?
18.     A.  Correct.
19.     Q.  Now, the next one is 7/7/16, and it says
20.  "Redacted Institutional Claim."  Do you know what
21.  that means?
22.     A.  It means there was some sort of a
23.  revision.  But without looking at it, I don't know
24.  what that is.
25.     Q.  Would that be something that could be

**Provided by Stone & George Court Reporting (615) 268-1244**

Page 121

1.  pulled up from the system?
2.      A.  Yes.
3.      Q.  In other words, if you clicked on the
4.  underlined "Redacted Institutional Claim" --
5.      A.  It would pull it up.
6.      Q.  Okay.  Do any of these documents listed
7.  in the claim documents provide us with what was
8.  sent by MRA to State Farm for the bill?
9.      A.  Without pulling them up individually,
10. no, I cannot tell you which one went to State
11. Farm.
12.     Q.  All right.  So, for instance, we have
13. listed on here the no-fault billing letter.  Is
14. that the cover page that says "Assignment of
15. MedPay benefits"?
16.     A.  Yes.  I can assume it went to State
17. Farm, but unless I actually physically look at it,
18. I cannot tell you it went to State Farm or not.
19.     Q.  Would any of those documents indicate
20. whether or not MRA even had the signed Consent and
21. Agreement that contains the assignment of
22. benefits?
23.     A.  It would be listed here as "AOB" if we
24. did have it on file.
25.     Q.  So, in other words, if MRA had

Page 122

1.  possession of the signed Consent and Agreement
2.  document that I showed you earlier, it would be
3.  listed in the claim documents that is shown in
4.  MRA 74?
5.      A.  Correct.  It would either be listed
6.  under the claim or the account documents.
7.      Q.  And as best you can tell from reviewing
8.  the document, it doesn't -- it's not listed.
9.      A.  From what I can tell on these pieces of
10. paper, it was not listed.
11.     Q.  Which would indicate that MRA did not
12. have that document.
13.     A.  Correct.
14.     Q.  And if MRA did not have that document,
15. they could not have sent it to State Farm,
16. correct?
17.     A.  Correct.
18.     Q.  Up above there's a category called
19. account documents.  And there are two documents
20. that are also included in the claim documents.
21. Are those the same documents?
22.     A.  They would be.
23.     Q.  And then "Event Documents."  It refers
24. to two emails that were sent on 9/15/16.  What
25. could those be?

Page 123

1.      A.  Without pulling them up, I'm not sure.
2.      Q.  Did -- if someone at MRA sends out an
3.  email regarding this particular account for
4.  Ms. Hoops, are the documents listed in this box?
5.      A.  They should be.
6.      Q.  Going back for a minute to the MRA 37
7.  and 38 --
8.          MR. ALLRED:  Go ahead, Tom.
9.          (Mr. Allred exits the room.)
10.         THE WITNESS:  Okay.
11. BY MR. SCHWARTZ:
12.     Q.  It looks like 9/15 of '16 is when Cindy
13. Collins was working on the claim.  Does MRA 37 or
14. 38 tell us anything about these emails that are
15. listed under the Event Documents on MRA 74?
16.     A.  No.  It would not list anything about
17. the email in the history tab.
18.     Q.  Okay.  Going back to MRA 74, there's a
19. box on this document in the middle.  It has Tara
20. Love on the left, and then below that area,
21. there's a section called "Claims."  Do you see
22. that?
23.     A.  Yes.
24.     Q.  Can you take me through that line and
25. tell me what that means?

Page 124

1.      A.  So it lists the UB-04's date of service.
2.  So 5/31/16, that's the date she would have been
3.  seen at the facility.  The $6,519.54 would be the
4.  balance of her bill, when it was received.  The
5.  $1,519.54 would be the balance after the $5,000
6.  payment from State Farm.  77 percent would reflect
7.  the percentage of the payment that we received.
8.  So 77 percent of the billed amount.  Mercy
9.  Hospital would be the provider.  The next number,
10. 211, would be the account number, Mercy's account
11. number.
12.     Q.  Okay.  And then towards the middle,
13. under the patient contact form, does that indicate
14. that two calls were made on 6/8 of '16?
15.     A.  Correct.
16.     Q.  One was to Progressive and the other to
17. State Farm?
18.     A.  Yes.
19.         (Mr. Allred enters the room.)
20. BY MR. SCHWARTZ:
21.     Q.  Let's take a look at 72, please.
22.     A.  Okay.
23.     Q.  Is this a call form for a call to State
24. Farm on 6/8 of 2016?
25.     A.  Yes.

Page 125

1.    Q.  And it looks like -- is this same call
2. tracked both on page 74 and 72?
3.    A.  74 shows the condensed version.  It just
4. shows that a call was made.  72 would give,
5. exactly, the information that we received on the
6. call.
7.    Q.  Then looking at 70 and 71, similarly,
8. this is the breakout information for the
9. Progressive call on 6/8/16?
10.    A.  On page 70, yes.
11.    Q.  And do you know why there wouldn't be
12. call forms for the two calls made to the patient?
13.    A.  I only see one, so I couldn't tell you
14. why the other one is not reflected here.
15.    Q.  Where is the one call to the patient?
16.    A.  It would be MRA 74 on 6/20.  Patient
17. contact form.
18.    Q.  Based on your review of these documents,
19. does it indicate whether or not MRA had knowledge
20. that Ms. Hoops had commercial health insurance
21. with BlueCross BlueShield?
22.    A.  Based off of what I've looked at, I
23. don't see any knowledge ...
24.    Q.  What information from -- strike that.
25.       Do you know if MRA has access to Mercy's

Page 126

1. records to look at those records and try to
2. determine what insurance is available?
3.    A.  I don't know.
4.    Q.  Have you ever -- strike that.
5.       Do these documents that we have in front
6. of you tell us what information Mercy provided to
7. MRA?
8.    A.  I don't know.
9.    Q.  If MRA would have known that the patient
10. had commercial health insurance, would it have
11. asserted a lien?
12.    A.  No.
13.    Q.  Why do you say that?
14.    A.  Because we don't file liens when a
15. patient has commercial health insurance.
16.    Q.  Across the board?
17.    A.  Across the board.
18.    Q.  For any of MRA's clients?
19.    A.  To my knowledge, correct.
20.    Q.  Did you read any of the deposition
21. testimony in this case from Mr. O'Connell or
22. Ms. Love?
23.    A.  No.
24.    Q.  Is it your understanding from -- strike
25. that.

Page 127

1.       Have you ever worked for any other
2. employer than MRA that dealt with hospital
3. billing?
4.    A.  No.
5.    Q.  And is it your understanding for a
6. patient that has commercial health insurance and
7. medical payments coverage on their auto policy
8. that the medical payments coverage is primary to
9. the health insurance?
10.    A.  When it comes to coordination of
11. benefits, yes.
12.    Q.  Tell me what you mean by "When it comes
13. to coordination of benefits."
14.    A.  The way we coordinate insurance
15. benefits, we determine if that no-fault is primary
16. to help with the patient's out of pocket expenses,
17. make sure they're not coming out owing a whole
18. bunch of money, so it helps pay those medical
19. bills that are coming in.
20.       So we would -- we let them know that
21. that would be primary so that it assists them.  I
22. don't know really how to explain -- I mean, it's
23. just knowledge I have.  It's hard to put it into
24. words.
25.       MR. SCHWARTZ:  Could you read that

Page 128

1. back to me.
2.       THE REPORTER:  The answer?
3.       MR. SCHWARTZ:  Yes.
4.       (Whereupon, the requested answer was
5. read back by the reporter.)
6. BY MR. SCHWARTZ:
7.    Q.  At some point in your employment at MRA,
8. were you told by MRA that medical payments
9. coverage is always primary to health insurance
10. coverage?
11.    A.  I don't remember.  I've been here seven
12. years.  Through training, it's a possibility, but
13. that was seven years ago.
14.    Q.  Is that your understanding, though, as
15. you sit here today, that medical payments coverage
16. is always primary to health insurance coverage?
17.    A.  Correct.
18.    Q.  That's your understanding?
19.    A.  Yes.
20.    Q.  Has that always been your understanding
21. since beginning your work here at MRA?
22.    A.  Yes.
23.    Q.  And is it you're understanding that for
24. clients like Mercy, for whom MRA collects medical
25. payments coverage, that MRA will collect the

Page 129

1. medical payments coverage, and then, after
2. completing that task, return the account to Mercy
3. to then collect the health insurance?
4.     MR. O'BRIEN:  Objection.
5.     MR. ALLRED:  Objection.
6.     MR. O'BRIEN:  Go ahead, Allen.
7.     MR. ALLRED:  As to the last part of
8. that question as to her testifying as to what
9. Mercy does once the bill was sent back or that
10. account is sent back to Mercy, she doesn't know
11. and there's no foundation what Mercy does or what
12. their practice is or procedure.  But she can
13. testify up to that last part of the question,
14. about what MRA does.
15.     MR. O'BRIEN:  And that part has
16. been asked and answered.  It's redundant, but ...
17.     THE WITNESS:  If it's commercial
18. health, correct.
19. BY MR. SCHWARTZ:
20.     Q.  Is it your understanding from your
21. experience in working here that Mercy doesn't bill
22. the health insurance until such time as you've
23. completed your efforts of billing MedPay?
24.     MR. ALLRED:  Objection.
25.     MR. O'BRIEN:  Yeah.

Page 130

1.     MR. ALLRED:  No foundation.  She
2. doesn't know what Mercy does.  She would be
3. speculating, and I'll move to strike if she so
4. speculates.
5.     MR. O'BRIEN:  Right.  I would join
6. that objection.  Lack of foundation.  She's not
7. testified at all as to what Mercy does, today.
8.     THE WITNESS:  I don't know.
9. BY MR. SCHWARTZ:
10.     Q.  You don't know that?
11.     A.  Huh-uh.
12.     Q.  Okay.  The documents that we've gone
13. over today that says, "Returning the account to
14. client for billing of health insurance, have you
15. seen those?
16.     A.  Yes.
17.     Q.  What do those mean?
18.     A.  That means we -- that means we've done
19. what we could as far as obtaining payment, and so,
20. at this point, we are letting them know that if
21. they wish to bill health, then they can go ahead
22. and bill health.
23.     We don't tell them to bill health.
24. Whatever they do once it's closed is up to them.
25.     Q.  When -- strike that.

Page 131

1.     Do Mercy account representatives look at
2. the health insurance contracts before making their
3. determination as to coordination of benefits?
4.     MR. ALLRED:  Objection.
5.     MR. O'BRIEN:  Foundation.
6.     MR. ALLRED:  She knows nothing
7. about Mercy and what they do with regard to
8. anything, much less a contract.
9.     MR. O'BRIEN:  Same.
10.     MR. SCHWARTZ:  Did I say "Mercy"?
11.     MR. O'BRIEN:  Yeah.
12.     MR. SCHWARTZ:  I'm sorry.  What I
13. meant -- I'll straighten that out, but I meant her
14. Mercy team.  Let me rephrase the question.  Okay?
15. BY MR. SCHWARTZ:
16.     Q.  The MRA account representatives that
17. work on the Mercy account, do they review the
18. patient's health insurance contract to assist them
19. in making a coordination of benefits
20. determination?
21.     MR. ALLRED:  Objection.  It hasn't
22. been established that they even have any health
23. insurance contracts in any circumstance, much less
24. that they have health insurance contracts, in this
25. case, the BlueCross BlueShield policy, involving

Page 132

1. Ms. Hoops.
2. BY MR. SCHWARTZ:
3.     Q.  You can answer the question.
4.     A.  No.
5.     Q.  Do MRA automobile department
6. representatives who work on the Mercy account
7. review network agreements between health insurance
8. companies and Mercy to assist them in making a
9. coordination of benefits determination?
10.     MR. ALLRED:  Objection.  No
11. foundation they even have such documents, and
12. therefore no foundation as to what they would
13. look -- or look at them.
14.     THE WITNESS:  No.
15. BY MR. SCHWARTZ:
16.     Q.  Do Mercy -- strike that.
17.     Do MRA claims representatives in the
18. auto department that work on the Mercy account
19. refer to any Missouri statutes or regulations in
20. making their coordination of benefits
21. determination?
22.     MR. O'BRIEN:  Would you please read
23. the question back to me.
24.     (Whereupon, the requested question
25. was read back by the reporter.)

Page 133

1. MR. ALLRED: Are you going to
2. object?
3. MR. O'BRIEN: I'm going to object
4. to legal conclusion, but subject to that --
5. MR. ALLRED: And I would also
6. object, insofar as that question could cause a
7. nonlegal witness to get into any discussion she
8. may or -- may have, if there is any, as far as
9. guidance from any legal counsel with MRA as to any
10. Missouri statutes or regulations.
11. BY MR. SCHWARTZ:
12. Q. You can answer.
13. MR. O'BRIEN: So would revealing
14. any communications you've had with lawyers, if you
15. can answer his questions as to -- well, if you can
16. answer his question, you can answer it.
17. THE WITNESS: I don't know.
18. MR. SCHWARTZ: Do you have
19. questions?
20. MR. ALLRED: Just one.
21. MR. SCHWARTZ: I'm going to just
22. breeze through my notes real quick.
23. (Pause in the proceedings.)
24. BY MR. SCHWARTZ:
25. Q. I'm going to ask you a few questions

Page 134

1. about training for the auto claims reps. Can you
2. tell me, as best you recall, what materials are
3. used to train auto department claims
4. representatives.
5. MR. O'BRIEN: Today?
6. BY MR. SCHWARTZ:
7. Q. Let's go back to December of 2013,
8. three-and-a-half years ago. And if any of that's
9. changed now, you can tell me.
10. MR. O'BRIEN: Hoops' claim was in
11. 2016, though.
12. MR. SCHWARTZ: I'm sorry?
13. MR. O'BRIEN: Hoops' claim was last
14. year, not 2013.
15. MR. SCHWARTZ: Yeah, but assumably,
16. somebody trained before the day her claim was
17. processing.
18. MR. O'BRIEN: Yeah. So I'm okay
19. with claims -- or I'm okay with training prior to
20. Hoops' claim, but you're going back to prior to --
21. or at the Mercy --
22. MR. SCHWARTZ: It goes -- it's the
23. Mercy date. Right. So, anyway ...
24. MR. O'BRIEN: I understand the
25. date. I just -- I object to the relevance of

Page 135

1. that. That has no pertinence to this case
2. whatsoever.
3. MR. SCHWARTZ: Okay.
4. THE WITNESS: I don't remember. I
5. don't know what training was done in 2013.
6. BY MR. SCHWARTZ:
7. Q. Is it any different than the training
8. that's done now?
9. A. I don't know. I don't remember. I
10. didn't go through training in 2013.
11. Q. Okay. Are you involved at all in the
12. training of the auto claims representatives before
13. they come to work for you?
14. A. No.
15. Q. Who is in charge of that training?
16. A. Our training department.
17. Q. And do you know who the manager of the
18. training department is?
19. A. Brian Neiderhauser.
20. Q. Do you know how long he's been in that
21. position?
22. A. I do not.
23. Q. Have you seen any of the training
24. manuals for auto claims representatives?
25. A. Briefly, if I need to look at something.

Page 136

1. But I don't look at them regularly, so ...
2. Q. Would you recognize any of them if I
3. showed them to you?
4. A. I may.
5. Q. But you wouldn't know if there were
6. others.
7. A. I wouldn't.
8. Q. Okay. And in the last three or four
9. years, you haven't been involved in training any
10. employees?
11. A. Correct. I've not.
12. MR. SCHWARTZ: I don't have any
13. further questions. I appreciate your time.
14. CROSS-EXAMINATION
15. BY MR. ALLRED:
16. Q. Ms. Voorhies, do you recall when
17. Mr. Schwartz asked you whether or not MRA was
18. aware that Ms. Hoops had health insurance with
19. BlueCross BlueShield?
20. A. I remember his question, yes.
21. Q. And you remember you said that MRA was
22. not aware that Ms. Hoops had insurance with
23. BlueCross BlueShield. Was that your answer?
24. MR. O'BRIEN: I think the question
25. was did these documents indicate anything about

Page 137

1. BlueCross BlueShield.
2. BY MR. ALLRED:
3.     Q.  Let's do that.
4.         MR. O'BRIEN:  Exhibit 12.
5. BY MR. ALLRED:
6.     Q.  Is it correct that the documents in
7. front of you that Mr. Schwartz has been asking you
8. about -- those are MRA documents, correct?
9.     A.  Correct.
10.    Q.  And you indicated earlier, as
11. Mr. O'Brien indicates, that nothing in those
12. documents tells you that MRA was aware that
13. Ms. Hoops had insurance with BlueCross BlueShield;
14. is that correct?
15.    A.  Correct, not that I can tell.  I don't
16. see it.
17.    Q.  Okay.  But you, yourself, independent of
18. the documents, you don't know one way or the other
19. if MRA knew whether or not Ms. Hoops had insurance
20. with BlueCross BlueShield?
21.    A.  Outside of these documents?
22.    Q.  Yes, ma'am.
23.    A.  I do not know.
24.    Q.  Okay.  So here is my question:  As far
25. as MRA's request for Ms. Hoops' State Farm policy

Page 138

1. to pay their portion of the charges for her
2. medical care at Mercy, whether MRA knew about the
3. BlueCross insurance for Ms. Hoops or not, would
4. that have made any difference in MRA going forward
5. and requesting State Farm, her auto policy, to pay
6. a portion of her medical care that she had
7. acquired at Mercy?
8.    A.  No.
9.    Q.  And why is that, ma'am?
10.    A.  Because when it comes to no-fault, it
11. doesn't matter what the patient has, as far as
12. health insurance, whether it's commercial,
13. government, or no health.
14.    Q.  So whether you had any record in the
15. documents, or even if you had had it in the
16. documents that you've just gone through with
17. Mr. Schwartz in great detail, that there was a
18. BlueCross policy for Ms. Hoops, regardless, MRA
19. would have made a claim on her State Farm policy
20. to pay their portion of the medical care she
21. received at Mercy, correct?
22.    A.  What do you mean by "made a claim"?  We
23. wouldn't -- we wouldn't have opened the claim.  We
24. would have sent our bill.  Yes.
25.    Q.  Okay.  Let me -- whatever term you want

Page 139

1. to use, the point is regardless of what you knew
2. about Ms. Hoops having insurance with BlueCross --
3. and when I say "you," I mean MRA.
4.    A.  Right.
5.    Q.  -- MRA was going to make a demand on
6. State Farm to pay under Ms. Hoops' policy with
7. State Farm for their portion of Ms. Hoops' medical
8. care; is that correct?
9.    A.  Correct.
10.    Q.  And that's your normal course --
11.    A.  Correct.
12.    Q.  -- with Mercy or any other provider of
13. care, like a hospital, correct?
14.    A.  Correct.
15.        MR. ALLRED:  Thank you very much.
16. That's all I had.
17.        MR. SCHWARTZ:  No further
18. questions.
19.
20.        FURTHER DEPONENT SAITH NOT.
21.
22.
23.
24.
25.

Page 140

1.      E R R A T A
2.
3.     I, MISTI VOORHIES, having read the foregoing
deposition, Pages 1 through 139, taken June 26,
4. 2017, do hereby certify said testimony is a true
and accurate transcript, with the following
5. changes, if any:
6. PAGE  LINE     SHOULD HAVE BEEN
7. _____  _____   _____
8. _____  _____   _____
9. _____  _____   _____
10. _____  _____   _____
11. _____  _____   _____
12. _____  _____   _____
13. _____  _____   _____
14. _____  _____   _____
15. _____  _____   _____
16. _____  _____   _____
17.
18. _____
19.      MISTI VOORHIES
20.
21. _____
22.    Notary Public
23. My commission expires: _____
24.
25.

Page 141



```
 1.          REPORTER'S CERTIFICATE
 2.
 3.    STATE OF TENNESSEE   )
 4.    COUNTY OF WILLIAMSON )
 5.
 6.          I, Cassandra M. Beiling, CCR,
 7.    LCR #371, Notary Public and Court Reporter, do
 8.    hereby certify that I recorded to the best of my
 9.    skill and ability by machine shorthand all the
10.    proceedings in the foregoing transcript, and that
11.    said transcript is a true, accurate, and complete
12.    transcript to the best of my ability.
13.          I further certify that I am not an
14.    attorney or counsel of any of the parties, nor a
15.    relative or employee of any attorney or counsel
16.    connected with the action, nor financially
17.    interested in the action.
18.          SIGNED this 15th day of June, 2017.
19.
20.
21.          _____
22.          Cassandra M. Beiling, CCR, LCR# 371
23.
24.    My commission expires:  3/15/2020.
25.
```

**Digitally signed 7/15/2017 at 1:55pm CDT**

**A**

**a0-16** 100:9
**aallred** 2:20
**ability** 141:9
141:12
**able** 53:25 60:25
77:5
**above** 108:9 122:18
**abstraction** 115:23
**accept** 21:4 21:12
**accepting** 22:21
**accepts** 22:8
**access** 18:11 24:13
24:16 24:19 25:3
25:25 125:25
**accessed** 23:18
58:13 68:18
**accident** 26:18
39:20 39:22 62:8
65:8 79:1 96:22
**according** 113:4
**account** 7:8 10:12
10:19 12:20 14:8
14:23 15:16 15:20
17:14 17:16 17:22
18:7 18:11 19:2
20:13 23:19 23:21
23:21 23:23 24:10
25:12 25:16 27:20
27:21 28:3 28:23
29:1 29:5 29:13
31:1 31:20 32:9
32:12 32:25 33:4
33:16 33:20 34:1
34:8 34:9 34:12
34:20 34:22 34:23
36:3 36:10 36:12
41:6 43:10 43:12
43:20 44:9 44:15
44:18 44:21 52:14
54:22 56:1 56:2
56:9 56:11 56:13
56:13 56:17 56:17
56:18 56:20 58:7
58:8 58:13 58:18
58:25 60:11 62:16
62:19 63:15 66:10
67:14 68:19 76:10
76:12 76:16 76:18

77:18 79:15 86:24
88:8 90:14 96:18
97:24 98:2 101:3
101:16 101:17
101:19 101:21
102:3 105:23 108:7
109:22 110:11
110:16 110:17
111:6 111:17
111:23 112:3 112:7
113:16 115:4 115:6
115:9 115:10
115:13 115:16
116:1 117:25 120:4
122:6 122:19 123:3
124:10 124:10
129:2 129:10
130:13 131:1
131:16 131:17
132:6 132:18
**accounts** 10:9
18:22 25:4 25:5
31:13 102:13
107:12 111:9
**accurate** 140:4
141:11
**acquired** 138:7
**across** 126:16
126:17
**action** 47:13 141:16
141:17
**actionable** 42:10
74:4
**actions** 96:4
**activities** 58:18
58:22 59:1 61:11
62:1 70:25 95:7
103:15 103:16
103:19 110:12
110:13
**activity** 60:4 90:15
90:16 91:1 91:17
94:15 94:18 96:19
97:11 97:16 97:22
97:23 98:4 98:4
99:8 103:21 103:25
104:6 106:14 107:5
107:16 107:18
108:12 108:12
109:12 109:19

**actual** 90:8 103:5
**actually** 36:23
55:12 68:18 88:7
99:9 121:17
**add** 52:5
**added** 56:17 75:19
77:17 79:10 91:3
**additional** 80:8
**address** 18:21
18:21 92:4 92:8
92:8 92:10 92:14
92:16
**addressed** 103:22
**adjuster** 35:14 45:7
49:20 49:21 75:23
77:4 77:10 80:15
83:17 85:2 100:13
**adjusters** 46:18
**adjustment** 108:3
**adjustments** 108:7
**advocate** 117:10
**after** 5:4 5:16 5:25
6:9 6:18 9:8 12:18
34:22 107:14
108:11 109:2 124:5
129:1
**again** 8:20 9:20
10:7 32:14 36:11
40:11 65:11 68:17
82:4 90:11 94:7
94:11 94:18 94:22
94:24 96:17 96:21
97:8 101:13 102:24
110:13 115:3
118:14 119:9
**agf** 1:6
**ago** 128:13 134:8
**agree** 55:9 63:21
63:25 64:11 92:25
117:15
**agreed** 4:8
**agreement** 26:18
84:2 84:5 87:20
121:21 122:1
**agreements** 132:7
**agrees** 114:3
**ahead** 19:9 28:15
35:13 74:22 75:18

**actual** 76:8 77:1 77:13
78:17 79:9 80:11
80:25 83:6 91:25
97:5 108:23 123:8
129:6 130:21
**alerting** 107:19
**all** 3:24 4:5 6:16
6:20 12:1 12:10
12:14 12:15 13:15
13:23 30:4 30:21
38:22 39:7 44:24
48:13 55:1 55:6
56:1 56:5 56:7
57:22 59:1 59:5
60:12 61:20 63:1
64:10 64:25 65:20
67:8 67:19 68:20
70:19 71:24 78:12
79:3 79:4 82:9
82:15 82:20 83:14
85:5 85:21 86:2
87:15 90:9 91:25
92:13 92:17 95:4
97:5 97:11 97:20
101:12 103:10
105:14 106:7
108:19 109:20
111:22 113:10
113:11 113:12
113:20 118:7
118:12 119:5 119:6
119:17 119:18
120:12 121:12
130:7 135:11
139:16 141:9
**allen** 2:17 88:23
116:3 117:15 129:6
**allow** 21:6
**allowed** 19:21
**allows** 21:20
**allred** 2:17 3:4
19:20 21:25 22:10
26:13 26:14 28:17
51:20 51:23 52:9
78:18 78:24 79:4
79:7 84:11 85:9
86:6 86:9 86:21
88:18 113:25
114:11 114:13
114:19 115:19
116:7 116:9 116:18

**actual** 117:2 117:8 117:17
123:8 123:9 124:19
129:5 129:7 129:24
130:1 131:4 131:6
131:21 132:10
133:1 133:5 133:20
136:15 137:2 137:5
139:15
**along** 28:3
**already** 10:12
35:10 35:13 67:21
78:20 78:20 97:4
101:1 116:4
**always** 101:4 117:2
128:9 128:16
128:20
**amanda** 13:20
14:11 74:1 74:7
74:9 74:14
**america** 1:8 2:9
2:24 4:4
**amount** 108:25
124:8
**another** 8:19 8:22
11:8 12:12 22:7
45:14 54:12 54:13
55:15 81:2 96:10
**answer** 19:25 20:4
21:24 21:24 22:25
38:4 41:18 43:23
48:10 48:12 52:7
68:22 69:23 69:24
76:16 116:20 128:2
128:4 132:3 133:12
133:15 133:16
133:16 136:23
**answered** 118:18
129:16
**answering** 38:5
57:13 57:15 57:20
65:15 116:5
**anybody** 45:13
**anyone** 14:21 15:2
24:11 87:2
**anything** 10:17
10:21 11:11 20:2
25:13 41:19 42:22
44:5 45:14 48:14
55:16 60:8 61:18
85:6 85:11 85:23

86:11 87:6 87:13
87:18 91:3 94:22
103:23 104:9
115:15 115:22
116:4 123:14
123:16 131:8
136:25
**anyway** 134:23
**aob** 84:3 84:14 85:8
85:18 85:24 87:4
87:24 88:11 121:23
**aobs** 84:15 84:19
86:24
**apart** 60:14
**apparently** 81:2
88:24
**appear** 58:8 58:16
60:17 71:19 75:25
77:8 98:20 120:5
**appearances** 2:1
**appears** 26:24
59:10 70:9 74:18
81:7 97:8 112:21
113:7
**appreciate** 65:22
136:13
**apprise** 52:1
**approach** 117:10
**appropriate** 99:12
**ar** 105:20 107:10
107:11
**area** 45:14 68:5
123:20
**areas** 18:6 68:14
**arguable** 117:11
117:13
**around** 6:12 96:17
**aside** 65:25
**ask** 17:19 20:8
30:11 35:10 37:13
39:24 44:6 45:4
45:5 45:23 49:1
49:15 49:18 49:21
52:24 53:16 54:2
59:6 61:22 66:1
71:21 114:3 114:7
118:7 133:25
**asked** 25:10 53:19
65:13 78:20 84:13
129:16 136:17

**asking** 14:22 26:23
53:2 55:18 57:25
66:13 114:23 137:7
**asserted** 98:22
126:11
**assigned** 75:8 75:9
75:24 83:25 87:4
98:4
**assignment** 82:6
84:22 121:14
121:21
**assist** 131:18 132:8
**assists** 127:21
**associate** 62:15
**associated** 23:24
43:1 70:20 101:4
**assumably** 134:15
**assume** 36:21 45:1
50:18 65:19 67:23
88:4 121:16
**assumes** 51:18
**assuming** 68:17
78:11 87:10 93:23
**attach** 33:16 72:10
**attached** 18:6 23:20
33:18 33:20 69:3
69:18 82:4 83:22
120:3
**attempts** 65:5 65:9
**attended** 5:15
**attorney** 7:15 60:23
141:14 141:15
**attorneys** 2:4 2:10
2:17
**august** 9:19 15:14
15:17 15:23
**auto** 12:2 12:3 12:8
16:1 16:17 16:22
24:16 25:2 27:22
27:23 32:3 32:6
32:15 33:13 34:23
37:4 37:17 39:14
39:20 39:23 40:1
40:12 40:15 40:17
40:25 41:10 43:2
43:5 45:20 47:14
49:24 50:3 50:7
50:12 50:20 51:2
51:6 51:8 51:12
51:14 51:17 59:2

74:7 74:11 74:16
99:1 99:4 99:6
101:17 107:20
127:7 132:18 134:1
134:3 135:12
135:24 138:5
**automatic** 97:2
97:4
**automatically**
98:13
**automobile** 77:9
79:1 132:5
**available** 7:13 7:17
12:16 25:21 25:25
27:13 35:11 45:6
49:22 100:20 126:2
**aware** 42:15 61:13
61:19 65:7 65:14
103:15 136:18
136:22 137:12
**away** 66:4

---

**B**

**back** 13:12 15:4
15:7 25:9 28:13
33:2 34:6 34:19
39:2 41:6 41:24
42:16 42:25 48:19
48:21 59:5 66:20
69:8 73:14 73:16
73:18 74:25 75:14
75:21 77:19 91:2
91:4 94:21 94:23
96:8 96:21 97:3
101:25 106:15
109:17 111:4
111:23 116:22
117:24 123:6
123:18 128:1 128:5
129:9 129:10
132:23 132:25
134:7 134:20
**background** 5:13
35:24 42:3 42:15
42:19 42:24 43:4
43:15 44:4 44:17
59:21 74:3 74:20
78:23 90:22 91:9
95:15 95:21 101:13
103:1
**bad** 17:20

**balance** 28:9 109:2
109:3 124:4 124:5
**ball** 78:19
**bank** 2:18
**based** 75:10 75:11
75:11 76:2 76:4
78:6 88:13 90:16
92:2 92:7 96:12
97:21 97:23 98:14
98:23 99:21 100:15
101:11 102:21
103:9 103:16 104:2
104:20 104:25
105:15 107:23
108:18 109:3 109:7
110:6 111:9 111:11
112:9 118:11
125:18 125:22
**basically** 28:19
34:21 62:16 91:14
107:19
**basis** 47:18 48:8
52:5
**bates** 30:13 55:13
**baynem** 91:19
**became** 9:9 10:13
15:12 15:20 25:12
25:14
**becomes** 29:14
**been** 5:4 5:21 7:7
8:9 8:18 9:18 9:19
9:20 11:6 13:14
16:4 23:13 26:5
27:5 30:10 30:13
32:9 35:10 35:13
44:18 46:21 50:14
52:21 54:21 56:14
56:15 56:16 56:16
56:17 58:13 59:22
59:23 63:5 68:1
72:14 75:3 81:4
81:11 82:23 83:23
88:10 89:24 90:21
90:23 92:7 93:14
100:23 106:23
107:20 109:1 112:1
124:2 128:11
128:20 129:16
131:22 135:20
136:9 137:7 140:6

**before** 10:15 17:11
19:14 19:18 20:8
27:9 29:15 34:19
45:14 53:2 74:10
84:13 84:17 102:10
131:2 134:16
135:12
**began** 17:7
**begin** 59:17
**beginning** 55:20
128:21
**behalf** 1:17 38:15
38:16 49:10 49:11
51:25
**beiling** 1:22 4:8
141:6 141:22
**being** 4:9 50:16
80:7 88:15
**believe** 5:19 6:1
6:20 9:24 13:23
15:14 16:11 19:6
20:5 21:1 22:1
23:25 31:17 38:7
42:3 60:12 64:23
85:5 86:11 89:8
**believed** 74:19
**below** 123:20
**benefits** 7:3 7:9
7:11 27:24 34:12
34:24 37:10 39:15
39:21 50:5 79:23
84:22 108:15 111:2
121:15 121:22
127:11 127:13
127:15 131:3
131:19 132:9
132:20
**best** 18:18 27:18
38:9 47:7 66:15
101:2 122:7 134:2
141:8 141:12
**between** 12:3 22:2
26:18 97:16 132:7
**beunrostro** 9:3
**beyond** 19:20 41:17
48:13 111:8
**bi** 77:3
**big** 116:12
**bill** 7:7 12:17 12:21
12:24 12:25 13:2

13:4 18:1 19:14
19:18 20:8 21:10
22:2 22:5 22:7
22:12 23:5 23:20
28:7 28:11 28:14
28:15 29:3 29:6
29:8 29:19 32:10
33:6 35:15 37:12
40:8 40:9 45:9
50:22 50:23 51:1
51:8 51:12 51:17
69:5 72:10 78:3
81:9 81:21 82:19
83:8 84:8 89:6
89:16 121:8 124:4
129:9 129:21
130:21 130:22
130:23 138:24
**billed** 41:7 41:12
47:14 72:4 77:14
124:8
**billing** 11:25 18:21
30:21 32:19 37:13
72:5 72:9 72:11
72:13 78:1 78:2
83:16 89:19 111:18
111:24 112:7
121:13 127:3
129:23 130:14
**bills** 7:6 13:7 13:9
127:19
**binding** 114:1
**bishop** 109:22
109:24
**bit** 5:12 35:16 89:4
**bluecross** 115:8
125:21 131:25
136:19 136:23
137:1 137:13
137:20 138:3
138:18 139:2
**blueshield** 115:8
125:21 131:25
136:19 136:23
137:1 137:13
137:20
**board** 126:16
126:17
**body** 67:9
**both** 11:18 53:14

99:4 125:2
**bottom** 23:22 44:21
55:25 59:12 64:15
68:25 91:18 106:19
107:25 120:8
**bouncing** 78:19
**box** 62:7 123:4
123:19
**break** 45:13 88:21
88:24 89:1
**breakout** 125:8
**breeze** 133:22
**brian** 135:19
**briefly** 135:25
**brings** 6:13 71:15
**brittany** 74:24 75:1
109:22 109:24
**buffton** 92:12 92:22
**built** 33:25
**bunch** 127:18
**business** 74:14
**busy** 91:14
**button** 42:9 42:10

— — — — —

**C**

**call** 6:10 7:19 11:21
35:8 36:22 36:25
37:6 38:24 39:3
39:13 45:4 54:20
60:17 60:21 60:22
60:24 61:1 61:2
61:5 61:6 61:14
65:16 71:3 71:10
71:12 71:15 71:20
72:19 75:22 76:5
77:5 80:20 80:23
81:6 88:19 89:21
89:23 89:25 90:2
90:8 93:9 93:10
93:12 93:15 93:16
93:18 93:18 93:19
96:14 106:14 118:1
119:23 120:1 120:2
124:23 124:23
125:1 125:4 125:6
125:9 125:12
125:15
**called** 5:3 6:2 36:22
46:20 69:5 71:5
71:9 76:1 117:23

118:3 118:9 118:15
122:18 123:21
**calling** 38:15 38:16
48:4 49:9 49:12
52:4 71:13 71:14
71:16
**calls** 37:9 38:20
38:21 38:22 38:25
45:17 46:5 56:15
59:22 59:25 65:9
66:22 80:12 124:14
125:12
**came** 15:19 32:13
63:7 67:20 68:1
69:11 74:24 76:9
91:4 94:17 94:21
94:23 101:20
104:15 106:4
108:12
**cannot** 88:8 93:11
104:21 104:25
121:10 121:18
**card** 14:5
**care** 138:2 138:6
138:20 139:8
139:13
**carlson** 101:22
102:3 102:10
**carothers** 4:4
**carpet** 6:5
**carrier** 19:14 35:9
37:2 37:11 37:15
39:7 45:4 45:18
48:23 50:8 60:24
72:5 77:15 77:16
78:5 78:8 78:9 79:2
79:14 82:10 82:11
83:20 99:24 100:11
115:2 115:7
**carriers** 21:5 82:15
84:19 85:3
**case** 14:13 14:19
15:2 19:21 19:22
23:14 47:2 54:2
69:22 80:16 83:1
84:1 85:21 87:4
95:22 111:10 116:5
116:12 116:13
126:21 131:25
135:1

**cashier** 5:24
**cassandra** 1:22 4:8
141:6 141:22
**categories** 33:12
60:9 61:9 61:22
**categorize** 10:1
10:3
**category** 42:2 42:7
44:3 122:18
**catherine** 13:19
**cause** 39:2 47:13
133:6
**ccr** 1:22 141:6
141:22
**center** 6:10 17:5
**certain** 8:2 8:3 10:7
19:11 25:7 42:13
45:23 48:14 56:4
56:18 85:3 88:5
90:7
**certainly** 47:24
57:18
**certificate** 141:1
**certify** 140:4 141:8
141:13
**chad** 2:23
**chance** 53:1
**changed** 98:3 134:9
**changes** 24:13
56:15 140:5
**charge** 135:15
**charges** 70:8 138:1
**checked** 106:7
**checking** 106:3
**cherry** 116:20
117:6
**choice** 51:11 51:16
51:22
**chris** 11:9 13:18
**chrisy** 11:7 11:13
11:22 13:21 14:10
103:14
**chronological**
72:23 113:6
**cindy** 14:23 15:5
62:23 66:6 81:3
89:16 110:10
110:10 110:14
111:3 112:5 123:12
**circumstance**

131:23
**civil** 4:6
**claim** 35:9 35:13
36:24 37:1 37:14
39:23 40:5 40:11
42:12 45:5 45:8
46:23 47:1 47:16
48:4 48:6 49:1 49:3
49:16 49:19 49:23
49:23 69:1 69:3
69:4 69:6 69:10
69:18 71:18 71:22
75:24 77:3 80:13
80:14 80:15 80:16
89:14 99:24 100:4
100:7 100:10
100:11 100:21
120:9 120:15
120:20 121:4 121:7
122:3 122:6 122:20
123:13 134:10
134:13 134:16
134:20 138:19
138:22 138:23
**claims** 6:24 6:25
7:2 7:5 8:8 12:2
12:4 12:4 12:8 20:3
24:16 24:24 25:2
26:18 31:13 35:24
37:17 39:14 40:12
40:15 41:10 42:16
42:25 45:20 47:5
51:6 123:21 132:17
134:1 134:3 134:19
135:12 135:24
**clarify** 57:23
116:22
**class** 68:7
**clear** 57:14 57:18
65:12 84:11 84:17
116:4 116:15
116:23
**clearer** 73:8
**clerk** 116:11
**click** 18:8 24:1 34:1
44:22
**clicked** 121:3
**client** 17:23 17:24
18:1 18:5 18:10
20:8 20:11 21:3

21:9 21:11 21:13
22:20 23:7 23:13
23:17 24:2 24:3
24:7 24:14 24:17
24:20 24:23 25:3
25:10 27:14 33:17
105:8 105:15
105:20 105:21
106:21 130:14
**clients** 19:13
126:18 128:24
**close** 107:25 110:24
111:9
**closed** 60:11 63:12
63:15 63:16 63:18
65:3 71:4 72:4
90:15 91:17 94:18
95:7 96:19 97:9
97:22 103:14
103:19 103:25
109:19 109:23
110:3 110:12
110:16 110:17
110:25 111:3 111:7
111:9 111:10
111:12 111:14
112:4 112:6 130:24
**coburn** 2:16
**code** 100:3
**codes** 100:2
**collect** 128:25
129:3
**collection** 22:12
29:9 55:12 59:9
115:17
**collects** 128:24
**collins** 110:10
110:14 111:4 112:5
123:13
**column** 68:14 104:5
**com** 2:7 2:13 2:20
**comes** 23:20 29:15
31:2 31:8 36:16
36:21 44:3 70:13
91:2 97:2 127:10
127:12 138:10
**comfortable** 65:20
**coming** 14:21 86:14
114:6 127:17
127:19

**commercial** 12:23
13:2 13:7 13:9
28:13 28:14 28:16
125:20 126:10
126:15 127:6
129:17 138:12
**commission** 140:23
141:24
**communicating**
99:11
**communications**
133:14
**communities** 1:8
2:15
**comp** 25:5
**companies** 132:8
**company** 16:5 16:8
22:7 45:21 49:8
49:25 50:4 50:12
50:19 51:3 114:2
**compiled** 55:1
**complaint** 39:5
**complete** 141:11
**completed** 4:11
108:12 129:23
**completely** 31:6
**completing** 129:2
**complies** 117:21
**computer** 15:8
91:22
**concerned** 12:18
**conclusion** 52:4
133:4
**conclusions** 21:22
**condensed** 125:3
**confirm** 39:19
52:13
**confirmation** 51:2
**confirms** 80:13
**confused** 117:3
**confusing** 117:12
**confusion** 115:20
**connected** 141:16
**consent** 84:2 84:5
87:20 121:20 122:1
**consequence**
114:14 114:17
**considered** 11:23
11:24 12:1
**consolidated** 11:19

13:17
**consolidation** 14:9
**contact** 17:5 32:11
32:16 35:22 36:7
36:9 36:13 36:18
37:4 37:22 51:10
65:5 65:9 77:4
80:17 124:13
125:17
**contained** 87:7
**contains** 121:21
**contest** 116:24
**continue** 20:10
49:14 67:16 75:18
89:8 96:9 99:19
101:12
**continuing** 95:15
**contract** 21:9 21:11
21:14 21:16 21:19
116:2 131:8 131:18
**contracts** 131:2
131:23 131:24
**contradict** 114:19
**contributed** 115:24
**conversation** 51:14
**conversations** 15:1
47:2
**coordinate** 7:3 7:9
27:24 34:12 79:23
127:14
**coordinates** 34:24
**coordinating** 39:21
**coordination** 7:11
12:18 37:10 39:15
50:5 127:10 127:13
131:3 131:19 132:9
132:20
**corner** 54:9 55:11
56:22 59:13 66:24
**correct** 8:12 11:20
13:8 13:11 16:20
19:5 25:19 26:19
32:4 32:18 33:5
34:13 44:9 48:23
52:15 57:3 58:19
62:20 63:10 66:19
68:4 69:24 70:21
72:2 74:17 75:8
76:25 78:16 80:22
81:13 81:20 85:20

88:17 91:7 93:20
94:10 95:2 95:18
97:14 97:19 98:8
98:11 101:23
102:19 103:2 106:6
106:9 110:8 111:14
111:18 111:21
113:22 115:18
118:17 119:23
119:24 120:18
122:5 122:13
122:16 122:17
124:15 126:19
128:17 129:18
136:11 137:6 137:8
137:9 137:14
137:15 138:21
139:8 139:9 139:11
139:13 139:14
**could've** 118:18
**counsel** 2:24 4:2
133:9 141:14
141:15
**county** 141:4
**couple** 28:22 104:5
**course** 24:23 108:6
139:10
**court** 1:1 1:23 4:9
141:7
**coventry** 21:10
**cover** 83:6 121:14
**coverage** 39:25
40:1 40:8 40:25
45:6 49:22 72:1
127:7 127:8 128:9
128:10 128:15
128:16 128:25
129:1
**create** 29:5 29:17
30:23 60:24
**created** 7:8 29:14
32:10 56:14 62:20
64:6 69:12
**criteria** 42:13 49:18
51:5 98:14 98:16
109:15
**cross** 3:4 136:14
**culled** 68:2
**current** 9:15
**currently** 13:16

13:16 14:7 16:23
101:2
**custom** 104:7 104:8
**customer** 5:24
**cv** 1:6
**cynthia** 1:4

_____

**D**

**data** 15:7 29:3
31:12 31:15 31:18
31:23 32:1 32:1
32:7 33:14 42:9
43:6 43:12 43:14
43:18 43:20 44:8
44:12 44:16 44:25
56:14 59:2 67:21
68:2 74:1 74:7 74:8
74:15 75:7 95:4
**date** 23:25 49:3
56:25 58:9 58:11
58:12 58:14 64:7
64:14 65:3 69:17
69:19 70:4 90:10
91:23 91:24 97:10
103:9 112:20 124:1
124:2 134:23
134:25
**dates** 61:23 63:2
63:5 63:7 63:8
**day** 73:24 76:12
95:13 113:14
119:10 119:13
119:13 119:17
134:16 141:18
**deal** 10:22 108:7
**dealing** 85:22
115:23
**deals** 69:17 70:16
99:6
**dealt** 127:2
**dean** 13:18
**december** 116:2
134:7
**decides** 83:3
**defendant** 2:9 2:15
**defendants** 1:9
**definitely** 6:17
**delivered** 94:8
**demand** 139:5
**denial** 115:1 115:11

**dentons** 2:10 2:13
**department** 12:12
12:20 16:1 16:17
16:22 28:8 29:4
31:7 31:10 31:16
31:18 31:23 32:1
32:1 32:3 32:6 32:7
33:13 33:14 34:23
36:12 37:4 43:3
43:14 43:19 44:5
44:6 44:8 44:13
67:2 68:2 74:11
74:15 75:1 85:13
95:3 95:24 97:25
98:2 98:5 98:6 98:7
99:1 99:3 99:6
99:14 99:16 101:15
101:24 105:20
108:22 109:25
110:14 110:15
112:6 132:5 132:18
134:3 135:16
135:18
**departments** 59:2
**depending** 28:4
41:5 41:20 49:18
79:24 85:18
**depends** 105:7
**deponent** 139:20
**deposition** 1:13 4:1
4:11 14:19 26:7
26:17 27:6 52:22
126:20 140:3
**describe** 29:7 33:23
59:16
**described** 34:8 36:3
64:1
**detail** 72:20 138:17
**detailed** 113:19
113:21
**determination**
131:3 131:20 132:9
132:21
**determine** 35:9
35:12 36:17 41:21
77:6 110:5 126:2
127:15
**determined** 36:23
**determining** 7:17
**differ** 55:15

**difference** 12:3
138:4
**different** 8:20
17:19 25:2 31:6
33:20 33:24 34:2
35:18 118:8 119:13
119:13 119:16
135:7
**direct** 3:4 5:6 48:9
**directly** 67:20
100:22
**discount** 21:8 21:20
**discounts** 21:4 21:6
22:9 22:22
**discoverable** 47:24
48:2
**discovery** 19:21
19:23 41:17 48:5
**discussed** 50:16
61:10
**discussing** 69:9
**discussion** 26:15
52:18 112:24 133:7
**dismissed** 90:24
90:25 91:13 91:15
**district** 1:1 1:1
**division** 1:2
**document** 25:18
26:4 26:9 26:25
27:7 27:10 30:12
30:15 30:16 53:13
53:17 54:12 54:13
56:8 59:18 63:21
64:5 64:6 65:17
66:21 67:9 68:13
69:21 70:16 70:24
71:1 73:3 73:3 76:3
83:25 84:1 84:12
84:13 84:16 87:8
87:19 87:22 88:4
90:11 94:4 94:6
96:2 100:15 100:22
104:4 104:14
104:25 105:12
107:24 118:4 118:8
118:23 120:9 122:2
122:8 122:12
122:14 123:19
**documentation**
37:21

**documenting**
106:10
**documents** 15:5
27:13 38:2 52:23
53:11 53:25 54:10
54:20 54:24 55:12
55:20 57:8 57:14
58:1 58:3 58:8 58:9
58:25 59:10 59:17
61:8 61:25 63:17
63:19 64:20 65:13
65:25 66:4 66:14
66:17 67:5 70:20
75:10 75:12 76:4
76:24 87:6 88:10
95:19 105:10 113:3
113:17 120:3 120:9
121:6 121:7 121:19
122:3 122:6 122:19
122:19 122:20
122:21 122:23
123:4 123:15
125:18 126:5
130:12 132:11
136:25 137:6 137:8
137:12 137:18
137:21 138:15
138:16
**doing** 39:16 45:11
50:4 66:15
**dollars** 19:3
**done** 37:13 56:15
56:18 91:8 112:17
130:18 135:5 135:8
**down** 58:13 67:8
68:5 68:25
**drive** 92:12 92:22
**driver** 65:5 65:8
66:22 78:9 78:13
79:2 95:9
**duly** 5:4
**duplicate** 104:7
104:7
**during** 37:18

_____
**E**
_____
**each** 8:23 18:7
18:11 23:18 23:20
34:1 34:2 61:21
71:12 113:12

114:20 119:9 119:9
119:12 119:16
**earlier** 30:19 59:21
60:6 69:9 75:4 90:5
113:4 116:16
119:22 122:2
137:10
**earliest** 73:18
**early** 73:23
**easiest** 70:23
**east** 1:8 2:15
**eastern** 1:1 1:2
**educational** 5:13
**efforts** 129:23
**either** 15:16 46:8
49:21 122:5
**elect** 19:10 25:6
**electronically** 29:3
29:7
**else** 20:11 23:7
25:13 83:7 87:2
101:16 114:4
**email** 123:3 123:17
**emails** 122:24
123:14
**employee** 49:7
49:24 50:3 50:7
50:11 50:21 141:15
**employees** 10:2
31:19 38:6 51:10
86:23 87:3 136:10
**employer** 127:2
**employment** 128:7
**encouraged** 24:22
**end** 11:1
**ends** 80:6
**enter** 71:16 90:6
101:6
**entered** 67:15 80:2
89:15 90:14 96:18
96:25 100:24
101:15 101:17
101:18 102:3
103:14 109:22
110:10 110:10
**enters** 28:17 124:19
**entire** 13:16 32:9
33:16 110:17
**entitled** 84:2
**entries** 54:1

**entry** 29:3 31:12
31:16 31:18 31:23
32:1 32:1 32:7 42:9
43:6 43:13 43:14
43:18 43:20 44:8
44:12 44:16 45:1
56:14 59:2 67:21
68:2 74:1 74:7 74:8
74:15 75:7 80:6
95:4
**esq** 2:4 2:11 2:17
2:23
**established** 86:11
131:22
**establishment**
22:13
**even** 44:6 50:23
114:2 115:17
117:17 121:20
131:22 132:11
138:15
**event** 62:13 62:14
62:18 62:24 64:1
67:10 122:23
123:15
**events** 63:24 64:4
64:5 67:9 69:17
70:16 73:18 73:20
89:7
**ever** 13:2 26:4 27:8
37:20 38:18 50:14
86:18 86:23 102:9
108:7 126:4 127:1
**every** 38:24 39:13
61:1
**everybody** 24:8
38:23
**everything** 53:8
**evidence** 51:19
**exact** 72:12 86:1
113:12
**exactly** 18:13 57:16
93:24 96:7 116:16
125:5
**examination** 3:4
3:4 5:6 136:14
**examined** 5:4
**example** 36:20
58:20
**exception** 110:25

115:1
**exclusions** 115:2
**exclusively** 14:8
**exhausted** 28:2
 83:18 108:14 111:1
**exhibit** 26:5 26:17
 27:5 29:21 30:11
 52:22 54:6 54:21
 55:11 55:12 58:17
 61:10 83:24 87:7
 87:9 87:12 87:20
 88:16 89:7 137:4
**exist** 52:2
**exits** 26:14 123:9
**expanded** 119:16
**expands** 119:9
**expenses** 40:6
 127:16
**experience** 23:4
 25:1 57:7 58:7
 85:22 116:19
 129:21
**expires** 140:23
 141:24
**explain** 12:22 23:19
 31:9 34:5 35:19
 36:19 37:9 37:10
 39:19 52:24 55:19
 61:23 127:22
**explains** 39:15
**extent** 57:6

———————
**F**
———————
**f4-629** 100:18 101:3
**facilities** 8:20 8:21
 10:7
**facility** 68:10
 111:17 124:3
**fact** 50:20 77:9
**facts** 19:22 51:19
**failed** 109:6 109:11
 109:12
**fair** 13:6 55:5 93:4
**fairness** 54:23
**falsification** 14:5
**familiar** 26:10
 27:11 53:9 61:8
**familiarize** 17:22
 25:11 25:15 53:1
**far** 10:7 12:18

130:19 133:8
 137:24 138:11
**farm** 22:6 23:4
 36:20 36:22 46:20
 46:20 47:3 47:6
 47:10 77:7 77:9
 77:18 78:8 79:10
 79:14 80:12 80:21
 81:5 81:8 81:10
 81:19 81:24 87:9
 88:11 89:5 89:13
 93:18 106:23
 108:14 121:8
 121:11 121:17
 121:18 122:15
 124:6 124:17
 124:24 137:25
 138:5 138:19 139:6
 139:7
**fault** 40:2 95:10
**fax** 2:6 2:13 2:19
 50:22 50:23 51:1
**faxed** 72:7
**feeds** 97:3
**fell** 55:6
**few** 5:15 25:8 66:1
 133:25
**field** 104:7 104:8
**fields** 31:24
**fieldstone** 1:23
**figure** 12:15
**file** 45:9 66:6 66:11
 74:15 75:6 80:20
 100:5 108:23
 108:23 111:3 112:6
 121:24 126:14
**filed** 35:13 39:23
 99:9 99:14 99:17
**files** 86:25
**filing** 99:9
**fill** 61:5 83:17 83:20
**financial** 68:7
**financially** 141:16
**find** 18:5 55:22
 55:25
**fine** 57:9 57:11
 68:23 88:22 88:23
**finish** 12:11
**finished** 86:20
**first** 5:4 7:14 7:23

8:25 9:24 10:10
 14:12 27:25 28:23
 30:1 30:12 31:15
 34:7 34:13 34:25
 36:24 51:7 54:11
 56:8 56:19 57:1
 58:17 66:21 66:23
 67:10 67:13 67:18
 70:19 71:13 74:13
 75:9 75:14 76:5
 80:1 81:14 82:4
 120:6 120:15
**first-party** 6:24
 6:25 8:8 11:24 12:4
 12:9 12:11 12:16
 12:19 35:8 36:25
 37:2
**fits** 101:2
**five** 8:10 10:9 88:19
 88:19
**fleming** 11:9 13:18
**focuses** 119:13
**folks** 11:21
**follow** 58:4 78:19
**follow-up** 89:19
**followed** 103:24
**following** 21:7
 26:15 58:22 106:4
 140:4
**follows** 5:5
**foregoing** 140:3
 141:10
**forgot** 75:4
**form** 17:17 22:20
 29:10 30:18 30:23
 60:24 61:1 61:6
 71:12 71:15 77:5
 82:24 84:5 84:7
 84:22 89:5 90:8
 97:1 119:5 124:13
 124:23 125:17
**format** 30:22 32:3
 95:17
**forms** 60:17 60:21
 119:23 125:12
**forth** 37:21 58:17
 58:22 59:3 60:5
 61:10 64:4 67:25
**forward** 73:19
 138:4

**found** 78:24
**foundation** 21:22
 22:11 22:13 43:21
 51:24 57:5 57:19
 85:10 93:1 115:22
 129:11 130:1 130:6
 131:5 132:11
 132:12
**four** 10:9 33:10
 33:12 33:21 136:8
**fourth** 96:13
**franklin** 1:24 4:4
**frankly** 57:9
**front** 5:24 66:5 85:4
 95:19 103:9 103:16
 126:5 137:7
**function** 116:1
**funds** 100:20
 105:14
**further** 136:13
 139:17 139:20
 141:13

———————
**G**
———————
**gaertner** 2:3
**garst** 66:25
**gather** 67:5
**gathering** 64:20
 95:21
**gave** 34:21 55:3
**general** 2:24 37:13
 53:25 54:3 57:7
 79:22 84:18 84:21
 100:2 100:3 116:8
 116:17
**generally** 54:19
 55:19 57:13 67:10
 67:11
**george** 1:23
**get** 23:21 29:3
 31:13 33:25 37:18
 38:5 43:15 45:14
 52:9 66:20 86:8
 86:16 95:11 117:1
 133:7
**gets** 12:11 29:15
 69:8
**getting** 25:9 25:10
 34:6 41:24 66:16
 74:15 114:5

**gilley** 74:24 75:1
 75:6 76:1 76:11
 76:13 76:20
**give** 25:1 33:17
 38:16 49:2 51:11
 52:25 52:25 60:11
 77:15 90:22 125:4
**gives** 36:1 59:19
 68:15 81:4 113:13
**giving** 14:18
**gladys** 13:20
**go** 5:16 5:25 6:8
 6:18 18:4 19:9 21:3
 28:15 28:22 33:2
 35:13 39:2 39:16
 43:15 48:19 52:16
 53:7 55:6 56:12
 58:11 58:20 59:9
 59:11 60:13 61:21
 68:5 68:12 71:12
 73:7 73:24 74:16
 74:22 75:18 76:8
 77:1 77:13 77:19
 78:17 79:9 80:11
 80:25 83:6 89:15
 91:25 96:4 96:21
 97:5 102:20 108:23
 109:21 110:20
 112:22 113:8
 113:24 114:2 114:9
 120:5 120:12 123:8
 129:6 130:21 134:7
 135:10
**goes** 31:15 42:11
 42:24 58:13 72:22
 81:3 81:23 83:3
 83:7 117:24 134:22
**going** 13:12 27:1
 30:11 40:17 52:24
 52:25 53:6 53:16
 53:17 53:21 59:5
 59:6 61:22 64:10
 66:14 71:13 71:21
 73:18 75:14 87:24
 90:11 93:6 101:2
 106:15 108:24
 113:23 114:21
 123:6 123:18 133:1
 133:3 133:21
 133:25 134:20
 138:4 139:5

**gone** 15:4 15:7 54:6
92:4 105:15 108:17
130:12 138:16
**good** 30:5 52:23
65:22 65:22
**got** 7:18 10:10 17:1
30:5 33:17 33:18
33:18 33:19 34:19
57:16 73:5 74:13
74:25 91:21
**gotten** 90:18
**government** 12:25
18:1 19:11 19:15
20:6 25:7 138:13
**graduated** 5:14
**great** 20:25 62:6
138:17
**group** 9:10
**groups** 17:8 17:11
**guess** 18:16 22:24
38:12 42:23 46:16
47:10 58:6 63:23
68:22 86:12 114:20
**guesswork** 22:14
**guidance** 133:9
**guidelines** 46:3
46:9 46:11
**guys** 57:8

**— H —**

**hale** 13:20
**half** 134:8
**hand** 52:21 83:20
116:12
**handle** 6:4 7:2
12:10 12:13 31:12
40:16 41:11 115:9
**handles** 66:10
107:10
**handling** 7:4 45:7
49:20 66:5 80:15
80:16 89:14
**happened** 76:15
108:10
**happens** 50:18
72:18 76:15 116:18
**hard** 34:5 127:23
**harkins** 11:7 11:13
11:22 13:21 14:10
103:14

**hasn't** 84:16 131:21
**haven't** 46:21 46:22
50:24 65:13 136:9
**having** 5:4 11:1
139:2 140:3
**hayden** 75:14
**head** 35:1 88:19
**health** 7:14 12:16
12:23 12:25 12:25
13:2 13:5 13:7 13:9
16:25 17:1 18:1
19:15 27:23 28:4
28:5 28:10 28:13
32:15 40:9 41:6
41:7 41:20 50:8
50:9 50:13 79:24
80:9 111:18 111:23
112:8 115:2 115:7
125:20 126:10
126:15 127:6 127:9
128:9 128:16 129:3
129:18 129:22
130:14 130:21
130:22 130:23
131:2 131:18
131:22 131:24
132:7 136:18
138:12 138:13
**heard** 14:15 87:2
87:5
**hearing** 48:14
**heart** 47:12
**heckman** 13:19
**help** 127:16
**helped** 67:5
**helpful** 60:15
**helps** 113:24
127:18
**hendrix** 104:15
106:2 108:3
**hereby** 140:4 141:8
**hi** 49:9
**higgins** 74:1
**high** 5:14 113:18
**hired** 6:21 6:23
7:23
**history** 54:22 56:2
56:9 56:11 56:20
57:11 58:7 58:9
58:11 58:25 96:5

113:16 113:19
117:25 123:17
**hold** 8:7 9:5 9:13
**holloran** 2:3
**holloranlaw** 2:7
**honest** 42:23 117:9
**hoops** 1:4 14:16
14:23 15:5 15:10
19:23 20:3 48:15
54:4 58:2 62:2
62:23 65:14 65:16
65:16 66:6 66:11
77:9 78:8 80:20
83:25 92:13 92:15
92:18 95:22 101:9
116:1 116:5 123:4
125:20 132:1
134:10 134:13
134:20 136:18
136:22 137:13
137:19 137:25
138:3 138:18 139:2
139:6 139:7
**hospital** 7:6 7:19
8:3 19:17 19:17
21:14 21:15 22:2
28:14 32:13 40:9
41:7 63:9 105:5
120:16 124:9 127:2
139:13
**hospitals** 1:8 2:15
8:5 10:4 82:20
**hour** 88:20
**how** 5:18 6:6 6:11
7:16 8:7 9:3 9:5
9:13 9:22 16:4
16:15 18:14 24:19
31:1 31:8 34:20
37:10 37:12 37:12
37:16 38:13 38:17
39:9 39:16 40:16
41:10 42:23 44:12
44:20 45:24 46:3
47:13 48:3 49:5
49:6 49:7 55:4
55:14 58:3 62:15
62:15 70:12 78:21
79:22 80:5 91:21
96:3 105:2 105:17
105:18 107:10

112:19 113:5
115:23 127:22
135:20
**however** 36:15
**huh-uh** 130:11
**hung** 114:1
**hunt** 13:19
**hyperlink** 18:7
18:11 23:18

**— I —**

**identify** 38:13
38:17 38:18 49:5
49:6 49:7 53:8
**illinois** 10:8
**implementation**
52:14
**implied** 86:12
**in-house** 33:25
**inc** 1:8 2:24 4:4
**include** 59:25
**included** 13:22
122:20
**incoming** 7:2 7:5
31:13
**incorrectly** 111:11
**independent**
137:17
**indicate** 71:5 80:19
101:8 102:2 102:7
103:11 104:22
106:16 110:1
110:22 118:8
118:14 121:19
122:11 124:13
125:19 136:25
**indicated** 118:1
137:10
**indicates** 137:11
**indicating** 68:6
68:15 88:14
**individual** 39:6
60:22 76:18
**individually** 121:9
**individuals** 13:13
14:7
**industries** 6:2
**information** 14:22
17:25 18:18 20:11
25:20 25:24 26:1

29:16 30:25 31:10
31:14 32:2 32:3
32:11 32:11 32:17
32:19 33:3 33:13
34:2 34:16 35:14
36:2 37:16 37:18
43:1 43:16 44:16
44:25 55:22 55:25
57:10 57:17 58:1
59:20 59:25 60:25
61:24 67:4 67:12
67:17 67:20 67:22
67:24 70:12 71:11
71:23 72:8 72:15
74:10 75:24 77:4
77:11 77:15 79:1
79:12 80:17 90:7
90:16 92:3 93:11
94:25 95:11 95:15
95:16 96:1 96:3
96:12 96:25 100:8
113:13 113:15
113:16 125:5 125:8
125:24 126:6
**injuries** 81:4
**injury** 49:4
**input** 29:4 71:11
107:9
**insofar** 133:6
**instance** 58:15
62:22 121:12
**institution** 69:4
**institutional** 69:1
69:5 69:18 120:15
120:20 121:4
**instruct** 48:12
**instructed** 41:10
50:11 51:6 51:10
51:15 86:23
**insurance** 7:3 7:9
7:11 12:9 12:9 13:3
27:22 27:23 27:24
28:4 28:5 34:12
34:24 35:8 37:14
39:7 39:21 39:24
40:9 40:17 41:6
45:4 45:17 45:21
46:18 48:22 49:8
49:25 50:4 50:8
50:9 50:9 50:12

50:13 50:19 51:2
60:23 77:7 77:10
77:14 78:5 79:14
79:23 83:20 85:3
85:13 100:11
100:13 111:18
111:24 112:8
125:20 126:2
126:10 126:15
127:6 127:9 127:14
128:9 128:16 129:3
129:22 130:14
131:2 131:18
131:23 131:24
132:7 136:18
136:22 137:13
137:19 138:3
138:12 139:2
**insurances** 7:12
7:17 7:18 12:10
12:14 12:16 32:14
**insurer** 21:17 78:15
83:7 84:8 84:9
85:18 85:19 105:4
**insurers** 82:20
84:23
**intentionally** 117:3
117:12 117:12
**interested** 141:17
**internet** 42:25
**interpret** 66:15
**interpreting** 65:12
**intersection** 96:22
**investigate** 70:4
**investigation** 66:16
**invoiced** 106:13
107:4 107:8
**involved** 52:13
90:18 135:11 136:9
**involvement** 66:9
**involving** 14:16
62:23 131:25
**iowa** 10:8
**issue** 83:1
**issued** 83:19 83:19
**it'll** 34:2
**items** 42:14
**iv** 96:22 96:23

— J —

**jackson** 21:1 24:9
**january** 64:15
64:16
**job** 8:7 9:5 9:13
9:17 15:24 116:22
**join** 20:1 21:25
51:23 130:5
**joined** 11:3 16:7
17:13 17:21
**jolley** 15:22 15:24
16:4 16:7 16:12
16:16 17:7 17:11
**joshua** 101:22
102:9 109:6 109:12
**judge** 116:11
**july** 101:25
**june** 1:19 4:5 6:22
73:20 140:3 141:18
**just** 7:20 9:12 11:12
11:23 12:1 12:5
19:16 22:14 25:7
29:16 30:7 30:11
34:1 34:8 42:21
42:21 42:22 42:24
42:24 46:16 47:10
49:1 52:3 52:5
52:13 53:8 54:2
54:16 54:23 55:18
57:4 57:9 57:11
61:9 64:12 65:11
65:17 66:1 67:9
67:10 67:11 70:24
73:17 73:19 76:11
78:18 82:2 84:11
84:17 90:24 91:12
94:18 100:1 100:2
103:21 103:22
103:24 103:25
106:3 107:9 111:13
113:12 113:20
114:1 114:3 114:7
114:9 114:22
114:23 115:21
116:8 116:9 116:17
117:10 118:6 118:7
119:9 119:19 119:15
125:3 127:23
133:20 133:21
134:25 138:16

— K —

**kathy** 66:25
**keep** 36:17 83:20
**keeps** 57:14 58:3
**kept** 39:9
**kind** 33:22 46:3
53:20 54:16 55:10
55:21 55:22 56:22
67:11 70:25 103:23
113:13
**kinds** 83:4
**knew** 137:19 138:2
139:1
**know** 9:16 10:16
12:6 14:2 15:12
15:15 15:25 16:4
17:6 17:7 17:10
20:15 20:24 22:8
22:23 22:25 23:2
24:3 24:6 24:8
24:15 26:21 29:11
29:15 29:17 29:19
30:24 30:25 31:21
31:22 38:13 39:9
40:7 41:4 43:23
44:20 46:19 47:7
47:25 50:15 55:5
55:14 57:11 57:13
57:15 57:19 62:8
64:10 65:14 66:8
67:22 67:23 68:3
68:4 68:8 68:10
68:16 68:22 69:2
69:13 69:16 69:23
70:1 70:5 70:14
72:1 72:7 72:12
72:13 75:15 76:16
76:21 77:16 78:5
78:7 78:11 78:21
79:3 80:4 81:14
82:5 82:25 83:3
84:7 87:13 88:12
90:15 92:5 92:8
94:11 95:3 95:5
95:23 95:24 95:24
96:11 96:24 99:18
100:13 100:23
101:24 102:14
102:16 103:3
105:18 107:10
108:4 111:8 112:16

113:25 114:4
114:10 114:20
114:21 116:4
116:19 116:25
117:4 117:9 117:9
120:20 120:23
125:11 125:25
126:3 126:8 127:20
127:22 129:10
130:2 130:8 130:10
130:20 133:17
135:5 135:9 135:17
135:20 136:5
137:18 137:23
**knowing** 85:10
**knowledge** 22:14
31:7 44:11 54:3
54:4 66:17 95:1
111:8 114:17
125:19 125:23
126:19 127:23
**known** 126:9
**knows** 54:1 65:15
86:11 114:18 131:6
**kristina** 15:22
15:23 16:12
**kristy** 81:9

— L —

**labeled** 36:16 94:1
**lack** 22:10 85:9
130:6
**laminate** 6:4
**last** 9:2 9:19 14:14
14:15 14:22 21:2
73:7 129:7 129:13
134:13 136:8
**later** 64:7 69:19
**law** 2:4 2:10 2:17
116:10
**lawyer** 15:2 116:19
**lawyers** 133:14
**lay** 37:12
**lcr** 1:22 141:7
141:22
**lead** 8:16 8:17 8:22
8:25 9:6 11:16 35:8
35:17 36:2 36:6
36:15 36:20 41:25
44:3 45:2 45:3 71:4

74:4 74:19 75:13
75:20 77:12 77:18
79:10 80:10 89:13
94:22 94:22
**leader** 15:16
**leads** 10:24 11:2
11:5 27:22 32:13
32:14 32:21 33:8
33:9 36:12 41:24
42:8 42:11 43:13
56:16 60:7 72:1
74:4 80:8 90:22
94:17 99:21 102:24
**learn** 14:12 17:15
114:23
**learned** 77:8
106:23
**least** 61:4 79:2
91:22
**leave** 46:6
**left** 14:2 39:11
76:11 90:13 93:10
93:12 93:19 96:10
117:23 118:9
118:15 123:20
**legal** 21:21 48:8
52:4 67:1 99:13
99:16 110:15 112:6
133:4 133:9
**less** 131:8 131:23
**let** 17:19 21:10
22:15 27:4 28:23
30:10 33:2 40:7
40:21 41:4 45:1
50:18 52:3 52:16
52:21 57:4 57:18
57:23 59:9 59:11
60:13 62:6 64:2
65:25 66:1 66:20
67:8 68:12 70:15
72:21 73:7 77:19
83:23 85:14 88:25
90:9 90:12 96:21
102:20 103:7 109:4
109:21 110:20
112:10 112:22
113:23 114:9 118:7
118:12 118:21
119:20 119:25
120:6 124:21

127:20 131:14 134:7 137:3 138:25
**letter** 72:6 72:9 72:10 72:12 72:14 77:17 78:1 78:2 78:14 78:14 81:12 81:14 81:16 81:18 81:18 81:21 81:23 82:2 82:3 82:12 82:14 82:17 82:19 82:22 82:24 83:1 83:7 83:16 89:18 89:18 92:3 92:5 92:14 92:17 92:22 93:5 93:23 93:25 94:2 94:7 94:8 94:11 102:4 102:5 110:4 110:5 110:11 121:13
**letters** 59:22 60:2 83:4 102:18
**letting** 130:20
**level** 113:18
**liability** 7:14 12:17 12:24 13:1 18:2 18:23 18:24 19:1 19:3 19:10 19:14 19:18 20:7 25:6 25:6 27:23 28:7 28:7 28:8 28:11 28:11 36:17 36:23 40:5 40:10 40:11 41:8 41:22 49:23 59:2 77:3 77:17 78:1 78:2 78:13 79:25 81:16 82:1 97:24 98:2 98:6 98:10 99:2 99:11 101:15 102:15
**licensed** 4:9
**lien** 98:13 98:15 98:18 98:21 99:5 99:12 99:14 99:17 102:4 108:16 108:17 108:20 108:21 108:23 108:24 109:6 109:12 110:11 110:23 126:11
**liens** 99:7 126:14
**light** 96:22 118:3

**like** 8:1 16:15 29:8 33:16 33:22 39:22 42:21 48:5 53:7 53:11 54:10 56:2 57:2 61:20 64:11 67:18 67:19 67:25 70:8 70:19 71:2 72:22 72:24 73:6 74:2 76:5 77:2 77:14 81:24 90:10 92:3 94:15 94:16 94:21 96:16 97:10 98:24 100:6 100:18 102:5 104:13 106:3 108:15 108:18 117:7 123:12 125:1 128:24 139:13
**limited** 19:23
**limits** 40:3
**line** 68:6 68:9 117:11 123:24 140:6
**list** 18:20 20:13 21:4 23:23 23:23 23:25 32:10 32:10 60:24 120:13 123:16
**listed** 14:6 23:11 98:14 102:23 115:7 121:6 121:13 121:23 122:3 122:5 122:8 122:10 123:4 123:15
**listen** 39:3
**lists** 17:25 18:22 19:10 120:3 124:1
**litigation** 14:16
**little** 5:12 6:15 35:16 55:6 89:4
**litzsinger** 2:5
**live** 5:10
**llp** 2:3 2:10 2:16
**locate** 42:12 49:15
**located** 105:22
**location** 8:3
**long** 5:18 6:6 6:11 8:7 9:5 9:13 16:4 39:9 82:22 135:20
**longer** 75:5
**look** 15:7 18:10

23:1 24:22 25:14 25:21 26:10 27:7 27:10 30:14 33:22 35:24 53:1 53:9 54:8 56:6 57:1 58:15 72:23 87:15 87:18 90:12 106:3 113:23 116:22 118:12 118:21 119:25 120:6 121:17 124:21 126:1 131:1 132:13 132:13 135:25 136:1
**looked** 15:4 54:7 69:11 125:22
**looking** 23:9 30:7 39:4 44:15 56:4 61:25 66:14 77:20 79:19 85:25 87:21 88:7 103:5 106:19 109:8 113:2 117:25 120:23 125:7
**looks** 42:14 54:9 56:2 57:1 67:18 70:8 70:19 71:2 72:22 72:24 73:6 74:2 76:4 77:2 77:14 90:10 92:3 94:15 94:16 94:21 96:16 97:10 98:24 100:6 100:18 102:5 104:13 108:15 108:18 123:12 125:1
**lot** 33:19 103:20
**louis** 2:5 2:12 2:18 120:16
**love** 13:23 13:25 14:11 14:18 53:20 70:21 71:20 76:13 76:21 80:23 98:21 100:24 117:16 123:20 126:22
**luna** 81:3 89:16

---

**M**

**ma'am** 16:10 30:10 48:25 54:6 62:12 89:4 112:14 137:22 138:9

**machine** 38:5 141:9
**made** 24:14 56:15 56:16 59:22 59:25 61:2 63:18 63:21 65:7 65:9 66:22 75:22 76:5 80:20 80:23 81:1 89:21 89:23 90:2 93:9 93:9 93:12 93:15 94:2 108:2 116:23 118:1 118:2 124:14 125:4 125:12 138:4 138:19 138:22
**magen** 104:15 106:2 108:3 108:11
**maiden** 91:20
**mail** 72:6 89:18 93:10 93:19 96:10
**mailed** 72:7
**mailing** 18:21
**main** 18:8 18:12 23:10
**make** 33:3 36:13 36:18 53:9 56:6 57:18 61:5 80:6 118:6 127:17 139:5
**makes** 36:25
**making** 47:6 48:4 71:8 131:2 131:19 132:8 132:20
**male** 21:1
**man** 20:20 117:9
**management** 26:18
**manager** 16:1 24:10 31:24 135:17
**managers** 20:13
**manuals** 135:24
**many** 9:22 16:15 18:14
**marhine** 13:19
**marked** 26:5 27:5 30:11 52:21 54:21 83:23 87:8 113:17
**material** 38:10
**materials** 134:2
**matter** 138:11
**mattie** 13:19
**may** 4:10 14:23 21:9 21:11 21:13 25:2 35:24 78:19

78:20 81:2 89:15 90:23 92:24 115:8 116:13 116:13 133:8 133:8 136:4
**maybe** 18:15 116:21 117:3
**mean** 7:4 7:10 8:1 10:3 12:13 18:25 19:12 19:16 21:14 28:25 29:8 29:9 32:14 33:15 33:16 33:19 35:4 42:6 46:2 47:23 47:24 59:11 63:8 63:14 63:16 65:2 65:6 73:2 78:3 85:12 98:1 98:15 100:9 100:19 101:18 103:18 103:20 103:23 104:9 105:3 107:7 109:14 114:4 114:10 115:2 115:13 119:2 127:12 127:22 130:17 138:22 139:3
**means** 19:16 28:1 35:5 56:10 63:15 65:7 69:2 70:5 93:24 100:10 100:11 108:4 109:15 114:14 115:3 115:5 120:21 120:22 123:25 130:18 130:18
**meant** 34:9 131:13 131:13
**medical** 1:7 2:9 2:24 4:3 72:1 127:7 127:8 127:18 128:8 128:15 128:24 129:1 138:2 138:6 138:20 139:7
**medicare** 19:15 19:18 20:6 20:8 28:7
**medpay** 7:13 19:4 21:5 21:5 21:8 21:17 22:22 23:5 24:24 27:25 28:1 28:3 34:13 34:25

35:11 35:12 40:13
41:12 41:25 47:14
49:25 50:21 51:3
51:8 51:12 51:17
71:4 71:18 71:22
82:7 82:14 82:19
84:8 84:9 84:19
84:23 85:18 89:20
89:22 105:4 115:17
121:15 129:23
**meet** 10:22 109:15
**melissa** 13:19
**memoranda** 27:12
**memorize** 53:8
**memory** 30:6
**mention** 75:4
**mentioned** 42:2
94:17
**mercy** 1:8 2:15 10:9
10:12 10:19 11:7
11:17 11:22 13:10
13:14 13:17 14:8
15:16 15:20 17:14
17:16 17:22 18:19
19:19 20:14 21:14
22:8 22:12 22:21
23:13 24:14 25:3
25:11 25:15 25:16
26:2 26:19 27:6
27:15 27:19 27:20
28:6 28:20 28:25
29:21 30:13 30:22
30:25 31:15 31:19
31:25 32:8 33:18
34:7 34:22 34:22
36:10 38:17 47:13
49:11 52:1 52:14
66:10 67:20 68:1
69:11 82:15 84:2
86:24 86:25 87:4
104:24 105:5
105:19 106:17
106:24 108:7
111:23 112:7
115:22 115:25
116:24 120:16
124:8 124:10
125:25 126:6
128:24 129:2 129:9
129:10 129:11
129:21 130:2 130:7

131:1 131:7 131:10
131:14 131:17
132:6 132:8 132:16
132:18 134:21
134:23 138:2 138:7
138:21 139:12
**message** 38:6 46:6
93:10 93:12 117:24
118:9 118:15
**messages** 39:11
39:11
**metropolitan** 2:11
**michael** 31:24
**middle** 117:22
123:19 124:12
**might** 19:4 41:25
42:1 46:24 47:2
70:23 117:10
**mine** 95:15
**minimize** 40:5
**minute** 52:17 88:19
88:19 123:6
**mischaracterizes**
86:10
**misreading** 69:21
**misrepresentations**
47:6
**missed** 78:19
**missing** 7:20 46:17
47:11
**missouri** 1:1 2:5
2:12 2:18 4:6 85:6
85:11 85:12 85:22
85:24 86:4 86:12
86:15 86:25 87:4
108:16 132:19
133:10
**misspoke** 101:16
**mistaken** 60:12
**misti** 1:15 3:3 4:1
5:2 5:9 107:1 140:3
140:19
**mix** 54:3 57:12
**money** 105:5 106:4
106:8 127:18
**monitor** 38:25
**month** 15:12
**more** 20:18 76:17
88:19 92:1 102:17
113:13 113:21

**morning** 73:24
**mosely** 13:21 14:10
**most** 47:4
**motor** 62:7
**mouth** 86:14
**move** 12:19 28:3
67:8 70:15 76:12
90:9 103:7 109:4
112:10 119:20
130:3
**moved** 12:12 76:20
**moving** 70:7
**mra** 6:18 6:21
10:12 10:19 11:13
13:9 13:25 14:24
16:7 17:15 19:16
24:7 24:11 25:12
25:22 26:1 26:18
27:14 27:19 28:19
28:25 30:22 30:22
31:1 31:15 31:25
33:14 34:6 34:21
36:9 38:5 38:18
46:20 47:13 49:7
49:24 50:3 50:7
50:11 50:21 51:5
51:10 51:14 51:25
52:14 54:24 57:13
58:3 59:1 59:12
61:4 61:11 62:1
62:13 62:20 65:16
66:5 69:1 69:12
70:7 70:15 71:25
77:24 78:21 82:14
82:22 82:23 82:25
83:3 84:8 84:22
85:17 85:22 89:5
90:12 91:19 95:22
96:19 97:13 97:21
99:23 101:9 101:14
102:21 104:4
104:20 104:23
105:6 105:16
105:18 106:1
106:25 107:3 107:4
109:5 111:7 111:16
111:23 113:5
113:17 116:1 121:8
121:20 121:25
122:4 122:11

122:14 123:2 123:6
123:13 123:15
123:18 125:16
125:19 125:25
126:7 126:9 126:18
127:2 128:7 128:8
128:21 128:24
128:25 129:14
131:16 132:5
132:17 133:9
136:17 136:21
137:8 137:12
137:19 137:25
138:2 138:4 138:18
139:3 139:5
**msm** 6:1 6:2 6:9
**mtsu** 5:15
**much** 92:1 131:8
131:23 139:15
**muleman** 13:21
14:11
**murfreesboro** 5:11

### N

**name** 5:8 9:2 9:10
21:2 24:1 32:12
33:19 38:16 42:14
49:2 49:9 49:14
66:25 68:15 68:16
70:20 75:13 81:2
91:20 102:9
**names** 3:24
**nature** 17:15 18:3
**need** 25:3 45:13
87:3 88:21 91:14
135:25
**needed** 25:14
101:21 103:22
**needs** 103:24
103:25
**neiderhauser**
135:19
**network** 132:7
**never** 13:7 13:9
14:15 14:17 14:25
84:12 111:12 117:5
117:6
**new** 31:14
**newest** 58:12
113:11

**next** 12:20 27:2
34:15 36:5 41:21
50:18 50:21 58:21
59:9 59:16 60:13
62:7 70:7 71:15
72:3 72:18 90:7
90:10 94:5 96:5
97:10 102:20
106:22 108:10
120:19 124:9
**ng** 68:7
**nicole** 13:20 14:10
**night** 96:17
**nine** 54:13 73:3
**nine-page** 70:16
**no-fault** 35:7 35:17
36:2 36:16 36:21
37:11 40:1 45:2
45:2 45:6 45:17
49:22 72:5 72:9
72:11 72:13 78:14
79:24 82:2 82:3
82:10 82:11 83:15
83:18 89:19 121:13
127:15 138:10
**nobody** 14:25 68:18
**nods** 35:1
**nonlegal** 133:7
**nonslip** 6:5
**nor** 141:14 141:16
**normal** 78:12
139:10
**normally** 80:5
**notary** 140:22
141:7
**notation** 87:24
108:2
**note** 3:24 81:1
103:22
**notes** 27:12 44:22
59:19 59:24 60:5
112:11 113:5 119:2
133:22
**nothing** 43:5
103:24 131:6
137:11
**notice** 4:2 102:4
110:11
**now** 11:15 11:18
13:18 39:8 97:20

115:3 120:19 134:9
135:8
**number** 8:4 23:21
23:23 32:12 32:25
33:4 49:3 49:19
52:22 56:4 59:12
62:8 62:10 62:11
62:13 62:14 62:16
62:18 62:19 62:24
80:14 83:24 100:18
101:1 101:3 124:9
124:10 124:11
**numbered** 55:2
**numerous** 90:20
91:16

_____

**O**

**o'brien** 2:11 17:17
20:1 21:21 22:23
23:15 26:6 26:20
26:24 29:23 30:1
30:4 30:7 32:24
41:2 41:15 43:21
46:13 46:16 46:23
47:1 47:5 47:9
47:15 47:18 47:21
48:1 48:5 48:11
51:18 51:21 52:3
53:11 53:15 53:22
53:24 54:23 57:4
60:14 63:20 63:25
64:8 64:14 64:18
64:23 65:11 65:19
67:4 68:21 69:20
72:25 73:5 73:13
73:17 73:23 83:10
84:18 87:14 87:23
88:15 88:21 88:23
89:10 92:20 92:24
106:25 112:17
114:22 116:3 116:8
116:14 117:1 117:4
117:14 118:18
118:24 119:6
119:12 119:15
129:4 129:6 129:15
129:25 130:5 131:5
131:9 131:11
132:22 133:3
133:13 134:5
134:10 134:13

134:18 134:24
136:24 137:4
137:11
**o'connell** 26:6
26:17 27:5 52:22
126:21
**object** 17:17 21:21
21:22 41:2 43:21
51:18 52:3 57:4
133:2 133:3 133:6
134:25
**objection** 19:20
20:2 22:10 41:15
51:20 51:24 52:6
52:10 57:21 69:20
84:12 85:9 86:6
86:9 115:19 129:4
129:5 129:24 130:6
131:4 131:21
132:10
**obligation** 51:25
**obrien** 2:13
**observed** 89:2
**obtain** 7:21 35:14
45:7 60:7 60:25
67:14 80:14 94:17
**obtained** 75:23
77:12 79:11 80:8
**obtaining** 130:19
**obtains** 80:17
**occurred** 52:19
97:21 112:25
**off** 6:15 6:17 6:17
9:21 26:13 26:15
52:16 52:18 63:19
64:6 64:22 76:2
77:25 78:6 88:13
90:13 90:16 92:2
92:8 96:12 97:23
98:14 98:23 99:21
100:15 101:11
102:22 103:9
103:16 104:2
104:20 104:25
105:16 107:23
108:18 109:3 109:7
110:6 111:11 112:9
112:22 112:24
118:11 125:22
**offhand** 15:18

17:12 20:7 20:17
108:8
**offices** 4:3
**official** 15:25 71:15
**oldest** 58:14 113:11
**once** 7:7 12:19
27:25 29:13 34:11
40:10 58:10 71:14
72:4 80:8 83:21
90:7 102:3 106:22
129:9 130:24
**one** 2:11 2:18 11:7
11:8 18:8 20:18
20:19 24:9 34:3
46:8 49:17 53:12
55:6 55:15 56:2
56:3 62:23 69:9
71:13 75:9 79:24
82:6 84:25 85:10
86:4 88:1 99:8
99:20 99:22 100:5
118:19 118:24
120:19 121:10
124:16 125:13
125:14 125:15
133:20 137:18
**open** 35:24 42:16
45:5 49:1 71:10
71:17 71:22 80:13
90:6 99:8 99:23
100:4 100:7 100:21
107:15
**opened** 35:10 37:1
37:14 71:2 89:20
98:3 98:13 98:19
104:16 107:6
108:11 108:16
119:15 138:23
**opening** 89:22
**order** 12:21 71:11
72:23 74:13 90:12
113:8 113:24
119:17 120:5
**organized** 56:20
56:25 58:9 112:19
113:6
**originally** 56:14
112:4
**oscar** 9:1 9:2
**others** 136:6

**otherwise** 3:24
**ourselves** 38:17
**out** 12:15 14:6
29:24 37:12 40:3
40:6 40:10 42:12
42:24 43:15 54:17
55:10 61:5 68:2
71:4 72:4 72:7
77:16 77:20 81:9
81:24 82:9 82:14
82:17 83:17 83:21
86:14 87:19 88:6
88:6 88:11 91:17
92:4 92:18 94:19
95:7 96:20 97:9
97:22 103:14
103:19 109:19
109:23 110:3 110:5
110:7 110:12
110:17 116:20
123:2 127:16
127:17 131:13
**outbound** 39:13
**outside** 137:21
**over** 7:6 7:8 9:14
9:24 11:7 16:1
17:14 28:8 28:9
28:11 28:12 29:16
31:8 31:25 32:13
35:15 36:21 41:22
45:9 50:22 50:23
51:1 51:8 53:1 63:7
97:24 98:2 104:5
108:21 130:13
**overseeing** 10:18
**owing** 127:17

_____

**P**

**packaged** 55:7
**page** 3:1 18:9 18:12
18:19 30:2 30:12
38:3 56:22 59:11
59:12 64:3 64:19
66:21 66:23 67:13
67:15 68:25 69:16
70:7 73:3 73:7
73:10 73:16 73:22
73:25 75:19 75:22
77:21 77:23 77:24
79:11 79:20 80:12
81:1 82:4 89:10

89:12 89:14 89:17
92:2 93:9 93:22
94:6 94:14 94:20
95:6 96:19 96:21
97:7 97:9 101:14
102:21 104:20
106:1 109:20
111:16 114:25
117:22 118:11
118:21 118:24
119:1 119:9 119:12
121:14 125:2
125:10 140:6
**pages** 18:14 54:9
54:11 54:13 54:14
56:4 56:9 56:19
57:1 57:16 57:17
58:16 58:17 58:22
59:24 67:18 67:25
116:22 119:22
119:25 120:6 140:3
**paid** 106:23
**paper** 122:10
**paperwork** 29:10
**paralegal** 67:5
**parkway** 1:23 4:4
**parlance** 78:13
**part** 67:1 110:15
111:19 129:7
129:13 129:15
**particular** 7:22
28:6 44:18 45:22
46:5 46:6 46:8
53:12 53:12 57:17
58:16 61:12 73:3
76:15 83:25 84:4
87:21 91:4 115:4
116:1 116:5 119:1
119:10 120:1 120:2
123:3
**parties** 3:25 141:14
**parts** 71:12 90:6
113:4
**party** 22:6 95:9
**patient** 7:3 7:13
7:19 12:23 12:24
17:5 22:18 31:1
31:14 32:11 32:16
33:3 35:11 35:22
35:25 36:6 36:9

36:13 36:18 37:1
37:3 37:5 37:22
38:4 38:19 38:21
39:6 39:12 39:15
40:13 40:13 40:16
40:24 41:11 42:1
42:12 42:14 42:17
43:1 44:18 45:6
45:25 46:5 49:2
49:2 49:13 49:16
50:8 50:9 50:12
50:20 50:24 51:3
51:7 51:11 51:15
51:16 51:16 52:1
60:23 61:12 62:16
62:17 62:19 62:21
65:8 71:3 71:6 71:9
71:10 71:17 71:21
71:21 72:11 75:24
77:6 78:15 80:14
81:2 85:24 89:15
89:21 89:23 89:25
95:8 95:9 99:22
100:4 100:21
105:22 108:15
111:1 115:7 117:23
118:9 118:10
118:15 124:13
125:12 125:15
125:16 126:9
126:15 127:6
127:16 131:18
138:11
**patients** 32:8 82:15
**pause** 133:23
**pay** 40:3 40:10
127:18 138:1 138:5
138:20 139:6
**payer** 100:20
**payers** 19:11 20:7
25:7
**payment** 21:12
28:2 83:18 104:16
104:18 104:22
104:23 105:22
106:12 107:20
108:13 111:1 124:6
124:7 130:19
**payments** 72:1
107:10 127:7 127:8
128:8 128:15

128:25 129:1
**pcc** 16:25 17:3 17:4
36:12 36:14
**pending** 92:4
**penumbra** 84:14
**people** 9:22 14:6
37:4 46:17
**percent** 21:12 22:3
124:6 124:8
**percentage** 124:7
**period** 91:3
**personal** 66:8 66:17
**personally** 87:1
**pertain** 116:13
**pertaining** 17:25
**pertinence** 48:7
135:1
**petition** 47:20
**phase** 72:19
**phone** 2:6 2:12 2:19
38:4 39:11 65:9
81:6 93:15 96:13
**phonetically** 3:24
**physical** 88:7
**physically** 104:23
104:24 121:17
**pick** 90:12 101:1
117:6
**picks** 116:20
**picture** 116:12
**pieces** 122:9
**place** 10:13 11:3
12:6 36:5 56:12
92:2 102:22 103:8
104:3 113:14
119:10
**placed** 106:12
**plaintiff** 1:5 1:17
2:2 4:2
**plan** 71:20
**plaza** 2:18
**please** 21:3 30:14
49:14 97:20 99:19
101:12 117:20
118:12 118:21
124:21 132:22
**pmb** 1:24
**pocket** 40:6 127:16
**point** 8:6 18:9
18:12 29:14 38:3

41:5 44:24 46:13
47:11 54:16 55:10
57:25 65:23 68:19
71:20 71:24 74:2
76:9 78:7 89:20
90:19 93:15 103:4
108:17 111:22
114:11 116:14
116:25 117:14
128:7 130:20 139:1
**pointless** 48:13
**points** 23:10
**policy** 40:2 127:7
131:25 137:25
138:5 138:18
138:19 139:6
**portion** 45:8 89:22
138:1 138:6 138:20
139:7
**position** 11:15
11:19 135:21
**possession** 122:1
**possibility** 50:6
128:12
**posted** 106:21
**powers** 2:23
**practice** 129:12
**premises** 18:22
25:4
**present** 2:22
**presents** 32:2
**presumably** 78:25
**pretty** 52:23 116:15
**previous** 10:22
95:13
**previously** 94:17
**primacy** 79:13
79:21 79:22 80:3
80:7 80:9
**primary** 37:11 40:3
40:13 49:25 79:14
80:10 127:8 127:15
127:21 128:9
128:16
**printed** 63:19 64:6
64:22 80:7
**prior** 13:22 14:8
14:15 14:21 15:17
25:9 27:17 43:19
44:8 51:7 116:23

134:19 134:20
**probably** 5:21 6:7
6:12 8:10 9:20 9:21
64:10 64:18 64:19
89:5
**problem** 34:19
**procedure** 4:6
129:12
**procedures** 22:12
**proceedings** 133:23
141:10
**process** 28:10 37:12
43:22
**processing** 24:24
134:17
**produce** 64:20
**produced** 23:13
54:25 55:13
**production** 64:19
67:6
**profile** 17:23 17:24
18:5 18:10 18:19
20:12 21:3 22:18
22:20 23:8 23:11
23:13 23:17 24:2
24:3 24:7 24:11
24:14 24:17 24:20
24:23 25:3 25:10
27:14 33:17 79:5
**program** 22:21
23:22 33:25 35:23
42:3 42:13 42:18
43:3 43:15 43:19
44:4 44:7 44:12
44:17 44:23 59:20
60:6 74:3 74:20
74:23 74:25 75:21
90:21 91:1 91:4
94:16 94:21 94:23
94:24 95:13 95:14
95:20 96:16 97:3
97:8 101:13 102:24
102:25 103:11
**progressive** 75:20
75:23 76:1 76:6
77:6 77:10 78:4
78:8 78:11 78:21
79:11 93:16 98:22
124:16 125:9
**promoted** 8:13 8:15

8:25
**proposition** 84:21
**provide** 121:7
**provided** 3:24 26:1
37:16 46:21 88:10
126:6
**provider** 13:4 23:22
23:24 24:1 29:2
33:19 35:21 36:1
38:15 41:25 43:13
67:14 115:5 115:8
124:9 139:12
**providers** 22:9
**provides** 59:21
**providing** 95:22
**public** 140:22 141:7
**pull** 24:2 42:16
59:1 96:1 96:3 96:7
121:5
**pulled** 96:7 121:1
**pulling** 121:9 123:1
**pulls** 42:25 95:1
**purposes** 4:5 39:4
111:7
**pursuant** 4:2 116:2
**pursue** 18:2 18:24
19:3 19:4 19:13
19:14 19:17 20:7
25:6
**put** 7:7 20:16 54:24
71:17 90:3 119:17
127:23

---

**Q**

**question** 17:19
17:20 21:23 22:16
34:18 41:18 43:23
43:25 48:17 48:20
51:24 58:6 65:15
85:15 86:15 112:15
116:20 118:8 129:8
129:13 131:14
132:3 132:23
132:24 133:6
133:16 136:20
136:24 137:24
**questionnaire**
83:16
**questions** 45:23
53:3 57:20 66:1

66:13 114:23 116:6
116:10 133:15
133:19 133:25
136:13 139:18
quick 133:22
quintessential
25:18

**R**

ran 44:23 59:21
74:5 74:23 78:22
96:17 96:22 97:8
101:13 102:24
range 10:7
rascal 117:18
rate 69:14
reach 51:7
read 48:19 48:21
126:20 127:25
128:5 132:22
132:25 140:3
reading 4:11 65:12
65:17 71:1 100:22
reads 116:11
ready 53:6 70:4
74:15
real 31:7 79:12
133:22
reason 57:20
109:16 109:16
111:14 115:1
115:11
reasons 90:20
91:16
recall 14:21 18:18
27:16 35:2 38:9
46:12 50:16 86:13
86:14 108:8 134:2
136:16
receivable 107:12
receive 27:21 29:6
32:7 33:11 33:15
34:8 34:11 34:16
34:20 34:23 44:16
44:25 51:2
received 28:2 43:12
75:6 75:10 74:17
104:19 106:16
107:20 108:14
111:1 124:4 124:7

125:5 138:21
receives 31:10
33:13
receiving 28:23
34:9 36:3 43:20
44:9
recess 89:2
recognize 136:2
recollection 66:3
66:7
record 5:8 26:13
26:15 26:16 52:17
52:19 112:23
112:25 115:21
116:15 117:6
138:14
recorded 37:9
38:21 38:22 39:3
39:12 39:13 45:18
141:8
recording 46:21
recordings 61:14
61:15
records 126:1
126:1
red 96:22
redacted 120:20
121:4
redundant 129:16
refer 132:19
referred 11:10
11:11 81:15 120:17
referring 100:14
refers 94:12 94:15
104:6 122:23
reflect 77:2 108:13
110:25 111:13
120:2 124:6
reflected 79:13
125:14
refused 99:23
100:21 101:9
regard 19:19 22:12
61:11 80:3 85:23
86:3 131:7
regarding 14:23
19:23 123:3
regardless 40:2
138:18 139:1
regards 22:21 58:2

62:1
regularly 20:22
29:12 31:4 39:1
136:1
regulations 85:12
132:19 133:10
reimbursements
1:7 2:9 2:24 4:3
relate 120:1
relates 46:24 47:2
48:15 85:7
relating 15:5 15:10
62:2 66:11
relationship 115:25
relative 95:21
141:15
release 110:11
released 110:23
relevance 19:22
41:2 41:16 46:17
134:25
relevant 47:24 48:1
remained 111:12
remaining 109:1
remember 11:4
12:7 13:15 13:23
20:21 23:6 23:9
38:11 38:12 48:16
53:19 56:21 66:12
84:6 128:11 135:4
135:9 136:20
136:21
renamed 12:5
reopened 111:13
rep 6:24 6:25 8:8
12:4 12:4 25:2
39:14 40:12 40:15
41:10 49:25 74:1
repeat 43:24
rephrase 22:16
85:14 131:14
report 15:21 16:2
16:12 16:15
reported 81:4
reporter 3:24 3:25
4:9 48:21 52:10
52:11 128:2 128:5
132:25 141:7
reporter's 141:1
reporting 1:23

representations
47:10
representatives
51:6 131:1 131:16
132:6 132:17 134:4
135:12 135:24
reps 11:25 12:2
12:8 24:16 37:17
45:20 51:14 91:13
91:14 134:1
request 28:15 43:8
71:3 71:9 71:11
85:4 89:21 89:23
90:4 90:6 93:23
93:25 94:2 94:7
98:13 98:16 98:18
99:5 108:16 109:6
109:13 137:25
requested 48:20
74:2 98:21 98:24
108:17 108:19
128:4 132:24
requesting 89:25
138:5
requests 43:14 85:2
requirement 86:13
86:15
research 83:21
99:15 101:20
researches 99:16
resolved 12:19 28:1
28:1
response 21:18
45:15 46:1 74:24
97:6 103:6 106:18
responsible 15:20
24:6 25:14
results 91:6
retrieves 58:4
return 28:13 41:22
110:24 111:10
111:11 112:9
115:11 129:2
returned 112:7
returning 111:17
130:13
revealing 133:13
reverse 72:22 90:11
113:8 113:24 120:5
review 29:5 39:5

88:9 107:6 107:21
109:17 125:18
131:17 132:7
reviewed 17:23
22:7 27:22 74:24
107:22 107:23
108:22
reviewer 21:10 22:2
22:5 23:5
reviewing 122:7
reviews 26:9 27:10
30:15 56:8 59:18
88:4 118:4
revision 120:23
richard 13:20
right 6:16 6:20
13:18 30:4 30:21
36:7 39:8 44:24
47:7 47:15 55:9
57:22 59:5 61:20
63:1 63:1 63:11
64:7 64:15 64:24
64:25 67:8 68:9
68:20 70:2 70:19
71:24 73:15 77:25
78:12 79:4 83:14
85:19 85:21 86:2
88:14 90:9 91:18
91:25 92:13 92:17
93:2 96:5 97:5
97:20 100:17
101:12 103:10
104:18 105:14
106:7 108:19
111:22 113:10
113:20 116:7 118:7
118:12 119:14
119:18 120:12
121:12 130:5
134:23 139:4
right-hand 54:9
55:11 56:21 59:12
66:24 92:11 104:5
rights 52:1
road 2:5
role 95:8
room 26:14 28:17
72:6 89:18 123:9
124:19
roughly 5:19 5:22

9:25 18:14 18:15
**rule** 61:4
**rules** 4:6
**run** 43:15 44:7 44:7
44:8 44:17 74:3
74:20
**running** 95:20
103:11
**runs** 35:23 42:3
42:15 42:18 42:21
42:24 43:4 43:19
44:4 90:22 94:25
95:14

——————
**S**

**said** 12:21 23:17
32:21 32:24 34:7
34:11 34:22 36:6
38:20 39:14 41:24
42:4 44:5 46:24
53:20 83:6 85:17
90:5 109:10 109:10
115:21 136:21
140:4 141:11
**saith** 139:20
**same** 18:10 18:13
28:10 41:15 41:20
46:2 64:3 76:17
81:6 82:17 82:19
98:7 113:12 122:21
125:1 131:9
**say** 8:10 13:6 18:15
19:15 21:10 21:13
22:20 29:6 37:5
37:17 37:22 38:6
38:10 39:17 39:25
42:10 42:11 42:18
45:21 49:11 49:15
49:19 54:11 55:5
56:3 59:7 71:8
85:11 87:19 88:6
103:18 107:14
115:12 115:24
126:13 131:10
139:3
**saying** 83:17 84:15
**says** 22:24 40:16
40:24 68:6 68:10
69:1 69:18 70:4
74:4 75:13 75:14

77:20 77:25 79:20
80:7 82:6 91:19
96:22 104:6 111:16
114:14 114:25
115:1 117:23
120:19 121:14
130:13
**scenario** 41:11
41:16 81:24
**scenarios** 25:2
**school** 5:14
**schwartz** 2:3 2:4
3:4 5:7 17:18 19:24
20:9 22:4 22:15
22:17 23:3 23:12
23:16 26:8 26:11
26:16 26:22 27:3
28:18 29:21 29:25
30:3 30:5 30:9 33:1
41:9 41:23 44:1
45:11 45:13 45:16
46:15 46:19 46:25
47:4 47:8 47:12
47:16 47:19 47:23
48:3 48:9 48:18
48:24 52:12 52:16
52:20 53:14 53:16
53:23 54:5 54:25
54:25 55:4 55:8
57:22 57:24 60:18
63:23 64:2 64:12
64:16 64:21 64:25
65:1 65:18 65:21
65:24 67:7 68:24
69:25 70:2 70:3
73:2 73:6 73:9 74:6
78:22 78:25 79:6
79:8 83:11 84:20
85:14 85:16 86:7
86:17 86:19 86:22
87:16 87:17 88:1
88:25 89:3 89:11
92:21 93:2 93:3
107:2 112:18
112:22 113:1 114:8
114:12 114:16
114:24 117:19
118:20 118:25
119:3 119:11
119:18 119:19
123:11 124:20

127:25 128:3 128:6
129:19 130:9
131:10 131:12
131:15 132:2
132:15 133:11
133:18 133:21
133:24 134:6
134:12 134:15
134:22 135:3 135:6
136:12 136:17
137:7 138:17
139:17
**scope** 19:21 41:17
**script** 46:3 46:7
46:8
**search** 78:22 91:8
**searched** 105:20
105:21 105:24
**second** 62:7 66:1
67:15 72:21 77:19
79:25 80:20 81:11
81:18 112:23
**section** 60:5 60:13
68:13 91:19 123:21
**sections** 53:10
**see** 12:17 12:22
25:4 25:5 29:12
29:13 36:24 37:1
38:1 39:23 44:22
49:16 54:14 55:2
56:5 69:25 70:17
70:20 75:15 79:16
89:21 91:14 92:10
93:21 99:16 99:25
106:4 106:4 114:11
120:10 123:21
125:13 125:23
137:16
**seeing** 98:16
**seen** 26:4 27:8
37:20 37:24 46:4
46:22 63:6 83:24
84:1 84:3 84:4
84:12 84:16 93:5
102:9 102:12 124:3
130:15 135:23
**select** 71:14 90:7
**selection** 42:10
**semesters** 5:15
**send** 7:6 22:6 28:8

28:11 35:14 41:5
41:6 41:21 45:8
72:6 82:12 82:14
84:19 84:22 84:25
85:2 85:3 85:8
86:24 87:3 88:6
95:16 105:5 105:5
105:8 105:8
**sending** 51:7 85:23
**sends** 30:25 31:25
85:17 111:23 123:2
**sent** 31:15 51:17
59:23 60:2 72:6
72:14 74:10 77:16
77:20 78:3 81:9
81:12 81:15 81:25
82:9 82:17 84:7
84:16 87:9 87:19
89:5 89:17 92:14
92:18 92:22 97:24
98:1 102:5 102:7
102:18 104:23
104:24 105:11
105:13 105:14
105:19 110:5 110:7
121:8 122:15
122:24 129:9
129:10 138:24
**separate** 61:15 66:4
**series** 54:10 70:8
**service** 5:24 23:25
63:5 63:7 63:8
110:24 115:1 124:1
**services** 70:9
**set** 58:17 58:22 60:4
61:10 64:4 65:25
67:24 80:9 80:10
106:13
**sets** 37:21
**settle** 40:4
**settlement** 40:4
40:11
**seven** 5:19 8:9 10:6
128:11 128:13
**several** 14:6 18:6
35:18
**shallyn** 13:21 14:10
**share** 18:8 18:12
38:3
**shared** 27:6

**shed** 118:2
**short** 119:4
**shorthand** 141:9
**show** 27:4 30:10
79:12 83:23 89:13
89:16 95:8 96:6
99:22 100:3 110:23
115:19 119:2
**showed** 122:2 136:3
**showing** 29:24 94:8
**shown** 122:3
**shows** 74:1 75:19
89:17 89:19 90:14
92:4 92:12 98:18
101:14 104:12
104:15 106:20
110:11 110:16
125:3 125:4
**side** 92:11
**signed** 84:22 85:8
85:18 85:24 86:24
87:20 88:11 121:20
122:1 141:18
**signing** 4:11
**similar** 45:24
**similarly** 125:7
**simple** 29:10 90:21
91:3
**since** 13:14 24:10
72:5 74:3 114:1
128:21
**single** 38:24
**sir** 15:18
**sit** 66:3 86:2 88:9
128:15
**sitting** 103:21
**situation** 40:16
40:24 41:3 41:21
65:14 116:16
**skill** 141:9
**slash** 7:14
**slavinski** 75:15
**smyrna** 6:2
**solely** 115:10
**somebody** 20:22
43:2 43:7 63:18
80:2 80:6 101:16
116:20 134:16
**somehow** 115:20
116:11

**someone** 43:18
101:8 119:15 123:2
**something** 31:4
38:11 61:15 64:11
69:8 75:13 76:14
76:23 80:2 80:6
83:19 86:3 90:21
98:25 99:2 101:10
108:15 114:4 117:7
120:25 135:25
**sometimes** 7:18
21:5 84:10 84:24
85:17 105:8
**soon** 51:1
**sorry** 19:9 20:17
33:2 34:18 46:25
48:18 69:5 70:2
72:22 77:22 82:1
83:12 86:19 109:10
110:1 131:12
134:12
**sort** 53:5 119:4
120:22
**sources** 7:21
**speak** 20:22 45:25
81:8
**speaking** 54:19
57:6 62:10 116:17
116:23
**specific** 17:25 54:1
54:2 57:10 57:10
58:1 100:15 101:6
112:15 115:6
**specifically** 31:19
59:7 85:7
**speculate** 22:24
**speculates** 130:4
**speculating** 130:3
**spell** 9:4
**spelled** 3:24
**spoke** 59:20 60:6
81:5
**spoken** 50:24
**spot** 20:16
**square** 2:11
**st** 2:5 2:12 2:18
120:16
**stack** 52:23
**stamped** 30:13
55:13

**stand** 96:23
**standard** 82:2
**start** 31:1 53:2
55:20 62:6 70:24
73:10 73:21
**started** 6:15 72:25
82:25
**starting** 7:13 27:25
34:13 34:24 73:13
**starts** 58:12 73:7
73:16
**state** 4:9 5:8 22:6
23:4 36:20 36:22
39:20 46:20 46:20
47:3 47:6 47:10
77:7 77:9 77:17
78:7 79:10 79:14
80:12 80:21 81:5
81:8 81:10 81:19
81:24 85:13 85:19
87:9 88:11 89:5
89:13 93:18 106:23
108:14 121:8
121:10 121:16
121:18 122:15
124:6 124:17
124:23 137:25
138:5 138:19 139:6
139:7 141:3
**states** 1:1 10:8 72:5
85:4
**stating** 72:11 81:1
**status** 83:16
**statute** 85:13
**statutes** 132:19
133:10
**stay** 76:18
**step** 35:5 114:9
**stephen** 2:11 2:13
23:12 114:3
**steve** 114:21 116:10
**still** 9:15 11:13
11:16 13:25 16:2
19:4 91:21 91:24
**stipulate** 64:13
**stone** 1:23
**stop** 72:21
**straighten** 131:13
**strictly** 10:9
**strike** 8:23 10:11

17:6 22:18 25:22
27:17 33:11 40:22
43:10 50:2 59:15
69:15 74:9 79:18
82:12 82:18 105:17
111:15 125:24
126:4 126:24 130:3
130:25 132:16
**stuff** 48:8
**subject** 133:4
**submitted** 51:12
100:10
**successful** 74:23
**successfully** 94:8
**suite** 1:24 2:11
**summarize** 28:19
119:4
**summary** 34:21
**superfluous** 114:6
**supervise** 16:21
16:24
**supervised** 9:11
**supervising** 10:15
17:8 17:10
**supervisor** 8:1 8:18
8:22 8:24 9:9 9:14
9:15 9:17 10:13
10:22 15:13 15:17
15:19 16:13 17:13
25:12 31:22 66:9
**supervisory** 10:18
**suppose** 108:3
**supposed** 37:22
52:1 61:5
**sure** 20:6 33:3
42:19 44:2 53:9
56:7 63:20 64:9
69:21 78:20 92:9
93:24 97:23 102:21
102:22 103:8 104:2
109:2 110:13 118:2
118:6 123:1 127:17
**swear** 4:10 27:1
**swoop** 55:7
**sworn** 5:4
**system** 7:7 8:3 29:4
42:11 42:22 63:18
67:15 67:21 68:18
74:5 80:2 100:25
104:7 104:8 105:22

105:25 106:3
106:11 106:21
107:9 113:5 121:1

**T**

**tab** 34:1 44:22
58:10 58:11 58:11
59:19 59:24 96:4
96:5 106:13 113:5
113:12 113:19
119:2 123:17
**tabs** 33:24 34:1
56:1 112:11
**take** 8:11 16:19
18:17 27:7 30:13
35:5 36:1 52:24
53:5 53:18 56:6
60:14 61:14 61:23
67:11 72:23 73:19
88:25 112:11
113:23 123:24
124:21
**taken** 1:17 4:1
56:12 116:15
117:15 140:3
**taking** 89:6
**talk** 28:23 35:16
37:3 50:19 53:21
53:25
**talked** 89:4 101:9
**talking** 30:19 46:18
57:8 84:14 91:6
98:10 115:4
**tara** 13:22 13:25
14:11 70:20 71:2
71:20 76:9 77:2
80:23 90:1 93:9
94:18 95:7 97:9
97:22 98:21 98:24
100:24 109:17
109:18 123:19
**task** 10:18 129:2
**tax** 18:20
**team** 7:22 7:25 8:2
8:5 8:16 8:17 8:19
8:22 8:25 9:5 9:12
9:14 9:17 9:23
10:10 10:13 10:15
10:24 10:24 11:2
11:5 11:8 11:10

11:12 11:16 11:22
11:23 13:5 13:6
13:14 13:17 13:18
14:7 15:13 15:16
15:19 16:13 17:13
17:21 25:13 25:15
36:17 36:22 36:25
38:23 43:5 43:5
43:8 66:10 75:3
80:16 89:14 90:1
107:6 107:19
107:20 131:14
**teams** 11:18 16:15
16:18 16:19 16:21
16:22 16:24
**tell** 5:12 7:4 7:10
8:5 8:20 9:3 12:13
13:13 14:18 18:17
24:9 27:8 27:18
29:18 31:10 34:15
35:4 37:8 39:16
40:12 40:17 40:25
42:6 44:15 46:11
49:13 49:24 50:3
50:7 50:12 50:19
51:15 53:6 54:19
55:21 55:23 56:10
61:11 61:24 61:25
66:21 67:10 67:11
69:9 70:25 71:7
75:11 76:2 76:23
77:5 78:10 79:19
79:21 81:23 86:1
87:7 87:21 88:5
88:8 88:13 92:1
92:14 93:7 93:11
93:17 95:20 96:15
97:15 97:18 97:20
97:21 98:1 98:15
98:23 99:21 100:8
101:11 102:8
103:12 104:18
105:1 105:10
105:12 105:21
105:24 107:7 108:9
109:7 109:20 110:4
110:19 113:5 120:8
121:10 121:18
122:7 122:9 123:14
123:25 125:13
126:6 127:12

130:23 134:2 134:9 137:15

**telling** 35:2 44:2 73:17 87:3 99:13 103:3

**tells** 41:11 69:14 137:12

**ten** 6:14 18:15

**tennessee** 1:24 4:5 4:10 5:11 141:3

**term** 98:9 138:25

**terms** 99:23 99:23

**testified** 5:5 130:7

**testify** 129:13

**testifying** 22:11 129:8

**testimony** 86:10 86:13 113:4 126:21 140:4

**text** 110:24 111:10 111:11 112:9

**thank** 63:1 107:13 139:15

**that'll** 49:19

**them** 12:1 12:17 12:17 12:21 12:22 13:15 18:2 18:2 21:11 24:9 28:14 28:15 35:15 40:7 40:21 40:25 41:4 41:11 46:12 47:4 49:2 49:13 49:21 51:11 54:25 55:1 55:3 55:3 55:4 55:4 55:7 55:16 56:5 58:3 58:4 66:15 71:1 84:3 85:2 85:3 85:4 102:6 119:17 121:9 123:1 127:20 127:21 130:20 130:23 130:24 131:18 132:8 132:13 136:1 136:2 136:3

**themselves** 38:14 49:5 49:6 49:8 115:10

**therefore** 132:12

**thereupon** 5:3

**they** 6:3 6:4 8:6

8:21 10:4 10:5 10:7 11:24 20:15 24:19 24:22 29:17 31:12 33:16 36:24 36:25 37:5 37:14 37:17 37:18 37:22 38:13 38:16 39:16 39:17 39:24 40:7 40:10 40:23 40:24 41:12 42:11 45:23 47:16 48:3 49:5 49:11 49:18 50:4 50:19 51:15 54:22 55:14 55:14 55:15 56:7 58:10 59:17 60:17 64:21 78:22 83:21 84:25 84:25 85:23 87:3 99:15 101:20 101:20 102:7 103:18 105:5 105:7 105:7 105:8 105:11 105:21 105:24 107:15 108:22 113:6 113:7 113:8 114:19 115:9 115:12 115:15 119:6 119:8 120:5 122:15 122:22 123:5 130:21 130:21 130:24 131:7 131:17 131:22 131:24 132:11 132:12 135:13

**thing** 29:19 32:21 34:7 41:20 56:23 58:21 62:23 70:23 98:7 113:12 114:2

**things** 17:15 18:2 32:23 33:10 33:15 33:20 33:21 56:18 61:16 88:5 103:20 117:11

**think** 9:18 9:18 20:17 23:15 26:3 32:24 34:17 39:7 46:7 48:6 48:6 48:8 48:12 48:13 50:14 53:24 60:10 60:10 69:20 70:23 86:3 86:9 99:12 99:14

114:6 114:13 114:16 116:14 116:15 117:14 136:24

**thinking** 115:25

**third** 22:6 32:21 32:25 42:2 42:6 44:3 79:25 92:17 93:4 93:15 95:9

**third-party** 36:23 99:2 99:7 99:11 102:14

**thomas** 2:4

**thompson** 2:16

**thompsoncoburn** 2:20

**thousand** 19:2

**three** 6:12 16:18 17:8 32:23 54:13 58:21 60:8 61:9 61:21 134:8 136:8

**three-page** 104:13

**threshold** 18:23 18:25 19:7 25:5

**through** 18:4 18:17 28:22 29:22 35:5 42:8 52:24 53:7 53:7 53:9 53:18 54:6 55:1 55:6 55:13 56:12 58:21 59:18 59:25 60:19 61:21 61:23 67:11 73:19 73:24 87:15 89:6 93:6 94:18 112:10 112:11 112:13 113:3 113:17 113:21 113:24 114:2 114:9 119:20 120:12 123:24 128:12 133:22 135:10 138:16 140:3

**ties** 116:11

**till** 88:20

**time** 8:19 10:13 11:6 13:24 14:5 24:4 24:4 28:14 28:16 35:6 44:25 53:5 56:6 60:22 71:25 73:12 80:1

114:9 129:22 136:13

**timed** 67:19

**times** 7:19 104:5

**title** 15:24 15:25

**today** 16:2 53:21 66:4 86:2 88:9 91:24 128:15 130:7 130:13 134:5

**together** 54:3 54:24 55:6 57:12 59:1

**told** 27:14 38:6 38:21 40:12 40:15 40:23 46:20 56:21 119:22 128:8

**tom** 26:13 78:18 88:18 117:5 117:16 119:7 123:8

**took** 9:17 9:24 12:6 92:2 102:22 103:8 104:3 113:14 119:10

**top** 54:8 55:11 56:21 70:24 79:17 79:20 88:20 89:17 114:25

**towards** 114:25 124:12

**tpl** 16:25 17:1 98:4 98:6 98:10 109:25

**track** 28:12 41:8 64:5 111:7 111:8 113:15

**tracked** 91:22 125:2

**tracks** 91:24

**trail** 93:5

**train** 134:3

**trained** 24:19 37:5 40:15 45:20 45:23 45:24 134:16

**training** 37:19 38:2 38:7 38:10 39:4 46:4 46:4 46:17 85:25 128:12 134:1 134:19 135:5 135:7 135:10 135:12 135:15 135:16 135:18 135:23 136:9

**transaction** 104:16 107:5

**transactions** 106:13

**transcript** 46:22 116:21 140:4 141:10 141:11 141:12

**transferred** 8:19

**transition** 10:18

**transpired** 62:1

**transpires** 72:3

**tried** 65:16 65:16

**tries** 42:12 60:7

**trigger** 43:3

**true** 140:4 141:11

**trust** 117:5

**try** 7:12 12:15 13:15 51:7 126:1

**trying** 49:15 55:10 58:2

**tschwartz** 2:7

**tucker** 21:2

**turn** 117:20

**twelve** 6:14

**twice** 65:17 114:5

**two** 6:7 7:21 11:1 11:2 54:3 54:11 57:1 57:12 58:17 63:2 63:17 65:9 67:18 67:25 71:12 85:11 90:6 102:6 102:17 122:19 122:24 124:14 125:12

**two-page** 64:4 90:11

**type** 28:4 29:8 49:21 53:17 60:4 104:6

**types** 54:20

**typical** 76:17

**typically** 29:2 32:7 63:4 70:12 76:14 91:2 98:25 99:4 105:2 105:3 105:7 115:3 115:5

———————

**U**

———————

**ub** 63:7

**ub-04** 29:14 29:16

29:17 29:18 29:24
30:17 30:22 69:3
69:4 69:5 69:10
69:15 83:12 83:21
100:12 120:16
124:1
**ub-40** 83:9
**uh-huh** 56:24
**under** 4:6 6:4 8:21
8:25 10:25 11:22
19:2 34:22 68:9
68:13 68:16 111:15
111:19 122:6
123:15 124:13
139:6
**underlined** 121:4
**underpayment**
106:14 107:5
107:15 107:17
108:11
**understand** 21:23
27:19 34:17 39:22
42:20 43:22 53:22
58:2 59:7 62:4 65:2
71:1 134:24
**understanding**
25:22 27:7 64:9
71:25 72:2 126:24
127:5 128:14
128:18 128:20
128:23 129:20
**united** 1:1
**unless** 3:24 88:7
114:3 121:17
**until** 12:11 36:21
40:3 129:22
**up** 5:24 11:1 24:2
55:7 66:24 71:15
73:1 80:6 85:4
90:12 95:21 96:7
103:24 106:4
106:13 114:1
119:16 121:1 121:5
121:9 122:18 123:1
129:13 130:24
**update** 24:11 90:23
91:2 91:4 94:23
**updated** 24:4 72:19
77:2 77:3 79:12
79:13 89:13 89:16

95:8 99:20 99:20
108:13 110:24
111:12 111:13
**updates** 80:18
**updating** 24:7
**upon** 85:18
**use** 23:5 55:3 98:9
100:2 139:1
**used** 44:12 44:18
82:19 82:22 100:3
134:3
**using** 82:25

———————
**V**
**various** 35:19 53:10
54:9 55:19 70:9
70:25
**vary** 36:11 109:16
**vehicle** 62:7
**verbal** 21:18 45:15
46:1 97:6 106:18
**verbatim** 39:18
**verbiage** 45:22
72:12 82:5 100:24
101:4 101:7
**verify** 7:12 64:3
**verizon** 6:10 6:11
6:18
**version** 125:3
**versus** 116:12
**view** 96:8
**voice** 93:10 93:19
96:10
**voorhies** 1:15 3:3
4:1 5:2 5:9 5:10
14:12 27:4 107:1
113:2 136:16 140:3
140:19

———————
**W**
**wait** 88:20
**waived** 4:12
**walmart** 5:17 5:18
5:25
**want** 18:4 19:13
28:22 35:5 35:16
37:3 38:12 41:12
54:2 57:9 57:12
57:14 60:15 65:12
67:23 73:21 87:13

87:14 88:18 88:20
112:16 115:6 115:8
115:9 115:13
115:15 118:6
120:12 138:25
**wanted** 25:21 54:16
73:19
**wants** 19:17 88:24
114:22
**way** 23:18 55:2
55:3 55:7 69:10
73:8 86:4 88:1
91:13 97:11 99:10
99:13 111:6 127:14
137:18
**ways** 35:18 35:20
**we'd** 99:23
**week** 14:14 14:15
14:22
**went** 6:1 7:16 48:3
63:18 88:6 88:11
89:18 93:19 109:17
110:6 113:21
121:10 121:16
121:18
**whatever** 7:20
31:25 46:24 47:2
119:16 130:24
138:25
**whatsoever** 20:3
48:7 135:2
**when** 5:20 5:20
6:20 7:8 7:23 8:25
9:24 10:10 11:3
12:6 12:21 14:12
15:19 16:7 17:7
17:13 17:21 19:15
21:13 24:1 25:12
25:14 29:6 33:25
37:5 37:22 42:18
43:12 46:20 53:6
53:19 56:3 56:13
60:11 63:17 63:18
64:6 64:17 64:19
64:21 66:21 67:10
71:10 80:5 81:23
82:25 84:8 84:25
84:25 85:11 89:20
90:5 90:8 98:9
103:18 112:2 112:3

115:12 117:24
123:12 124:4
126:14 127:10
127:12 130:25
136:16 138:10
139:3
**where** 5:10 5:16
5:25 6:8 18:5 25:2
25:9 35:17 38:1
40:24 41:11 55:15
55:21 56:1 60:7
67:13 77:11 77:19
79:16 79:20 89:15
90:5 90:13 92:10
95:11 98:16 99:25
102:12 105:11
105:12 105:14
105:24 117:11
125:15
**wherein** 51:5
**whereupon** 26:14
48:20 52:18 112:24
128:4 132:24
**whether** 18:11
18:21 27:22 28:1
32:14 39:6 44:17
51:11 51:17 54:1
55:2 60:22 65:17
67:24 68:1 69:10
69:11 79:24 85:7
87:8 88:11 103:22
104:22 104:23
121:20 125:19
136:17 137:19
138:2 138:12
138:14
**whichever** 53:23
**who** 8:24 10:15
11:5 13:13 15:15
15:20 17:6 17:10
20:15 20:24 21:19
24:6 31:22 36:9
40:2 40:17 40:25
49:6 49:12 56:17
56:18 66:25 68:13
68:14 71:13 72:13
75:1 75:15 79:1
81:4 81:8 81:14
83:3 83:19 86:24
89:24 92:5 92:6
93:11 93:13 94:25

96:11 96:25 100:7
102:7 107:22
109:24 110:5 118:2
118:3 132:6 135:15
135:17
**whole** 47:13 58:21
62:22 127:17
**whom** 108:20
128:24
**whose** 92:8
**why** 14:2 14:4
39:24 48:6 48:6
55:10 68:16 69:16
71:14 71:16 71:17
76:12 76:15 76:20
90:3 90:18 91:16
109:7 109:16 111:4
111:9 114:2 114:3
114:6 125:11
125:14 126:13
138:9
**will** 7:6 12:17 18:17
21:4 21:5 23:23
23:23 23:24 24:2
30:13 32:10 32:10
36:11 42:10 42:16
48:11 56:12 60:11
60:24 61:22 71:17
73:8 83:20 84:15
96:7 128:25
**williamson** 141:4
**wilson** 13:20 14:11
**wish** 130:21
**witness** 3:2 4:10
4:12 5:3 20:5 22:1
22:11 23:1 26:9
41:4 41:19 43:24
45:12 48:16 48:22
52:8 60:16 64:9
70:1 73:15 73:21
73:25 85:10 88:3
88:17 88:22 92:25
119:1 119:8 119:14
123:10 129:17
130:8 132:14 133:7
133:17 135:4
**woman** 20:20
**word** 50:14 63:12
**words** 24:13 46:2
54:11 57:1 62:18

71:19 98:9 99:10
105:4 113:20 121:3
121:25 127:24
**work** 5:16 6:8 7:22
7:25 8:2 10:5 12:8
18:22 24:23 25:4
25:5 27:14 31:5
31:19 39:5 66:9
75:2 80:5 86:24
91:14 105:2 105:3
108:6 115:6 115:9
115:13 128:21
131:17 132:6
132:18 135:13
**worked** 8:24 10:6
10:9 10:25 11:8
11:21 13:14 14:8
67:21 101:24 127:1
**working** 9:22 15:15
74:14 114:8 123:13
129:21
**works** 13:17 32:2
37:11 42:23 44:12
102:14 115:24
**world** 42:25
**worried** 116:9
**written** 37:20

_____
**Y**

**yeah** 12:1 22:15
29:9 34:19 64:16
64:19 65:21 84:21
88:1 89:23 92:24
106:20 106:20
116:3 129:25
131:11 134:15
134:18
**year** 6:13 9:7 9:16
9:19 9:19 9:21
134:14
**years** 5:19 6:7 6:12
6:14 8:9 8:10 9:20
128:12 128:13
134:8 136:9
**you-all** 95:16
**yourselves** 38:18

_____
**0**

**00** 96:17
**000** 19:7 19:8 28:9

28:12 105:18
106:16 106:23
109:2 124:5
**01** 5:14 94:3
**01543** 1:6
**02** 5:21
**03** 106:1
**04** 83:10
**09** 92:11

_____
**1**

**10** 5:21 77:21 77:23
77:24 90:9 92:18
92:23 96:17 118:15
**100** 22:3
**10091** 92:12
**1089** 1:25
**11** 77:25 77:25 94:2
98:19 100:1 106:1
**12** 52:22 54:6 54:21
55:12 61:10 67:19
72:16 75:22 87:7
87:11 87:12 88:16
89:7 103:7 110:20
111:5 111:25 119:5
137:4
**13** 69:2 69:18 70:5
75:19 94:9 103:13
**136** 3:4
**139** 140:3
**14** 9:25 10:1 73:16
73:22 73:25
**15** 9:20 9:25 10:1
15:14 73:11 93:9
94:15 110:9 110:12
110:18 111:4 112:3
112:5 122:24
123:12 141:24
**15th** 141:18
**16** 1:6 57:2 58:18
58:23 62:7 63:2
63:2 63:17 63:21
64:5 67:18 67:19
67:25 69:2 69:17
69:19 70:5 70:17
70:21 73:4 74:14
90:10 90:12 92:2
92:19 92:23 94:9
94:15 95:6 97:7
97:11 97:16 97:17

98:21 101:25
102:17 103:7
103:13 104:1
104:11 106:17
109:4 109:21 110:7
110:9 110:18
110:20 111:4 111:5
112:5 117:23
118:10 118:16
119:5 119:5 120:19
122:24 123:12
124:2 124:14 125:9
**17** 68:12 93:22
**175** 55:6
**18** 94:6
**19** 94:14 106:17
106:21

_____
**2**

**20** 94:20 95:6 96:9
96:10 96:17 104:1
104:4 116:22
117:23 117:25
118:3 118:10
125:16
**2010** 6:15 6:22 16:9
**2013** 116:2 134:7
134:14 135:5
135:10
**2015** 8:11 11:3
15:14 15:17 15:23
**2016** 106:21 112:3
124:24 134:11
**2017** 1:19 4:5 64:15
64:17 140:4 141:18
**2020** 1:23 141:24
**21** 68:10 95:6 96:18
98:19
**211** 124:10
**21st** 6:22
**22** 96:19 96:21 97:7
109:21 110:7
**221** 1:25
**23** 97:7 97:16
**234** 1:24
**24** 97:9
**25** 97:13 97:21
**259-5904** 2:12
**26** 1:19 4:5 29:21
30:11 101:14 140:3

**27** 102:21 106:1
**279-1333** 2:6
**28** 73:11
**29** 104:11

_____
**3**

**30** 29:21 30:13
114:3 114:7
**3000** 2:11
**31** 63:2 63:6 104:4
124:2
**314** 2:6 2:6 2:12
2:13 2:19 2:19
**32** 107:25
**33** 105:16 106:1
**34** 29:22 104:20
**35** 100:1 109:5
109:8
**37** 123:6 123:13
**37069** 1:24
**371** 1:22 141:7
141:22
**38** 72:16 123:7
123:14
**39** 56:9 56:19
111:16 113:17

_____
**4**

**40** 59:11 59:12
59:17 59:18 59:24
112:10 113:3
118:21
**42** 67:19
**434** 62:10
**45** 92:11 98:19
100:1

_____
**5**

**50** 72:16
**519** 108:4 124:3
124:5
**53** 118:12
**54** 108:4 124:3
124:5
**55** 77:25
**552-6000** 2:19
**552-7000** 2:19
**56** 117:20
**566-0468** 2:13

_____

_____
**6**

**615** 1:25
**63101** 2:18
**63102** 2:12
**63144** 2:5
**68** 113:23 114:25
**6840** 4:4
**69** 59:18 59:25
112:10 112:13
113:3

_____
**7**

**70** 60:19 119:20
119:22 119:25
120:2 125:7 125:10
**71** 119:25 120:3
125:7
**72** 124:21 125:2
125:4
**74** 120:6 120:9
122:4 123:15
123:18 125:2 125:3
125:16
**75** 21:12 55:1 55:13
60:20 60:21 119:20
119:23 120:6
**77** 124:6 124:8
**772-8989** 2:6

_____
**8**

**8th** 73:20

_____
**9**

**900** 1:24
**9200** 2:5